ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF CHARLESTON | FOR THE NINTH JUDICIAL CIRCUIT |
| Elizabeth De'Anna Scannell,<br>Plaintiff, | Case No.: |
| | **SUMMONS** |
| v. | |
| South Carolina Department of Social Services (SCDSS), Medical University of South Carolina, Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell, Michael Leach, Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3, and MUSC Public Safety Supervisor,<br><br>Defendants. | |

TO:  DEFENDANT'S ABOVE-NAMED

        YOU ARE HEREBY SUMMONED and required to answer the Complaint in this matter, a copy of which is herewith served upon you, and to serve a copy of your Answer to the said Complaint on the subscribers at, Post Office Box 610, Camden, South Carolina 29021, within thirty (30) days after the service hereof, exclusive of the day of such service, and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

                        Respectfully Submitted,

By:  s/Robert J. Butcher
Deborah J. Butcher
S.C. Bar No. 74029
Fed. Bar No. 10731
Robert J. Butcher
S.C. Bar No. 74722
Fed. Bar No. 9767
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone:     (803) 432-7599
Facsimile:     (803) 432-7499
rbutcher@camdensc-law.com
dbutcher@camdensc-law.com

Attorneys for Plaintiff

Camden, South Carolina
July 13, 2020

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF CHARLESTON | FOR THE NINTH JUDICIAL CIRCUIT |
| Elizabeth De'Anna Scannell,<br>                              Plaintiff,<br><br>v.<br><br>South Carolina Department of Social Services (SCDSS), Medical University of South Carolina, Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell, Michael Leach, Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3, and MUSC Public Safety Supervisor,<br><br>                              Defendants. | Case No.:<br><br>**COMPLAINT**<br>*(JURY REQUESTED)* |

The Plaintiff, complaining of the Defendants, would respectfully show the following:

## I.    PARTIES AND JURISIDICTION

1.    Plaintiff **Elizabeth De'Anna Scannell** is a citizen and resident of the County of Charleston, State of South Carolina. Plaintiff Scannell is the Biological Mother of A.D.S. a minor under the age of eighteen.

### South Carolina Department of Social Services Defendants

2.    Defendant **South Carolina Department of Social Services [SCDSS]** is an agency of the State of South Carolina created by the General Assembly of the State of South Carolina. Defendant SCDSS is responsible for investigating cases of abuse and neglect of vulnerable adults or self-neglect of vulnerable adults and ensuring there is probable cause before taking a vulnerable adult into its custody. Defendant SCDSS is

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

also responsible for investigating cases of child abuse and neglect and ensuring there is probable cause before taking a child into its custody. Once probable cause for the custody of an abused or neglected child or vulnerable adult is no longer present, SCDSS has a duty to relinquish custody of that vulnerable adult or child.

3.      Upon information and belief, Defendant **Cynthia Bradford** is a citizen and resident of the County of Charleston, State of South Carolina. During the times alleged herein, Defendant Cynthia Bradford was employed by SCDSS as a caseworker. Defendant Cynthia Bradford was responsible for the investigation and continued seizure of the minor child A.D.S. Cynthia Bradford is being sued in her individual capacity.

4.      Upon information and belief, Defendant **Mosetta Clark** is a citizen and resident of the County of Charleston, State of South Carolina. During the times alleged herein, Defendant Mosetta Clark was employed by SCDSS as a caseworker supervisor and Defendant Cynthia Bradford directly reported to her. Defendant Mosetta Clark was responsible for the investigation and continued seizure of the minor child A.D.S. Mosetta Clark is being sued in her individual capacity.

5.      Upon information and belief, Defendant **Louchetia Simmons-Robinson** is a citizen and resident of the County of Charleston, State of South Carolina. During the times alleged herein, Defendant Louchetia Simmons-Robinson was employed by SCDSS as a caseworker. Defendant Louchetia Simmons-Robinson was responsible for the case of the minor child A.D.S. Louchetia Simmons-Robinson is being sued in her individual capacity.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

6.      Upon information and belief, Defendant **Jane Bell** is a citizen and resident of the County of Charleston, State of South Carolina. During the times alleged herein, Defendant Jane Bell was employed by SCDSS as a caseworker supervisor and Defendant Louchetia Simmons-Robinson directly reported to her. Defendant Jane Bell was responsible for the case of the minor child A.D.S. Jane Bell is being sued in her individual capacity.

7.      **Michael Leach** is the State Director of the South Carolina Department of Social Services during the times of the matters complained of herein. Michael Leach was in charge of making sure that policies and procedures were carried out, were not abused, and at all times South Carolina citizens were afforded due process. He is being sued in his official capacity and at all times was acting under the color of state law.

### Medical University of South Carolina Defendants

8.      Defendant **Medical University of South Carolina [MUSC]** is a state agency located in the County of Charleston, State of South Carolina. S.C. Code Ann. § 59-123-60(E). It operates numerous hospitals and medical facilities through the State of South Carolina, including the hospital where the Plaintiff gave birth to A.D.S.

9.      Upon information and belief, Defendant **Donna Johnson, M.D.** is a citizen and resident of the County of Charleston, State of South Carolina. Defendant Donna Johnson, M.D. is a physician and Professor employed by the Medical University of South Carolina. Donna Johnson is being sued in her individual capacity.

10.     Upon information and belief, Defendant **Michelle Irene Amaya, M.D.** is a citizen and resident of the County of Charleston, State of South Carolina. Defendant

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

Michelle Irene Amaya, M.D. is a physician and Associate Professor employed by the Medical University of South Carolina. Michelle Irene Amaya is being sued in her individual capacity.

11.     Upon information and belief, **Defendant Kelly Finke, MSW**, is a citizen and resident of the County of Charleston, State of South Carolina. Defendant Kelly Finke, MSW, is a Licensed Master Social Worker employed by the Medical University of South Carolina. Kelly Finke is being sued in her individual capacity.

12.     Upon information and belief, **MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3** are citizens and residents of the County of Charleston, State of South Carolina and are employees of the Medical University of South Carolina. Their names are unknown. It is believed that these Defendants ordered Dr. Johnson to place Elizabeth Scannell into emergency protective custody (EPC) without cause. They also ordered, allowed, and approved of Michelle Ireme Amaya's and Kelly Finke's actions in taking A.P.S. into emergency protective custody without cause. MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 are being sued in their individual capacities.

13.     Upon information and belief, **MUSC Public Safety Supervisor** is a citizen and resident of the County of Charleston, State of South Carolina and an employee of the Medical University of South Carolina. MUSC Public Safety Supervisor is being sued in her individual capacity. Her name is unknown.

**<u>Jurisdiction</u>**

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

14.    That this Court has jurisdiction over the subject matter of this action under Article V Section 11 of the Constitution of South Carolina; Sections 14-1-80, 15-78-100, and 33-56-180 of the Code of Laws of South Carolina 1976, as amended; and the Common Law of South Carolina. This Court has subject matter jurisdiction pursuant to S.C. Const. art. V, § 11, S.C. Code Ann. § 15-78-100(b), and 42 U.S.C. § 1983.

15.    That because the acts and omissions alleged herein occurred in Charleston County, South Carolina venue is proper in this Court under Sections 15-78-100 and 15-7-30 of the Code of Laws of South Carolina 1976, as amended.

## II.    Chronology of Events.

### A.  Preamble.

16.    At no time during the facts asserted below did any physician determine Plaintiff Elizabeth De'Anna Scannell was actively causing harm to herself or to her unborn child, nor did Elizabeth or her child fit the requirements for emergency protection by the state. All violations of Elizabeth's individual liberties, rights, and constitutional rights by the Defendants were a result of the practice of defensive medicine and pure speculation by MUSC's administrators, physicians, and legal counsel and complete disregard of the law, due process, and medical ethics.

### B.  Mental health history.

17.    Plaintiff Elizabeth De'Anna Scannell was involuntarily committed to the Medical University of South Carolina (MUSC) Institute of Psychiatry (IOP) on January 4, 2008 for the following reasons:

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

> Patient is a 39-year-old white female with a remote history of depression NOS, and personality disorder NOS, who was brought in by police after found tearful on the Ravenel Bridge with questionable suicidal ideation. She had an argument with her parents prior to that and stormed out of the house.[1]

18.     Christopher C. Pelic, M.D. noted in Elizabeth's discharge summary,

"Significant for urine drug screen that was negative. Blood alcohol level was negative."[2]

Under Mental Status Examination, Dr. Pelic wrote:

> She was alert and oriented x3. She was well-groomed and appropriate in appearance with cooperative and good eye contact. Speech was normal rate, volume, and prosody with normal motor function. Mood was angry. Affect was congruent with mood with full range of affect. Concentration and memory were intact. Insight and judgment were mildly impaired.[3]

19.     In describing Elizabeth's treatment, Dr. Pelic wrote:

> Ms. Scannell was admitted to 3 North and placed on appropriate precautions after alleged suicidal ideation. She adamantly denied that she was suicidal, stated that she just wanted to get some air and take a walk on the bridge which is a common place she likes to go to when she is upset. Father confirmed that she stormed out of the house after a heated argument. She has a prior IOP admission which she did not initially report. She denied significant depressive symptoms but instead felt "stressed" because of her relationship with her mother and having to move.
>
> The patient remained on topamax which she took qod for migraine headaches. The patient denied SI, but did report some new stressors such as moving to a new house, arguments with parents. She agreed that she was crying on the bridge but was misunderstood and did not need to be shackled and detained. Through the weekend, she continued to deny SI and only complained of poor sleep. Antidepressant medication was offered but patient refused. She did, however, agree that she could use the help of a therapist to get through current stressors and work on her coping mechanisms. On discharge, she continues to deny SI, was still irritable about being here. It seems that she has chronic dysthymia which is *possibly* secondary to personality pathology. Court was petitioned for commitment to be dropped and the judge agreed, so on discharge, patient was in stable condition, denied suicidal ideation. Of note, her father initially voiced some concerns about her need to stay in the hospital but

---

[1] FCA Bates No. 001961.
[2] FCA Bates No. 001961.
[3] FCA Bates No. 001961.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

later changed his mind, citing no concern. In fact, he demanded her release and limited benefit to further stay. He did outline his plans to help ensure close follow up and monitor for a decline in her condition.[4] (Emphasis added)

20.     Despite the limited time Dr. Pelic spent with Elizabeth and the limited conversations Elizabeth had with MUSC IOP mental health practitioners and staff, Dr. Pelic diagnosed Elizabeth with Depression, not otherwise specified, and personality disorder with cluster B traits. Given the amount of time Dr. Pelic spent with Elizabeth, the diagnosis is suspect, at best.[5]

21.     Despite the doubtfulness of this diagnosis, MUSC physicians would eleven years later rely upon the dubious diagnosis to justify stripping Elizabeth of her human rights, seizing Elizabeth and placing her in protective custody without cause, and seizing her newborn daughter without cause.

### C.  Antepartum history at MUSC.

22.     Plaintiff Elizabeth De'Anna Scannell was 49 and 50 years of age during the relevant times complained of in this matter.

23.     Elizabeth taught elementary school from 1998 through 2001. She then opened a small business providing education services for children with learning difficulties which she ran for about seven years. On or about 2008 Elizabeth sold the business, Education Success Learning Center, LLC and bought investment properties.

24.     Elizabeth moved to Mexico in 2012. Although Elizabeth was unmarried, she desired to be a mother.

---

[4] FCA Bates No. 001961-001962.
[5] FCA Bates No. 001962.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

25.     Because of her advanced age, Elizabeth arranged for artificial insemination through in-vitro fertilization [IVF] at a clinic in Mexico where health care costs are lower. Even though the costs were lower, they were substantial and required Elizabeth to spend a great deal of time in Mexico receiving treatment before and after the IVF procedure.

26.     Elizabeth saved her money and began the procedure in 2014. The procedure failed.

27.     Elizabeth returned to the United States in 2016. She saved her money for another IVF procedure at the clinic in Mexico in October of 2017. During the time leading up to the procedure Elizabeth worked out, lifted weights, and maintained a healthy diet in order to facilitate the IVF procedure. Elizabeth followed a course of medication that included shots several times a week and towards the end, daily. The side effects of the medication include physical pain and erratic emotions.

28.     On October 17, 2017 the embryo transfer was successful and Elizabeth was pregnant.

29.     Elizabeth returned to Charleston and sought care at a child birth center in Charleston.

30.     On December 12, 2017 Elizabeth was in Indiana when she experienced spotting, or bleeding. She sought treatment from R. Eric Seward, M.D., a physician at Woodlawn Medical Professionals in Rochester, Indiana. Dr. Seward referred Elizabeth for lab work and an ultrasound at Bon Secours St. Francis Hospital in Charleston, South Carolina.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

31.    On December 19, 2017 Elizabeth was diagnosed with placenta previa[6] at St. Francis and she was referred to the Medical University of South Carolina for assessment and monitoring. Upon receiving this diagnosis, Elizabeth immediately began to educate herself on the subject. She read journal articles and more colloquial blogs written by nurses and experienced mothers. She also learned that physicians practice defensive medicine when faced with placenta previa and often seek to deliver the baby early when there is no real danger to the baby or the mother. Elizabeth also learned that it was best for the baby's development to wait until 40 weeks unless the placenta previa created conditions that endangered the life of the baby or the mother. Elizabeth continued to research and educate herself on the conditions and diagnoses she received through the duration of her pregnancy.

32.    Because of this diagnosis, her IVF pregnancy, and advanced age, she was extra-cautious about any symptoms. On December 24, 2017 Elizabeth went to the Trident Hospital with concerns of spotting (minor bleeding).[7] The bleeding continued and she sought medical care, speaking with Melanie Blohm, M.D. on December 27, 2017.[8] Early on, there were concerns of a miscarriage.[9]

33.    Elizabeth presented for her initial obstetrician visit on December 28, 2017. The notes state that Elizabeth was "seen a few days ago at an [outside hospital] with concern for a 2 cm subchorionic hematoma and reports several days of light bleeding.

---

[6] Placenta Previa is a condition where the placenta lies low in the uterus and partially or completely covers the cervix. The placenta may separate from the uterine wall as the cervix begins to dilate (open) during labor. American Pregnancy Association, https://americanpregnancy.org/pregnancy-complications/placenta-previa/, last accessed January 9, 2020 at 1433.
[7] FCA Bates No. 001976.
[8] FCA Bates No. 001976.
[9] FCA Bates No. 001976.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

Finally, she has frequent nausea, no vomiting. She is adamant about avoiding medication." [10]

34.    Krista Teresa Wagoner, M.D. performed a dating summary December 28, 2017 based upon the embryo transfer conducted on October 17, 2017.[11] The working expected delivery date was set by Dr. Wagoner at July 6, 2018.[12] Dr. Wagoner also noted that Elizabeth's pregnancy was high risk.[13] During this visit, Elizabeth communicated her strong desire to have a natural childbirth.

35.    Elizabeth returned to the clinic on January 10, 2018 to speak with Dr. Wagoner about her pregnancy.[14] Elizabeth was very engaged with her care.

36.    On January 24, 2018 Elizabeth attended another appointment with Dr. Wagoner.[15] Elizabeth, "reports that she desires a delivery with minimal intervention and as "natural" as possible." Dr. Wagoner reported that Elizabeth had "pages" of questions prepared for the visit. Dr. Wagoner referred Elizabeth to "Centering in Pregnancy," which is "designed for low-risk pregnancies and is available to any woman with no anticipated pregnancy problems."[16]

37.    Elizabeth saw Allison Sizemore Nissen, CNM, MSN on February 1, 2018. Plaintiff was concerned that she would not have a choice of nurse-midwife at the time of labour and delivery. Elizabeth also discussed prenatal testing, nutrition and diet during

---

[10] FCA Bates No. 001981.
[11] FCA Bates No. 001016.
[12] FCA Bates No. 001016.
[13] FCA Bates No. 001013-001014.
[14] FCA Bates No. 001984.
[15] FCA Bates No. 001985.
[16] FCA Bates No. 001985 and "Centering Pregnancy Groups, MUSC Health, https://muschealth.org/medical-services/womens/pregnancy/centering, last accessed January 11, 2019 at 1752.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

pregnancy, weight gain, mood changes during pregnancy, pregnancy physiology and lifestyle choices.

38.     Elizabeth was referred to Barbara B. Head, M.D., with MUSC Maternal-Fetal Medicine on February 6, 2018. Dr. Head discussed with Elizabeth diagnosis of elderly primigravida, aneuploidy risk, and increased risk of late pregnancy stillbirth.[17] Dr. Head recommended delivery at 38 to 39 weeks of gestation and antenatal surveillance. Dr. Head noted that Elizabeth was reluctant to receive these services because it could cause early delivery, labor induction, and potentially cesarean delivery and warned her that it was against medical advice and could lead to intrauterine fetal demise. Dr. Head also noted the "increased risk of preeclampsia associated with nulliparity and AMA" and Elizabeth's continued regimen of aspirin to prevent preeclampsia.[18]

39.     On February 8, 2018 Dr. Head diagnosed Elizabeth with placenta previa antepartum in the second trimester, recording, "[t]he placenta is at the internal cervical os."[19] Dr. Head informed Elizabeth that if the placenta previa did not resolve, "cesarean delivery would be indicated at 36-37 weeks."[20] Dr. Head also noted that Elizabeth has seizures and that women with seizure disorder were at increased risk of fetal structural abnormalities.[21]

40.     Dr. Head wrote Elizabeth was "very concerned about having a relationship with a provider throughout her pregnancy and ensuring that provider will be present at her delivery."

---

[17] FCA Bates No. 001996.
[18] FCA Bates No. 001015.
[19] FCA Bates No. 001997.
[20] FCA Bates No. 001997.
[21] FCA Bates No. 001997.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

41.    Elizabeth met with Dr. Head and Mary Sterrett, M.D. on March 6, 2018 to discuss placenta previa.[22] Dr. Head noted that there was no evidence of vasa previa, a condition that "occurs when fetal blood vessel(s) from the placenta or umbilical cord cross the entrance to the birth canal, beneath the baby. Vasa previa can result in rapid fetal hemorrhage (occurs from the vessels tearing when the cervix dilates or membranes rupture) or lack of oxygen (if the vessels become pinched off as they are compressed between the baby and the walls of the birth canal)."[23]

42.    Dr. Head nonetheless recommended Cesarean section at 36-37 weeks. Drs. Head and Sterrett could not guarantee consistent medical providers and recommended that Elizabeth find a "doula to be a constant patient advocate and support throughout her pregnancy".[24]

43.    A fetal echocardiogram was performed by Dr. Head on March 6, 2018 and the results were normal.[25]

44.    The Charleston Birth Center informed Elizabeth that the delivery would be too high risk for a birth center.

45.    Sometime before April 11, 2018 Plaintiff was seen at Trident Hospital "for decreased fetal movement."[26] She had an appointment with Dr. Head on April 11, 2018. Dr. Head noted that Elizabeth became upset when Dr. Head informed her that a cesarean delivery would be needed. Dr. Head noted that she still wanted a natural birth.[27] Dr. Head performed an ultrasound and the results were normal.

---

[22] FCA Bates No. 002003.
[23] FCA Bates No. 002003 and "Vasa Previa Fact Sheet", International Vasa Previa Foundation, http://vasaprevia.com/Vasa-Previa-Fact-Sheet, last accessed January 11, 2019 at 1932.
[24] FCA Bates No. 002004.
[25] FCA Bates No. 000258-000264.
[26] FCA Bates No. 002008.
[27] FCA Bates No. 002008.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

46.    Elizabeth also met with her nurse-midwife, Allison Sizemore Nissen. Elizabeth again stated her preference to have a natural birth and not deliver by cesarean before full term unless the baby or the mother is endangered.

47.    Elizabeth met with Dr. Head on May 8, 2018 and again expressed her concerns with an unnecessary cesarean delivery and the consequences with neonatal care due to the baby not having enough time to develop in the womb.

48.    On May 8, 2018 an ultrasound was performed by Dr. Head and the physician noted "a posterior placenta previa that completely covers the internal os of the cervix and an anterior succinterate lobe. There appear to be vessels bridging the anterior and posterior portions of the placenta."[28]

49.    Dr. Head continued to recommend delivery by cesarean section at 36-37 weeks and increased monitoring at 35-36 weeks.[29] Elizabeth inquired about the risks of delivery prior to 39 weeks, which she learned about in her research. Elizabeth again voiced her preference for a natural childbirth, skin-to-skin contact between the mother and child after the birth, delayed cord clamping, and delayed bathing. Dr. Head recommended that Elizabeth present a written birth plan to place in her chart. Dr. Head also recommended increasing antenatal fetal surveillance to a weekly basis beginning at 32 weeks.

50.    Elizabeth attended another appointment on May 22, 2018 with Dr. Head. Dr. Head again discussed recommendations for delivery by cesarean at 36-37 weeks.[30] Elizabeth continued to express her desire to have a natural birth for the benefits it would

---

[28] FCA Bates No. 002010.
[29] FCA Bates No. 002010.
[30] FCA Bates No. 002022.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

confer to her and the baby.[31] Elizabeth also presented a statement to Dr. Head asking that no fellows, residents, or students participate in the delivery.[32] Elizabeth also expressed requests after delivery to include skin to skin contact, delayed cord clamping, immediate breastfeeding, and delayed bathing all based on optimizing the newborn's health.[33]

51.    Dr. Head recommended that Elizabeth meet with Dr. Johnson.[34]

52.    On May 24, 2018 Elizabeth attended Centering Pregnancy Group at MUSC and met with Allison Sizemore Nissen.[35] Elizabeth reported abdominal cramping and concerns that she was having contractions.[36] Elizabeth was given a fetal non-stress test which was reviewed by Dr. Head.[37] The fetal non-stress test was reactive and the fetal surveillance was reassuring.[38]

53.    Elizabeth was brought to MUSC by ambulance on May 26, 2018 due to vaginal bleeding, bright red and moderate in amount, that began in the morning.[39] Scott A. Sullivan M.D. attended. Dr. Sullivan informed Elizabeth that the hemorrhaging could be managed on an outpatient basis but upon a second incident of hemorrhaging, he would recommend inpatient management until delivery.[40]

54.    Dr. Sullivan and Elizabeth discussed delivery by cesarean and the risks involved. Plaintiff asserted her preference for a natural delivery and Dr. Sullivan noted, "we had a frank discussion about patient autonomy and I have had patients accept injury

---

[31] FCA Bates No. 002022.
[32] FCA Bates No. 002287-002288.
[33] FCA Bates No. 002025.
[34] FCA Bates No. 002025.
[35] FCA Bates No. 002028.
[36] FCA Bates No. 002028.
[37] FCA Bates No. 002028.
[38] FCA Bates No. 002030.
[39] FCA Bates No. 001049.
[40] FCA Bates No. 001049.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

or death in the past over recommended treatment. We always respect patient's rights, even when the outcome is difficult or sad. She clearly has capacity and can make these decisions. We have notified Risk Management, the Ethics Committee and our chair Dr. Johnson. We hope that she will change her mind and I made clear that we will keep the door open for this."[41]

55.    An ultrasound was performed by Dr. Sullivan and the results were normal.[42] Elizabeth was discharged after a period of observation and a discussion with Dr. Sullivan.[43]

56.    Elizabeth met with Dr. Head on May 29, 2018 for a follow-up evaluation.[44] Dr. Head performed an ultrasound which was normal. Both Dr. Head and Dr. Johnson reviewed the risks of "hemorrhage with potential for severe morbidity and mortality in the patient and fetus, and recommendations for scheduled cesarean delivery at 36-37 weeks. The patient agreed to cesarean delivery at 39 weeks and is aware of the 80-85% risk of hemorrhage prior to 39 weeks."[45]

57.    Later during the visit, Elizabeth complained of back and neck pain.[46] She was transferred to Labor and Delivery.[47] Eugene Y. Chang, M.D. examined Elizabeth and conducted an ultrasound which was normal and showed no change in the placenta previa from previous ultrasounds.[48] Dr. Chang discussed cesarean delivery with Elizabeth.

---

[41] FCA Bates No. 001049.
[42] FCA Bates No. 001020.
[43] FCA Bates No. 001049.
[44] FCA Bates No. 002032.
[45] FCA Bates No. 002032.
[46] FCA Bates No. 002044.
[47] FCA Bates No. 002044.
[48] FCA Bates No. 001053.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

58.     Dr. Head noted in her report irregular uterine tightening.[49] She also reported blood tinged mucus earlier that day.[50] Dr. Head again spoke with Elizabeth about a cesarean delivery at 36-37 weeks, which was about 6 weeks away.[51] Elizabeth expressed her desire for a natural childbirth and allowing the baby to develop in the womb for as long as possible.[52]

59.     Dr. Chang noted on June 8, 2018 that an ethics consultation was ordered.[53]

60.     Dr. Chang also conducted another ultrasound and noted that the placenta previa was more likely a partial previa than a complete previa.[54] Dr. Chang noted that Elizabeth, "…plans to refuse scheduled cesarean section with hopes that the placenta continues to migrate away from the cervix"[55]

61.     Dr. Head wrote the following plan for Elizabeth's treatment:

a.  Notify MFM Attending on call of admission.
b.  Notify Deb Brown of admission (803-622-XXXX)
c.  Notify Ethics on call of admission. Request they contact legal based on patient's willingness to consent to cesarean delivery.
d.  Ask patient if she has advance directive and obtain a copy.
e.  Ask patient if she has an Emergency Contact and obtain information.
f.  If patient is bleeding or has other non-reassuring maternal or fetal surveillance, consent for cesarean delivery.
    i.   Place IV
    ii.  Contact Anesthesia Attending
    iii. CBC, Type and Cross for 4 units PRBC
g.  If patient will not consent for cesarean delivery, have her sign a DNR.
h.  If patient refuses cesarean delivery, emergent Psychiatry consultation to determine capacity. Ethics and Legal may need to be involved if Psychiatry is not immediately available.[56]

---

[49] FCA Bates No. 002040.
[50] FCA Bates No. 002040.
[51] FCA Bates No. 002040.
[52] FCA Bates No. 002040.
[53] FCA Bates No. 002048.
[54] FCA Bates No. 002049.
[55] FCA Bates No. 002049.
[56] FCA Bates No. 002050.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

62.    Elizabeth was not aware of this plan.

63.    Elizabeth was seen by Charles S. Rittenberg, M.D. on June 14, 2018.[57] Dr. Rittenberg spoke with Dr. Head about the case. Dr. Head asked Dr. Rittenberg to obtain consent for cesarean delivery or else convey to Elizabeth that the MUSC ethics committee had determined if Elizabeth presented with vaginal bleeding or nonreassuring fetal status, "we should be able to perform a cesarean even if she refuses to consent."[58]

64.    Elizabeth is not aware of when or if the ethics committee made such a determination.

65.    Dr. Head recorded the following: "After the patient's visit with Dr. Rittenburg and her request to meet with me, I spoke to Drs. Guille, Johnson, Sullivan. We all feel that it would be advantageous to meet with the patient to discuss her ongoing unwillingness to consent to cesarean delivery in the face of a placenta previa."[59]

66.    Dr. Head saw Elizabeth on June 19, 2018 for a routine prenatal visit. The ultrasound showed, "a posterior placenta previa with the edge of the placenta immediately adjacent but not covering the internal os. The maternal cervix is very vascular. There are large vessels behind the chorioamnion that appear to be venous. It is difficult to determine whether these are fetal or maternal vessels. The possibility of a vasa previa cannot be completely excluded."[60]

67.    Dr. Head noted that Elizabeth had agreed to cesarean delivery on June 22, 2018 but Elizabeth did not want to proceed because the baby would only be at 38

---

[57] FCA Bates No. 002051.
[58] FCA Bates No. 002051.
[59] FCA Bates No. 002053.
[60] FCA Bates No. 002055.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

weeks.[61] In discussing the scenarios between bleeding and hemorrhaging, Dr. Head "reiterated the hospital's position regarding our responsibility to rescue her and the baby if she were not to consent to cesarean, which she found to be alarming."[62]

68.    Dr. Head did not review the standards for adult emergency protective custody with Elizabeth at this time, nor did anyone from MUSC ever explain this process or take note that Elizabeth did not qualify as an at-risk-adult since there was no indication that she was abused or neglected.

69.    Dr. Head also wrote, "I informed her that if she were not to consent to cesarean delivery in the face of a persistent placenta previa and labor with or without bleeding, it would be necessary to evaluate her capacity to make these decisions. She was very upset and asked if we thought she was "crazy". I informed her that in that situation, the provider(s) would need to merely understand her reasoning for such a decision and her capacity to make such a decision."[63]

70.    Dr. Head asked Elizabeth to consent to the cesarean delivery on June 27, 2018.[64] Plaintiff tentatively scheduled the cesarean delivery for that date when she would be 39 weeks (full term gestation is considered to be from 39 weeks 0 days and 40 weeks 6 days).[65] Elizabeth also inquired about scheduling the cesarean on July 5, 2018 when she would be 40 weeks. [66]

71.    Dr. Johnson called Elizabeth and spoke with her for an hour and a half on June 20, 2018. Dr. Johnson noted that Elizabeth, "does not wish to give up her notion that

---

[61] FCA Bates No. 002055.
[62] FCA Bates No. 002055.
[63] FCA Bates No. 002055.
[64] FCA Bates No. 002055.
[65] FCA Bates No. 002055.
[66] FCA Bates No. 002055.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

she can have a vaginal delivery. However, she does not have a death wish either. She hopes the longer she waits the better her child may do and the higher the chance of a vaginal delivery."[67]

72.     In fact, Elizabeth did not wish to die in childbirth and did not want her baby to die, she wanted to make health care decisions to the best of her ability for the long-term benefit of herself and her child and with the help of trusted providers.

73.     Dr. Johnson wrote a new birth plan:

a. She will schedule her c/s when and if she wants it.
b. If she has vaginal bleeding and soaks a pad in less than 30 minutes she will agree to a c/s.
c. If she is just dribbling blood, she will have a c/s after she has soaked 6 pads.[68]

74.     Dr. Johnson also recorded, "[s]he has a clear understanding that any delays may increase her risk of a blood transfusion and she is fine with this."[69] Dr. Johnson also addressed specific symptoms:

a. If she comes in laboring, she agrees to a cervical check if she feels the urge to push or if she wants pain control.
b. I would recommend that her first cervical check would be in the OR and if she starts to bleed, then we convert to the pad counts above.
c. I tried to get her to agree to a cervical exam after she has been contracting 48 hours and she would not agree.
d. If she is contracting irregularly she still wants to be admitted because of the risk of bleeding. She understands she may go to antepartum if she is not contracting very much.[70]

---

[67] FCA Bates No. 002060.
[68] FCA Bates No. 002060.
[69] FCA Bates No. 002060.
[70] FCA Bates No. 002060.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

75.     Elizabeth met with Dr. Head and Dr. Johnson on June 25, 2018 regarding delivery plans. She also spoke alone with Dr. Johnson regarding the birth plans.[71] She was in agreement with the plan.

76.     Elizabeth was brought to the Emergency Department by ambulance on June 29, 2018 and reported that her boyfriend had shaken her.[72] She was then transferred to Labour and Delivery for observation.[73]

77.     Gweneth Lazenby, M.D. contacted Dr. Johnson, Deb Brown, and Ethics representatives at the hospital of her admission.[74] Elizabeth was not aware that ethics representatives had been contacted.

78.     Elizabeth was observed with fetal monitoring, assessed, and discharged with no new concerns.[75]

79.     Elizabeth returned to the MUSC on July 2, 3018 at 5:53 p.m. for an antepartum non-stress test which was reactive and the fetal surveillance was reassuring.[76] Elizabeth was always consistent in attending appointments and getting information that would support her care and as her estimated due date arrived she was even more diligent.

80.     Elizabeth returned to MUSC on July 7, 2018 at 7:53 p.m. with concerns of decreased fetal movement.[77] Alexandra Mainiero Rowin, M.D. recorded in her notes, "[g]iven patient's known placenta previa, I recommended that she be admitted for cesarean delivery. She declines this recommendation. I did review with her the risk of both maternal and fetal morbidity and mortality by refusing cesarean delivery prior to

---

[71] FCA Bates No. 002064-002065.
[72] FCA Bates No. 001123.
[73] FCA Bates No. 001123.
[74] FCA Bates No. 001123.
[75] FCA Bates No. 001123.
[76] FCA Bates No. 001161.
[77] FCA Bates No. 001180.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

labor."[78] Dr. Rowin also noted, "Return precautions given to return tomorrow if she continues to appreciate decreased fetal movement, or with any bleeding or signs of labor."[79] Elizabeth was discharged at 8:56 p.m.[80]

81.    Hours later, Elizabeth returned to MUSC at 1:54 a.m. on July 8, 2018 by ambulance due to bleeding.[81] By her estimate she was at 40 weeks and two days, within the window of full-term gestation. She informed Dr. Rowin that she passed a golfball sized clot and she was feeling irregular, but not painful, contractions.[82] Dr. Rowin recommended continuous electronic fetal monitoring in the Labor and Delivery department and noted that the fetal status was currently reassuring.[83]

82.    Elizabeth was reassured by the electronic fetal monitoring noting that her fetus was not in distress.

83.    Dr. Choi transferred Elizabeth from Labor & Delivery to Antepartum at 10:08 a.m. on July 8, 2018 for, "further management".[84]Dr. Choi wrote in the transfer note:

> Patient has been extensively counseled about the recommendation for delivery at 36-37 weeks and declined. She has been counseled extensively about the recommendation for delivery via cesarean given her placenta previa and declines. She has agreed several times to cesarean and has been posted on the OR schedule, but has cancelled. ***Patient ultimately remains hopeful for a vaginal delivery with minimal interventions.***[85] (Emphasis added).

---

[78] FCA Bates No. 001181.
[79] FCA Bates No. 001181.
[80] FCA Bates No. 001172
[81] FCA Bates No. 001198, 001189
[82] FCA Bates No. 001199.
[83] FCA Bates No. 001201.
[84] FCA Bates No. 001205, 001206.
[85] FCA Bates No. 001205.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

Dr. Choi noted, "She was counseled by both Dr. Rowin on admission and by Dr. Choi prior to transfer regarding the recommendation for delivery via cesarean section and declined. She has, therefore, not been consented for cesarean."[86]

84.    Elizabeth was seen by Angela Rank Choi, M.D. at 11:40 a.m. Dr. Choi discussed Elizabeth's care with Dr. Rowin and she also made Dr. Johnson aware that Elizabeth was admitted.[87] Dr. Choi noted of Elizabeth, "[s]he denies bleeding and endorses good F[etal] M[ovement]".[88] Dr. Choi wrote in her notes:

> I outright recommended and offered a c/s for delivery in the setting of 40+ weeks gestational age with bleeding and a placenta previa. DeAnna refuses. Given bleeding in the setting of a previa, I recommended admission for frequent NST (we discussed TID or with clinical changes) and monitoring of her bleeding. I continued to recommend c/s and explained that we are ready to do a c/s when she will consent to the procedure. I spent a long time reviewing goals (healthy mom and baby) risks (AMA, IVF, placenta previa), etc.[89]

85.    Dr. Choi ordered and Elizabeth consented to a fetal non-stress test which was conducted at 1:11 p.m on July 8, 2020. The fetal non-stress test was reactive and the fetal surveillance was reassuring.[90] Elizabeth was further reassured that her fetus was not in distress.

86.    Dannielle O. Wright, M.D. performed an antepartum non-stress test at 5:28 p.m. on July 8, 2018 and the fetal non-stress test was reactive and the fetal surveillance was reassuring.[91]

---

[86] FCA Bates No. 001207.
[87] FCA Bates No. 001202.
[88] FCA Bates No. 001203.
[89] FCA Bates No. 001203
[90] FCA Bates No. 001204.
[91] FCA Bates No. 001208.

87.     At 7:26 p.m., Dr. Choi discussed the fetal non-stress test results with Elizabeth and again offered a cesarean delivery, which Elizabeth declined since neither she nor her fetus were in distress.[92] Another test was conducted at 11:34 p.m. and the results of the fetal non-stress test was reactive and the fetal surveillance was reassuring.[93] Fetal monitoring the next morning on July 9, 2018 at 10:00 a.m. showed "reactive and reassuring" with contractions at eight minutes apart.[94]

88.     Elizabeth had now been admitted to the hospital in accordance with the plan Dr. Johnson established on June 20, 2020, and she was following the plan.

89.     More fetal non-stress tests were conducted on July 9, 2018 when Elizabeth was 40 weeks an 3 days, within the window of full term. Katherine A. Bebeau, M.D. noted that the antepartum non-stress test was reactive and the fetal surveillance was reassuring at 12:32 p.m.[95] Dr. Bebeau performed a second test at 3:10 p.m. and again, the results were reactive and reassuring.[96]

90.     Roger B. Newman, M.D. saw Elizabeth at 4:31 p.m. Elizabeth asked Dr. Newman if labor could be induced, which, he refused. Dr. Newman noted, "she again declines [cesarean delivery] preferring a trial of labor."[97] Dr. Newman also documented, "[i]n subsequent conversation with Dr. Johnson she has now agreed to a [cesarean delivery] on Friday [July 13, 2018 at the end of the full-term window] if she does not labor before then or hemorrhage. That has been scheduled"[98]

---

[92] FCA Bates No. 001208
[93] FCA Bates No. 001210-001211.
[94] FCA Bates No. 001211.
[95] FCA Bates No. 001212
[96] FCA Bates No. 001213-001214.
[97] FCA Bates No. 001215.
[98] FCA Bates No. 001215.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

91.    Dr. Newman also noted Elizabeth preferred to stay in the hospital due to "risk of bleeding (she states she lives alone) and we agree that staying in hospital is best."[99] He further document, "[i]f patient labors, Dr. Johnson has outlined a decision tree based on amount of vaginal bleeding. Patient has agreed with this plan. Currently patient is hemodynamically stable and w/o bleeding."[100]

92.    Later that evening, Sara Askins, RN met with Elizabeth and reviewed, "notes about birth wishes on patient's chart and discussed plan with patient. Patient states that she wants to go by exactly what is in the notes and would like to retain the ability to change her mind, and verbalize those wishes, if the situation becomes emergent."[101] Nurse Askins also documented, "Patient in a very agreeable mood and reinforces that she "would like the opportunity for as normal and natural a birth experience as possible."[102]

93.    On July 9, 2018 at 8:35 p.m. Nurse Askins reported that Elizabeth's mood/behavior was, "anxious; calm; cooperative; behavior appropriate to situation".[103]

94.    L. Mackenzie Harbin, M.D. recorded the results of the 6:19 a.m. July 10, 2020 antepartum non-stress test as reactive and reassuring.[104] Elizabeth continued to feel reassured her fetus was not in distress.

95.    Dr. Newman visited Elizabeth in the morning of July 10, 2018 when she was 40 weeks and 4 days, within the window of full term. Both the ultrasound and the

---

[99] FCA Bates No. 001215.
[100] FCA Bates No. 001215.
[101] FCA Bates No. 001216.
[102] FCA Bates No. 001216.
[103] FCA Bates No. 001464.
[104] FCA Bates No. 001220.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

antepartum non-stress test were reactive and reassuring.[105] Again, Dr. Newman

documented that Elizabeth had agreed to cesarean delivery on Friday, July 13, 2018. [106]

96.    The next afternoon, on July 10, 2018, Ashley L. Navarro, M.D. recorded

the results of the antepartum non-stress test as reactive and reassuring.

97.    Dr. Rowin responded to a call to Elizabeth's room 7:55 p.m. regarding

bleeding.[107] An antepartum non-stress test was reactive and reassuring.[108]

98.    Dr. Rowin recorded in her progress notes at 2:03 a.m. on July 11, 2018

that she reviewed the results of the earlier antepartum non-stress test was reactive and

reassuring.[109]

99.    Elizabeth did not have any indication that her fetus was in distress and

continued to feel reassured.

100.    At 9:23 a.m. on July 11, 2018, when she was 40 weeks and 5 days, within

the window of full term, Elizabeth reported increased bleeding and thought her water

broke during the night.[110] Rebecca Jane Wineland, M.D. met with Elizabeth and advised

her to have a cesarean section at that time, which she declined.[111] Dr. Wineland wrote in

her progress notes, "Reviewed that my recommendation is for a c-section now, prior to

fetal or maternal compromise. Indications for c-section are placenta previa, vaginal

bleeding, PROM, AMA at age 49, IVF pregnancy. Ms. Scannell declines at this time."[112]

---

[105] FCA Bates No. 001219.
[106] FCA Bates No. 001219.
[107] FCA Bates No. 001221.
[108] FCA Bates No. 001222 and 001223.
[109] FCA Bates No. 001223-001224.
[110] FCA Bates No. 001224.
[111] FCA Bates No. 001225.
[112] FCA Bates No. 001226.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

101.    At about 12:00 p.m. on July 11, 2018, Dr. Wineland advised Elizabeth, "…I think you need to have a c-section today."[113] Plaintiff declined knowing she had not yet completed the window of full term gestation.

102.    Dr. Wineland spoke with Dr. Johnson by phone who then spoke with Elizabeth. Upon speaking with Dr. Johnson, Elizabeth agreed to the following: "Plan of care per Dr. Johnson is for an [ultrasound] for AFI. If less than 5cm, then assume ROM. If >5cm, pt will agree to spec exam but is undecided what she will do if rupture confirmed,…"[114]

103.    Kara Ellison, RN, noted at 11:17 a.m. on July 11, 2018, "[b]aby is confirmed Cephalic at this time."[115]

104.    Dr. Bebeau recorded the results of an antepartum non-stress test as reactive and reassuring at 3:00 p.m. and 5:00 p.m. on July 11, 2018.[116]

105.    Ryan D. Cuff, M.D. recorded he agreed with Dr. Harbin's results of an antepartum non-stress test as reactive and reassuring at 7:04 a.m. on July 12, 2018.[117]

106.    Dr. Newman saw Elizabeth at 11:18 a.m. on July 12, 2018 and recorded the following:

> Currently 40 w 6 d. She reports that she has not bleed since yesterday am and is no longer leaking fluid. She believes that she has not experienced ROM. She reports diminished FM this am but FHR monitor shows a reactive Cat I strip…She was asked if she intended to follow thru with plan for CD tomorrow am. She declined to answer. I asked her to notify us if she decided the decline the CD tomorrow so we can open that OR slot for other patients. She says she will. Patient ordered NPO after midnight in anticipation of possible delivery.[118]

---

[113] FCA Bates No. 001229.
[114] FCA Bates No. 001225.
[115] FCA Bates No. 001226.
[116] FCA Bates No. 001227-001228.
[117] FCA Bates No. 001231-001232.
[118] FCA Bates No. 001232.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

107.     Dr. Navarro recorded the results of an antepartum non-stress test as reactive and reassuring at 2:57 p.m. on July 12, 2018.[119]

108.     Dr. Johnson recorded extensive progress notes on July 12, 2018 after a visit with Elizabeth beginning at 3:15 p.m. Dr. Johnson wrote, in part:

> I have been involved in Ms. Scannell's inpatient admission. I have talked with her probably 8-10 hours since Monday. I have also been in contact with our hospital administration. The patient came in bleeding and was scared. She did not soak a pad in 30 minutes after arrival so she refused a c/s. To me she admitted that at home she bled enough that blood got into her shoes. I had told her we call this the positive previa sign.
>
> On Monday, she wanted to wait until Friday (tomorrow) for her c/s. She will be 41 weeks at the time and there is no benefit to staying pregnant any longer and the mortality and morbidity simply goes up after 41 weeks. She agreed to the c/s if she remained stable.
>
> I have spent time trying to explain to the patient why a vaginal delivery is out of the question. She was confused as to why she did not labor at 40 weeks because she knows the minute she conceived. She told both me and Dr. Newman that this always happens on TV.
>
> I talked with her about ROM. She could not understand why we did not discuss this earlier. A conversation with her takes an hour or more. She asks questions in a circle. Usually bleeding and contractions are more common with previas. With ROM we would recommend delivery, especially since we do not know her GBS status. We could not prove she had ruptured membranes so we went back to pad counts. Last night she was trying to hide her pads from the nurses. I explained to her that if she did not cooperate with medical advice for her baby, then she may not have a chance to have input about the care of her baby. She does not think MUSC has any authority over her baby and to some extent she is right but the state certainly does and we will follow what the state recommends.
>
> Yesterday I spent time talking with her about a c/s and what to expect. I went over a spinal anesthesia and the sensations she will feel. The different things she will feel in a cs and the expected recovery. We went over her fears and I suggested that she may take ativan to help calm her. She refuses. I do not think she has taken any birthing classes because her basic understanding of labor is absent. She does not know the cervix has to fully dilate to have a baby.

---

[119] FCA Bates No. 001232-001233.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

Today I talked with her again and now she does not want a c/s tomorrow. She initially committed to a c/s at 38 weeks and canceled because she was not bleeding and her placenta had moved some. Then she promised me if she would get her c/s at 40 weeks and then she canceled that. Now she is at 41 weeks, I have told her it is detrimental to the baby to stay pregnant longer, especially since we cannot say 100% that she is not ruptured. We just can't prove it due to the bleeding. I have asked her when she would like her c/s and she does not give an answer.

The patient up to this point has made arguments that waiting is the best for the baby. While other physicians do not think she is primarily interest in the best for her baby, I felt she would be reasonable and she would come in if she bled. However, now I think her sole purpose of her decision making process is her birth experience. She truly wants a vaginal delivery even if it costs her child its life. Given she is 49 years old the chance of her getting a vaginal delivery now is almost zero given she has a previa still, may have ROM and is 41 weeks. Even when I ask her when does she want her c/s if not tomorrow, she will not answer because she does not want a c/s

I have notified administration and we will have a conference on her again at 5 today with the key team members. We will make a plan. We have consulted psych to interview the patient. She discusses things in circles and I want to make sure they think she is capable of making a decision. The pediatric team has notified DSS.[120]

109.    Brittany A. Austin, M.D. asked David Robert Beckert, M.D., to perform a psychiatric consult to evaluate Elizabeth's competence at 1:47 p.m. on July 12, 2018.[121] It is not clear whether Dr. Austin coordinated with the doctors providing Elizabeth's care about this. Elizabeth was not aware that a psychiatric consult had been requested.

110.    Dr. Beckert met with Elizabeth at 4:35 p.m. that same day and documented the results at 4:49 p.m.[122] Dr. Backert wrote:

I was asked to consult on this patient by the primary team (Ob service) due to the complexities involved during this hospitalization at a variety of levels. When approached, the patient was lying in bed, talking on her cell phone. She asked who I was and I introduced myself. The patient

---

[120] FCA Bates No. 001233-001234
[121] FCA Bates No. 001234.
[122] FCA Bates No. 001234-001235.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

immediately became upset and defensive. She ended her phone conversation and I again introduced myself and attempted to explain my role as supportive and wishing to simply talk with her. She told me that she declines psychiatric services at this time, and that she did not ask for me to visit with her. She then asked me who wanted me to come speak with her. I told her that I (or my service in general) am often called by treatment teams including various medical and surgical services all across our hospital system to assist patients for a variety of reasons, and I attempted to reassure her when she stated "I am not crazy, but I guess my doctors are trying to say that I am. This is unbelieveable". She then politely asked me to leave her room, which I did, after once again offering to simply chat with her. During the brief encounter she did mention that "this is supposed to be such a happy time for me, but MUSC is trying to make it unhappy". She then stopped talking further and I left the room, and I reiterated to her that I would be available if she changed her mind and wished to have someone neutral and supportive to talk to.[123]

111.    Sometime in the afternoon, a meeting was held by the Medical University of South Carolina Ethics Committee along with Dr. Johnson and Dr. Michelle Irene Amaya. Upon information and belief, Dr. Johnson was ordered to place Elizabeth Scannell in Emergency Protective Custody to force her to submit to a caesarean section.

112.    On July 12, 2018 at 5:03 p.m., Kelly Finke, MSW, was ordered by Michelle Irene Amaya, M.D., Director of Level I Nursery to make "…a DSS report to Charleston DSS based on threat of harm to the unborn baby. SW will remain in contact with DSS for discharge placement plans for the baby if needed."[124]

113.    Previously, Dr. Johnson had told Dr. Amaya not to report Elizabeth until they observed the mother's interactions with the baby. Upon information and belief Dr. Amaya ignored Dr. Johnson's advice.

---

[123] FCA Bates No. 001234-001235.
[124] FCA Bates No. 001235.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

114.    At 5:38 p.m., Dr. Navarro recorded the results of an antepartum non-stress test as reactive and reassuring.[125]Elizabeth continued to feel reassured that her fetus was not in distress.

115.    That evening, Thursday, July 12, Elizabeth noticed a security guard outside her bedroom. When she went out of the room and into the hall, she overheard the security guard on his phone inquiring how to restrain a pregnant woman.[126] Elizabeth asked Nurse Richardson about her rights and whether she could check out.[127]

116.    Taiwana D. Richardson, RN, recorded that she made Dr. Newman "aware of pts questions concerning "checking out". No new orders but pt is to be made aware that it would be against medical advice."[128]

117.    Some time that evening, Elizabeth went to the nurse's station and inquired about the security. She was physically moved back into her room by the MUSC Public Safety Supervisor.

118.    Dr. Johnson met with Elizabeth at 9:27 p.m. on July 12, 2018 to inform her that she was placed in protective custody. No one from Adult Protective Services met with Elizabeth and no determination was ever made that she was at risk by reason of abuse or neglect. Dr. Johnson documented the following:

> Discussed with the patient the EPIC. She cannot leave her room and if she tries she can be restrained. She is obviously upset but I had tried to tell her she needs to follow our advice and she would not listen. She understands the issues have escalated now and she has less options. She asked me what I recommended and I still recommend a c/s in am. She now agrees to this. I told her me and Dr. Hebbar will see her at 6:15 in the morning. Literally everything is an issue with her. I explained how we would get her friend in

---

[125] FCA Bates No. 001235-001236.
[126] FCA Bates No. 001266.
[127] FCA Bates No. 001266.
[128] FCA Bates No. 001236.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

the room and she was upset that she would not be there the entire time. I have not discussed any of the newborn issues with her.[129]

119.    Stavia Gaston, RN recorded that she was called to Elizabeth's bedside by Dr. Johnson to discuss the updated plan of care at 9:30 p.m.[130] She recorded that Elizabeth appeared to be agitated. Nurse Gaston recorded:

> Dr. Johnson spent 1.5 hours at the bedside discussing the EPC and requirements of the pt. Pt did not like having to have Public Safety present. Pt wishes to be treated with respect. Pt does not see how her desire for a vaginal delivery places the baby at harm.
>
> Pt is very defensive and argumentative. Pt's POC reviewed including restraints if the situation escalates.
>
> After having her questions answered multiple times, pt has agreed to the c/s in the AM. Pt agreed to have an IV placed, labs drawn, an epidural, and medications administered.
>
> -Pt wishes for her friend Tamara to be present. Pt does not want friend to know her age or that she had IVF.
> -Pt would like to do skin to skin.
>
> Pt wishes to eat and shower. Pt informed of NPO status at midnight. Pt had no other needs at this time. Will continue to monitor.[131]

120.    Nurse Gaston supplemented her notes at 11:45 p.m. and wrote:

> PCT observed pt crying in the bathroom after shower. Pt states that she has had time to think about the c/s. Pt feels forced and is wondering about the next steps. Pt is scared of having "a major surgery". Pt stated that it seems like DSS will take her baby due to the State getting involved.
>
> Pt "vented" for an hour. Reassurances given. POC for c/s reviewed. Pt seemed overwhelmed but handled it well. Pt desires to go to the mother/baby unit once delivered. All questions answered. Pt had no other needs at this time. Will continue to monitor.[132]

121.    Nurse Gaston supplemented additional notes at 9:45 p.m. and wrote:

---

[129] FCA Bates No. 001236.
[130] FCA Bates No. 001236.
[131] FCA Bates No. 001236-001237.
[132] FCA Bates No. 001237

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

> After Dr. Johnson left the bedside, I spent 45 minutes talking to pt about her initial birth plan after going through IVF and the current changes to her POC. Pt discussed her feelings and how "it is a lot to deal with". Pt has periods of being upset and then accepting the new updated POC. Pt still agrees to the c/s. Surgical scrub given to pt. Pt instructed on how to use. Will bring dinner to pt and continue to monitor.[133]

122.    At 2:15 a.m. on July 13, 2018, Nurse Gaston noted that Elizabeth's observed emotional state was, "anxious; apprehensive; frustrated; hopeful; irritable" and Elizabeth verbalized emotional state was, "anger; anxiety; frustration; hopefulness; powerlessness".[134] Under Mood/Behavior, Nurse Gaston wrote, "anxious; uncooperative; behavior appropriate to situation".[135] Nurse Gaston also recorded that Elizabeth was not an elopement risk.[136]

123.    Nurse Gaston spoke with Elizabeth at 2:45 a.m. on July 13, 2018 and recorded the following:

> Assessment completed and all questions answered. Pt endorses positive fetal movement and occasional contractions in the form of "stomach tightening". Denies any VB, LOF, vision changes, or SOB. Pt stated that she has not had any VB for 2 days. Pt appears to be more calm. Pt able to discuss new topics such as the growing of Charleston. Pt is ready for her NST. Will continue to monitor.[137]

124.    Before proceeding to give Elizabeth the surgery, Dr. Harbin recorded the results of an antepartum non-stress test as reactive and reassuring at 6:23 a.m. on July 13, 2018.[138]

### D.  Postpartum history at MUSC.

---

[133] FCA Bates No. 001238.
[134] FCA Bates No. 001410.
[135] FCA Bates No. 001411; 001477.
[136] FCA Bates No. 001414.
[137] FCA Bates No. 001238.
[138] FCA Bates No. 001239.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

125.    A cesarean section was performed by Dr. Head and Dr. Johnson between 7:25 a.m. and 8:40 a.m. on July 13, 2018.[139] It should be noted that although MUSC took Elizabeth into protective custody, the procedure was not determined to be emergent and was done with Elizabeth's consent.[140]

126.    Elizabeth was fully expecting to hold and care for her newborn immediately after birth and pursuant to her request for immediate skin-to-skin contact and initiation of breastfeeding. She was conscious following the procedure. Her baby was healthy upon delivery.

127.    Cynthia Bradford, a SCDSS caseworker, arrived at MUSC Children's hospital on July 13, 2018 and met with Kelly Finke, MSW to discuss the placement of the baby in emergency protective custody. Cynthia Bradford recorded the following conversation:

> Kelly Finke informed CW Ms. Scannell was refusing to have a C-section since she was diagnosed with Placenta Privea at l8 weeks gestation. Ms. Finke informed CW not having a C-section is contrary to the doctor's opinion in order to lower the chances of the infant dying. According to Ms. Finke this diagnosis in combination with Ms. Scannell's age (49) increased the risk of infant death the longer the baby stayed in Ms. Scannell's womb. Ms. Finke told CW she and the Pediatrician Dr. Amaya summarized notes from Ms. Scannell's doctor visits and summarized their concerns and sent them to Supervisor Telly Palm who can forward them to CW. Ms. Finke informed CW Baby Girl Scannell will be ready to discharge by tomorrow 7/14/18 at 5:00pm at the earliest, but Ms. Scannell will probably stay in the hospital until Monday 7/16/18 because her condition is worse than expected and is expected to need a hysterectomy. Ms. Finke told CW that if the child is released to Ms. Scannell, the baby will be placed in danger due to Ms. Scannell's decision making process prior to having the baby. Ms. Finke informed CW Ms. Scannell's bleeding was so bad last night to the point where Ms. Scannell's OBGYN, Doctor Johnson, was covered in blood from her hips down into her shoes. Doctor Johnson stated Ms. Scannell needed the C-section but Ms. Scannell was not accepting this request and that is why Ms. Scannell was placed in

---

[139] FCA Bates No. 001240-001242.
[140] FCA Bates No. 001758.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

EPC. In the room Ms. Finke, CW and Officer Shoem were in, CW got to sec Baby Girl Scannell. Doctors stated Baby Girl Scannell is in good health and no health concerns arc present at this time.

CW and Ms. Finke were informed that Ms. Scannell is awake and speaking. Officer Shoem and CW walked into Ms. Scannell's room and Officer Shoem informed Ms. Scannell that her child was placed in EPC and Ms. Scannell was crying and did not understand why. CW introduced herself and asked if we could speak about what is happening. CW informed Ms. Scannell is information is confidential and CW can speak to Ms. Scannell alone, but Ms. Scannell requested for people to stay and it was fine for CW to speak about the report. Two nurses, Ms. Finke, Baby Girl Scannell's pediatrician Dr. Amaya and Ms. Scannell's friend Tamara Neal were present. CW read through half of the allegations and Ms. Scannell became hysterical, crying and unable to speak. Dr, Amaya attempted to explain what was happening and MUSC's position for their reasoning to EPC. Ms. Scannell was still crying and hysterical. CW stepped out of the room to give Ms. Scannell time to calm down and Ms. Scannell wanted to call Dr. Johnson and attempted to call Dr. Johnson on her personal cell phone.

CW stepped back into the room with Dr. Johnson. CW asked for permission to speak of the allegations in front of Dr. Johnson and CW received permission from Ms. Scannell. CW read the rest of the allegations to Ms. Scannell. Ms. Scannell was still crying and asking Dr. Johnson what was happening. For about 30 minutes Dr. Johnson was describing to CW the events that led to the EPC and talking about each allegation.

Ms. Scannell stated she was unaware she was placed in EPC, and Dr. Johnson confirmed she did not fully tell Ms. Scannell that she was placed in EPC but informed Ms. Scannell that Dr. Johnson became worried when Ms. Scannell told Dr. Johnson she wanted to check out of the hospital last night after the bleeding episode, Ms. Scannell stated she was not serious about leaving, that Ms. Scannell was just asking out of curiosity. Dr. Johnson informed CW on Wednesday, 7/11/18 at 4:00 am Ms. Scannell's water broke, but Doctors were unsure if she had ruptured and doctors could not confirm with 100% certainty but Ms. Scannell still refused a C-Section. Dr. Johnson described the bleeding episode that occurred last night (already discussed with Ms. Finke).

CW asked about the domestic violence incident and asked Ms. Scannell why she had refused treatment, according to CW's report Ms. Scannell stated she did not refuse treatment; she stayed at the hospital for about hours. CW asked Dr. Johnson if that was true, and Dr. Johnson stated "yes."

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

CW asked about mental health diagnosis, depression and personality disorder with cluster b symptoms along with the suicidal ideations, Ms. Scannell denied having these diagnosis and these issues happened many years ago. CW report states 2008. Dr. Johnson told CW she does not know why that is on there, Ms. Finke stated when someone makes a report to DSS, intake will ask for that kind of history.

Dr. Johnson continued to talk with Ms. Scannell about what MUSC's grounds were for the EPC and what doctors were concerned about prior to the birth of Baby Girl Scannell. Dr. Johnson discussed Ms. Scannell's continued refusal to have a C-section forced Dr. Johnson to create a secondary care plan to help Ms. Scannell identify when it is the right time to have a C-Section and for MUSC to have a plan for when a C-section can be done. CW stepped out of Ms. Scannell's room and spoke to Supervisor Telly Palm over the telephone. Confirmed DSS is asking for the child to have supervised contact at this time. Hospital requested a confidential form to be signed by CW so family could not locate Baby Girl Scannell. A security officer informed medical staff that Ms. Scannell's friend, Ms. Tamara, was asking hospital staff where the nursery wings are in the hospital and was on the phone speaking to someone and that security officer heard Ms. Tamara state "we're going to get out of here" then started to speak in another language. CW signed confidential form.

Ms. Scannell refused to sign the notice of EPC and MUSC release of medical information, CW left brochure and booklet with CW's contact information. The hard copy of the EPC notice was left with Ms. Scannell and a copy was made for CW.

128.    Afterwards, MUSC placed a sitter in her room at 7:00 because of its

decision to place Elizabeth in protective custody and its claims of a risk of elopement.[141]

129.    At 9:37 a.m. on July 13, 2018, Kelly Finke, MSW, noted the following:

SW was paged to come to Level 1 Nursery. SW arrived to the nursery and found Public Safety, Security, pt's nurse, and SE Manager, Katy Decker, present. Per Public Safety, Officer Brett Schoem, Public Safety took custody of pt last night and has now taken custody of the baby as of time of birth this AM. Officer Schoem asked that DSS be called so they can respond. SW contacted Telly Palm at Charleston DSS and requested DSS presence for an EPC. Per Ms. Palm, she is sending Cynthia Bradford, 843-953-8479 (office) to MUSC immediately. Per Public Safety Officer Brett Schoem and Lt. Layne Thompson, since they have EPC'd the baby and

---

[141] FCA Bates No. 001723-001743.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

placed the baby in the custody of the state, they have authorized the MUSC PEDS medical team to provide the appropriate medical care for the baby without pt's permission, to include Vitamin K, Azithromycin, and Hep B vaccine. Public Safety Lt. Lane Thompson then asked SW to speak with Donna Cunningham, APS with Charleston DSS, who he had on the phone. SW spoke with Ms. Cunningham and explained the situation. Ms. Cunningham stated since Public Safety EPC'd pt, she will begin to prepare court paperwork for the mandatory 72 hour hearing and DSS will probably have a court hearing on Monday for the EPC of pt. SW will remain in contact with DSS and for discharge placement plans for the baby as needed.[142]

130.     Laura Herman, RN, noted at 10:28 a.m. on July 13, 2018 that Elizabeth declined medications after surgery.[143] Elizabeth did not want to pass her medications on to her daughter through her breastmilk. Nurse Herman also documented that Elizabeth made "multiple requests to see her baby…" and patient "…has threatened to get up [out of bed] if her baby is not brought to her. Elizabeth was not supposed to walk unassisted at this time.

131.     Dr. Head noted at 2:05 p.m. that Elizabeth complained of "…significant pain that she feels is like cramping contractions. Very tearful."[144] Dr. Head also noted that it was unknown if the newborn was breastfeeding.[145] Dr. Head recorded under impression:

POD0 s/p LTCD due to placenta previa with focal placenta accreta and postpartum hemorrhage s/p 5 u PRBC and 5 u FFP. Patient strongly desires to retain her fertility and the area of accrete was oversewn and a Bakri balloon was placed. Approximately 300 cc blood from Bakri since delivery.

US concerning for ongoing postpartum hemorrhage with the uterine fundus at the level of the diaphragm and an endometrial stripe of 9 cm.

---

[142] FCA Bates No. 001239-001240.
[143] FCA Bates No. 001240.
[144] FCA Bates No. 001242.
[145] FCA Bates No. 001242.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

> Options include attempt at uterine artery embolization in Interventional Radiology which may decrease the uterine perfusion or definitive therapy with hysterectomy. CBC, coagulation studies performed. Patient clinically stable at this time. Will discuss with patient further.[146]

132.    At 3:12 p.m. on July 13, 2018 Robert W. Grammer, M.D., wrote, Elizabeth "underwent a c-section this am secondary to placenta previa with focal accreta requiring 5u PRBC's and 5u FFp. VIR consulted for possible embolization."[147] Dr. Grammer added, "The patient will be scheduled today, 7/13/2018, time to be determined, for Fluoroscopic Guided embolization with Moderate Sedation. Consent obtained, labs reviewed, anticoagulation held, patient is NPO."[148]

133.    Dr. Head noted that Elizabeth did not want a hysterectomy.[149]

134.    Dr. Johnson documented the following progress notes on July 13, 2018 at 4:01 p.m.:

> I have been been involved in her care since 0615 this morning.Drs. Head, Hebbar and I went in her room this morning to get her ready for the c/s. She willing came to the c/s room without any difficulty. Drs. Head and I did her surgery with the assistance of Dr. Earhart. Her placenta was very difficult to remove and in fact we could not remove it all. We then oversewed the back of her uterus in the area of the placental bed. The bleeding decreased and with pressure it would stop. So we put in a bakri balloon. I talked with her during the cs that we may have to do a hysterectomy. And she said she came here with a uterus and she was leaving with one. Although she is perimenopausal age, she does have 2 more embryos in Mexico. So I could see why she would want to try to save her uterus. So we did this to try to see if we could stop the bleeding. She received 5 units of prbcs and 5 units of FFP and was sent to the PACU. She was stable until about 2 this pm when her fundal height was increased. Dr. Head looked at her uterus and it is filled with blood. The patient was told that the hysterectomy is the definitive treatment and is the safest course for her. But she would like to try to save her uterus. So we called IR and she consented to uterine artery embolization. I strongly suspect she will need a hysterectomy in the next 24 hours after the

---

[146] FCA Bates No. 001243-001244, 001251-001252.
[147] FCA Bates No. 001248.
[148] FCA Bates No. 001248.
[149] FCA Bates No. 001249.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

embolization. She knows she is likely to end up in the ICU and she has 49 year old blood vessels. She has already lost about 50 to 60% of her blood volume and continued ongoing blood loss will make her risk of morbidity and mortality higher.[150]

135.    Megan Welch, RN, noted at 7:30 p.m. Elizabeth's observed emotional state as "agitated; anxious; calm"; her verbalized emotional state as "frustration; powerlessness"; and her mood/behavior as "anxious/calm".[151] Nurse Welch also marked Elizabeth as an elopement risk noting the following factors: "Court appointed guard; Danger self/others; legally committed; lack cognitive decision-making; physical/mental impairments that increase risk of harm to self or others".[152]

136.    Dr. Johnson documented discussions with MUSC legal and administrative officials on July 13, 2018 at 7:58 p.m. Dr. Johnson wrote:

> Ms. Scanell is still under an EPC and has a case pending in adult protective service. So all of her medical decisions now can be made by the medical team.
>
> She went to IR because she still had bleeding. Her uterus enlarged from her umbilicus to her xyphoid over about 30 minutes. While we told her that a hysterectomy was the best treatment and the definitive treatment, she can have IR. It may delay a hysterectomy/increased her blood loss as well as her risk of going to the ICU, needing more blood products, and having more complications and mortality. She strongly desires her uterus. And wants us to everything to save it.
>
> She went to IR and I have reviewed the films with Dr. Grammar. She has a large blush compatible with retained placenta/placental bed on the right side in the area the placenta was most adherent. In this area there are also surgical clips. We did not use any clips today. I strongly suspect she has had a prior uterine surgery to remove a fibroid and clips were used in the bed to control bleeding. Prior to surgery she told us her only surgery was an appendectomy. They embolized her and the blush went away. The question is will it last?

---

[150] FCA Bates No. 001251.
[151] FCA Bates No. 001423-001424; 001495.
[152] FCA Bates No. 001426-001427.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

> So when she returned to the floor I started talking with her about the clinical parameters we would use to determine if she is still bleeding. Clinical parameters that we plan to use are to determine if she is still bleeding:
>
> 1. Pulse> 120. Her current pulse is 65
> 2. BP 90/50 currently 120/70 when she came back
> 3. Respiratory embarrassment from an enlarging uterus.
> 4. Falling hemoglobin
> 5. Oliguria
>
> If she is still bleeding, then our only option left is a hysterectomy. She told me she will not consent. So I explained to her that she is in adult protective services and we have to make her medical decisions if her decisions are not medical sound.[153]

137.    Nurse Welch observed the conversation with Dr. Johnson and Elizabeth and wrote,

> Pt is alert and orientated Pt still refuses hysterectomy. DR Johnson explaining that she is in adult protective custody. Pt then becomes very angry and frustrated. Pt agreeable to have labs, vitals, bleeding monitored, states she will not agree to hysterectomy unless she feels there is a change in her vitals, labs, and/or bleeding.[154]

138.    Having just given birth Elizabeth was physiologically compelled and anxious to hold and care for her newborn. No one told her when or how she would get to do this, when or how the emergency protective custody would be lifted. Elizabeth endured grievous mental and emotional suffering then, and over the next few months.

139.    Elizabeth asked Nurse Welch for Ativan to help her sleep, with Nurse Welch documenting, "…states she knows she will need something as she is sure she will be overwhelmed emotionally and have difficulty falling asleep when her friends at the bedside leave for the night."[155]

---

[153] FCA Bates No. 001252-001253.
[154] FCA Bates No. 001253.
[155] FCA Bates No. 001254.

140.    Nurse Welch observed Elizabeth's anguish at 12:14 a.m. and documented the following:

> Pt is very tearful after friends left. States her doesn't know what she will do without her baby. She states she cant stand the thought of not having her infant with her and how long the process will be to try to get her back. Emotional support and reassurance provided. Hospital sitter at bedside. Dr wagoner notified and aware.[156]

141.    On July 14, 2018 at 12:15 a.m., Nurse Welch reported Elizabeth's observed emotional state as "anxious, frustrated; grieving; hopeless; tearful/crying" and her verbalized emotional state as "hopelessness; powerlessness".[157] Nurse Welch later observed Elizabeth to be withdrawn at 1:00 a.m.[158]

142.    Nurse Welch offered Elizabeth pain medication at 1:21 a.m. on July 14, 2018 and Elizabeth refused for three reasons, (1) she was breastfeeding, (2) she wanted to remain alert because MUSC had violated her trust, and (3) Elizabeth wanted to be coherent when she spoke with her attorney.[159]

143.    Elizabeth appeared distraught at 1:11 a.m. on July 14, 2018. Nurse Welch wrote, "Pt moved to room from PACU, this RN asking pt if she has thought of harming herself. Pt states no that she just feels overwhelmed when she doesn't have her support people with her."[160]

144.    By 8:00 a.m. on July 14, 2018 Laura Herman, RN, noted that Elizabeth's mood/behavior was "anxious; sad".[161]

---

[156] FCA Bates No. 001254.
[157] FCA Bates No. 001428-
[158] FCA Bates No. 001248.
[159] FCA Bates No. 001254.
[160] FCA Bates No. 001253.
[161] FCA Bates No. 001429; 001503.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

145.    Dr. Johnson noted that Elizabeth was, "working on breast pumping to give milk for her baby," on July 14, 2018 at 9:59 a.m.[162]

146.    Nurse Herman noted at 11:20 a.m. on July 14, 2018:

> Breast pumping was initiated and the colostrum was hand delivered to the nurse caring for the baby and was able to inform patient about the baby's well-being. Pt continues to voice that she only wants the baby to receive her milk. Explained that I was not caring for the infant, but that this RN had let the RN caring for her baby her wishes.[163]

147.    At this point more than 36 hours of critical physiologic bonding time elapsed without Elizabeth or her newborn having any physical contact. Elizabeth continued to endure grievous mental and emotional suffering.

148.    On July 14, 2018 at 8:00 p.m., Kaitlyn Marie Mitchell, RN documented the Elizabeth's observed emotional state was, "sad; hopeful; anxious; apprehensive; withdrawn"; her verbalized emotional state was, "hopefulness; sadness"; and her mood/behavior was, "anxious; labile; sad; withdrawn".[164] Under interactions, Nurse Mitchell recorded, "mistrustful; suspicious; cooperative; eye contact appropriate".[165] Nurse Mitchell classified Elizabeth as an elopement risk and marked the following categories, "Court appointed guard; Danger self/others; Legally committed; Lack cognitive decision making; Physical/mental impairments that increase risk of harm to self and others".[166]

149.    Nurse Mitchell noted at 11:07 p.m. on July 14, 2018, "Pt complaining of pain with ambulation but still refusing pain medications at this time."[167]

---

[162] FCA Bates No. 001262.
[163] FCA Bates No. 001256-001257.
[164] FCA Bates No. 001434-001435; 001508.
[165] FCA Bates No. 001435.
[166] FCA Bates No. 001440.
[167] FCA Bates No. 001259.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

150.    Nearing 48 hours after giving birth, Elizabeth asked Nurse Mitchell about her protective custody status and paperwork at 12:10 a.m. on July 15, 2018 and the nurse was unable to provide any information or paperwork.[168]

151.    Elizabeth took some medication for pain at 2:17 a.m. on July 15, 2018.[169]

152.    It was now two days since her baby was born, on July 15, 2018 at 10:00 a.m., Paulina Solis, RN, noted Elizabeth's observed emotional state was, "calm; sad" and her mood/behavior was, "anxious; sad".[170] Nurse Solis also noted Elizabeth's interactions as, "mistrustful; uncooperative; demanding".[171] Nurse Mitchell classified Elizabeth as an elopement risk and marked the following categories, "Court appointed guard; Danger self/others; Legally committed; Lack cognitive decision making; Physical/mental impairments that increase risk of harm to self and others".[172]

153.    Elizabeth and her baby were both clinically stable, and were both physically capable and needing physical bonding time together. Elizabeth continued to endure grievous mental and emotional suffering.

154.    Nurse Solis noted that Elizabeth was able to pump 11 cc of breast milk for her daughter at 1:56 p.m. on July 15, 2018. Nurse Solis documented that the milk was taken to the nursery freezer.[173]

155.    Dr. Johnson recorded in her progress notes on July 15, 2018 at 6:33 p.m. the following:

> I saw Ms. Scannell tonight. I reviewed her care. Dr. Head will see her. I will need another CBC probably Tuesday am. I anticipate discharge

---

[168] FCA Bates No. 001260.
[169] FCA Bates No. 001260.
[170] FCA Bates No. 001434-001435; 001511.
[171] FCA Bates No. 001435.
[172] FCA Bates No. 001440.
[173] FCA Bates No. 001261.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

Wednesday or Thursday if she remains stable with no bleeding. I have talked with her about her clinical course. Currently she is doing fine. Two things would cause us to need to do a hysterectomy: infection or more significant bleeding. She may go home and have to return. I asked her to return to MUSC because we know her case. Also I explained to her she is at risk for sepsis.

I do not feel she is medically stable enough to go to the hearing tomorrow. I will send a letter for her.

I will talk with her during the week.

Addendum:
I talked with George G. Her lawyer and Ms. Scannell for about an hour. I am again happy to write her a letter and get it notarized because I do not feel I can let her go to the hearing without medical supervision. Ms. Scannell understands this. I again reviewed with her lawyer, I have no concerns about her taking care of herself or the baby. She has pumped her breast a lot because she feels breast milk is best for her baby. She has also not taken pain medication because she does not want narcotics in her breast milk. So I believe I can send her home and if she gets the baby or sees the baby she will not harm the baby and will take care of the baby. I again reviewed her medical decision making. This is our area of concern. She is intelligent and reads a lot but she cannot believe all she hears and must put it in medical context. She also needs to listen to the doctor. We do not make recommendations that we do not feel are the standard of care. If she does not believe one physician or is concerned about the advice, she is entitled to a second opinion. But if the second doctor says the same as the first she should follow medical advice.[174]

156.    On July 15, 2018 at 8:07 p.m. Jenna Jones MacLennan, M.D. issued an order for a psychiatric consult for Elizabeth.[175]

157.    At 11:00 p.m. on July 15, 2018, Margaret G. Darr, RN noted Elizabeth's mood/behavior as "sad; tearful".[176]

158.    At 9:59 a.m. on July 16, 2018, more than seventy-two hours after giving birth, Dr. Head noted Elizabeth's request for a lactation consultant.[177]

---

[174] FCA Bates No. 001263.
[175] FCA Bates No. 001798-001799.
[176] FCA Bates No. 001442; 001511.
[177] FCA Bates No. 001263-001265

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

159.    Both the South Carolina Department of Social Services and Dr. Johnson made a referral to Constance Guille, M.D., for a psychiatric evaluation at 9:40 a.m. on July 16, 2018. Dr. Guille documented the following:

> Elizabeth DeAnna Scannell is a 49 y.o. female who is currently on labor and delivery following a c/s 7/13 which was complicated by placenta accreta. DSS became involved in her case due to concerns that she may be a potential harm to her child because she was not following recommendations to have a c/s and as a result increasing the risk of harm to this child.
>
> Patient reports she was in her usual state of health until 7/6 when she experienced vaginal bleeding and consistent with her treatment agreement with Dr. Johnson she presented to MUSC and was admitted for inpatient monitoring. She states that she wanted to have her pregnancy go to at least 40 weeks because her understanding was that this was best for the baby's developing brain and felt that the risk of remaining pregnant was less than the risks of a c/s/delivery for her baby. Her bleeding had decreased, again reassuring her that her baby was not at risk of harm and baby continued to be monitored and findings were reassuring. During her hx on -7/11-12, there was inconclusive evidence of her water breaking so again she was reassured that the baby was not being harmed in anyway by continuing this pregnancy. On Thursday 7/12 patient reports seeing a security guard outside her bedroom and when she went out in the hall states she overhead him on his phone asking about restraining a pregnant woman- pt states she was frightened and wanted to know what her rights were and if she was able to leave the hospital. She stayed at the hospital with the plan to have a c/s on Friday when Dr. Head returned. She states that she delayed her c/s until Dr. Head's return because it was important to her to have Dr. Head, the Ob that she had worked most closely with throughout her pregnancy, do the c/s 7/13 given that she was not bleeding, her water had not broken and monitoring of baby had been reassuring.
>
> When explaining to the patient why DSS had been called, she stated that she would of had the c/s immediately if she had thought that she was putting the baby in harms way. She understood that Dr. Johnson and Dr. Head and others had explained to her the risks of continuing the pregnancy many times and not having a c/s, and she did consider these risk factors, but she felt reassured by all that she had read and what other mothers have told her about pregnancy and L&D. She was able to consider what the physicians recommendations were, as well as contemplate what she has read and understands about pregnancy, and ultimately felt that her decision to continue this pregnancy was in the best interest of the child and in line with her beliefs.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

The patient states that she would do anything to protect her child and would never harm her in anyway. She has no intent, desire or plan to harm herself or newborn in any way- and never has. She has wanted to be a mother her whole life and has gone to great lengths to make this happen. She is appropriately distressed by the separation of her and her newborn. She lives alone but is very active in her church and has a number of supports and friends through this community. Her community/friends have already made a schedule for being at home with her to help caring for the child if she had/has a c/s and have created a 'meal train' for her. Partner is not involved and his role has been consistent with a 'sperm donor.'

She denies current symptoms consistent with a depressive or hypomanic episode. She denies symptoms consistent with anxiety disorder, including panic disorder, GAD or OCD. She views the separation from her daughter as a traumatic experience. She has one prior trauma in her 20's (sexual assault) but denies symptoms consistent with PTSD. She denies symptoms consistent with AH/VH, or suicidal ideation.

**Past Psychiatric History:**
Previous psychiatric hospitalizations: 2008 at MUSC: depression in the context of multiple stressors. She did not have a suicide attempt. She may of had thoughts of harming herself, but never attempted suicide, or had a plan, intent or desire to end her life.
Previous suicide attempts: None
Previous episodes of self-harm: None
History of violence: None
Previous psychiatric treatment including therapy, medication trials and effect: In 2008 experienced a depressive episode in the context of many stressors. Was on an antidepressant for 2-3 years and engaged in counseling. She states that the antidepressant was not helpful and her symptoms and life improved after stopping this medication. Counseling was beneficial
Previous diagnoses: Depression

**Substance Abuse History:**
Illicit or prescription drug use/abuse: None
Use of alcohol: None
Tobacco use: None
Legal consequences of chemical use: None
Medical consequences of chemical use: None
History of complicated withdrawal: None

160.    Under "Mental Status Evaluation", Dr. Guille wrote:

Appearance: no acute distress, appears well nourished and well-developed

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

Musculoskeletal: normal gait and station
Behavior: appropriate, cooperative
Speech: normal rate, volume and prosody
Motor: no PMR or PMA no tremor
Mood: ' I'm okay'
Affect: Full range
Thought Process: Linear, logical, appropriate throughout entire interview
Thought Content: No evidence of hallucinations, delusions, suicidal or
homicidal ideation, or obsessions
Perceptions: no abnormal perceptions
Memory: intact to recent and remote events
Attention and Concentration: attends and follows interview
Orientation: to person, place, time and person.
Memory: recent and remote memory intact.
Language: fluent, appropriate
Fund of Knowledge: Average
Insight: fair
Judgment: fair

161.    Under "Assessment – Diagnosis – Plan", Dr. Guille wrote:

Elizabeth DeAnna Scannell is a 49 y.o. female with a remote history of a
depressive episode treated with therapy and medication with a good
response and no other psychiatric illness. She carries a diagnosis of
'Cluster B' likely referring to Borderline Personality Disorder. While it is
not accurate to diagnosis a personality disorder based on an initial
meeting, if she does have Borderline Personality Disorder this would not
impair her ability to safely care for her child. Further her history of
depression also does not impact her ability to care for her child. Her
history and presentation is consistent with someone whose past
experiences have led to a mistrust of the medical system and a cognitive
structure that is inflexible, however, she is aware that her
experiences/beliefs/behaviors have resulted in others concerns that she
could potentially harm her child, and understands her need to be
cognitively more flexible and work with medicine more collaboratively,
especially around newborn care including well-baby visits etc.
**Diagnosis: Remote History of Major Depression in full remission; Rio
Borderline Personality Disorder**
**Plan:**
1) H/o Major Depression: Past history of depression increases the risk of
postpartum depression. Patient to be provided with information about PPD
and her individual risk as well as resources for treatment. Please refer to
psych women's services walk in clinic 1-2 weeks after discharge to check
in and monitor of signs/symptoms of postpartum depression/anxiety etc.
Walk in Clinic now Mondays and Wednesdays at 8:30am-10:30am.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

2) Maternal-Infant Separation: Please refer to psych women's services walk in clinic to get therapy started in attempt to prevent PTSD like symptoms.

3) Newborn Care: would recommend immediate reunion of mom and baby to foster bonding and breastfeeding while in hospital. Once DSS valuation is complete recommend return of custody with above plan of care as well as patient bringing identified friend to all pediatrician visits.

162.    On July 16, 2018 at 11:00 a.m. Nurse Bethea documented that Elizabeth's observed emotional state was, "accepting; calm; cooperative" and her verbalized emotional state was, "acceptance".[178] Although Nurse Bethea marked most of the elopement factors as no, under "Lack of cognitive decision making", she wrote, "Yes per court decision deemed legally incompetent…"[179]

163.    Herman Harris, a Chaplin at MUSC noted at 11:46 a.m. that a SCDSS caseworker was in Elizabeth's room.[180]

164.    On July 16, 2018 at 12:25 p.m. Kathryn Bethea, RN noted that a SCDSS caseworker was in Elizabeth's room speaking with her.[181]

165.    Kelly Finke, MSW documented on July 16, 2018 at 2:13 p.m. that she "received a consult for "depression screening". Pt had a Psych consult ordered and completed as well. SW will defer to the Psych Consult as depression was addressed in the consult."[182]

166.    At 2:00 p.m. on July 16, 2020 a probable cause hearing was held at the Charleston County Family Court. Elizabeth remained in the hospital and was represented by counsel. SCDSS stated that it wished to "relinquish custody [of Elizabeth Scannell]

---

[178] FCA Bates No. 001443.
[179] FCA Bates No. 001448.
[180] FCA Bates No. 001269-001270.
[181] FCA Bates No. 001270.
[182] FCA Bates No. 001271.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

and would like to dismiss the adult protective services case." SCDSS recommended,

"return of custody of the infant to Ms. Scannell. However, in that case, DSS is asking to

keep the case open for an investigation phase."

167.    Vivian Fairbairn, an attorney for MUSC attended the hearing. Ms.

Fairbairn informed the Family Court:

> our concern was given her condition before the c-section, it had been
> recommended that the fear was if she went into delivery -- started to
> deliver, we had a four minute window to be able to perform the procedure
> to save her life. We went ahead and got the emergency protective custody
> to be able to save both, but in the interim before we shared that
> information with her, she consented to the c-section on her own.

168.    At the hearing, Caseworker Cynthia Bradford learned from the SCDSS

attorney the following:

> Ms. Scannell took a Psychiatric exam this morning and nothing was
> flagged and MUSC attorney is here to state that MUSC believes Baby Girl
> Scannell needs to be returned to Ms. Scannell and that would be in
> everyone's best interest.

169.    The Family Court Judge ruled from bench and ordered the return of

newborn child to her mother's custody, approximately seventy-eight hours after the baby

was born, and dismissed the Adult Protective Services case against Elizabeth. The filed

interim custody order and the filed Probable Cause order both return the child to

Elizabeth's custody without any limitations except that she "should cooperate fully with

SCDSS investigation, to include signing all necessary releases." Elizabeth continued to

endure grievous mental and emotional suffering.

170.    SCDSS continued the unlawful seizure and kept the baby in foster care

overnight. Despite the Family Court's orders, SCDSS insisted in violation of her rights

that Elizabeth have another adult supervise her around her child.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

171.    After the hearing, at 3:00 p.m. on July 16, 2018 Nurse Bethea changed the elopement risk for "Lack of cognitive decision making" to "No per court ordered pc deemed competent for self and baby".[183] No changes in Elizabeth's cognitive decision making was recorded.

172.    Kelly Finke, MSW received a telephone call from Donna Cunningham, an adult protective services caseworker at SCDSS, on July 16, 2018 at 3:41 p.m. and documented the following:

> Donna Cunningham, APS worker, who stated she is currently still at court for pt and the baby, but the judge has ordered that pt's rights be returned to her and ordered that physical and legal custody of the baby be returned to pt as well. SW verified this with pt's CPS worker, Cindy Bradford. SW informed the medical team of the above information. SW will remain available as needed.[184]

173.    Teresa Del Prince, RN received the report regarding the restoration of Elizabeth's individual rights and her parental rights at 3:41 p.m. and wrote that she "[w]ill speak with charge about plan and have a witness for all encounters with patient before taking her to AP."[185] At 7:22 p.m., Nurse Del Prince noted:

> I entered room with Jessica Simmons RN and wheel chair to take patient to antepartum. Patient requests 10 more minutes to say good bye to her lawyer.
>
> I spoke with Kathi Teske RN regarding her care. We will not be doing a patient assessment as to not irritate her; additionally, she will have one done when she gets to antepartum shortly.[186]

174.    It should be noted that MUSC did not initiate any mental health care plans until July 16, 2018, four days after it claimed Elizabeth was incompetent.[187] These

---

[183] FCA Bates No. 001448.
[184] FCA Bates No. 001271.
[185] FCA Bates No. 001271.
[186] FCA Bates No. 001271
[187] FCA Bates No. 001881-001895.

include issues with anxiety,[188] attachment,[189] breastfeeding,[190] positive maternal experience (seriously),[191] depression,[192] and thought process alteration.[193]

175.    Despite the Family Court returning Elizabeth's parental rights, and before any further investigation, SCDSS negligently insisted that she enter into a safety plan and have another adult supervise her with her own child.

176.    SCDSS informed Elizabeth that it would not return her child and it would not let Elizabeth be discharged from the hospital if she did not sign a safety plan.

177.    More than four days after giving birth, and still without her newborn, on July 17, 2018 SCDSS, Cynthia Bradford, and Mosetta Clark forced Elizabeth to sign a safety plan and move into her friend's home instead of returning to her own home. They told Elizabeth that the Court ordered her to have a supervisor. Fearful of never being able to care for her baby, Elizabeth signed the safety plan and succumbed to their demands that she be supervised with her child. Cynthia Bradford, Mosetta Clark, and SCDSS required these supervisors to undergo criminal background checks and supervise Elizabeth 24-hours a day.

178.    Dr. Chang met with Elizabeth on July 17, 2018 at 11:22 a.m. Dr. Chang noted, "Yesterday, the court determination was that she is capable of caring for herself and her baby. She is waiting to receive the baby from the Foster parents. She has not required narcotics…DSS has planned re-evaluation after discharge. Appreciate Social Work's help/involvement."[194]

---

[188] FCA Bates No. 001881.
[189] FCA Bates No. 001882.
[190] FCA Bates No. 001883.
[191] FCA Bates No. 001884.
[192] FCA Bates No. 001892.
[193] FCA Bates No. 001894-001895.
[194] FCA Bates No. 001281-001282

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

179.    Elizabeth was discharged from MUSC by Dr. Chang at 12:22 p.m. on July

17, 2018.[195] Dr. Chang noted the following in his discharge notes:

> Pt was admitted with a diagnosis of marginal previa. Delivery was
> recommended and she continued to refuse. Plan was made to proceed with
> Lap counts and fetal testing. She agreed to a plan of care outlined by
> MFM with respect to her bleeding/fetal monitoring. She was monitored on
> the Antepartum unit Pt requested induction but this was not done because
> of her placenta previa.
>
> Despite multiple attempts due to her bleeding and previa, she continued to
> refuse definitive treatment with C/S. Psychiatry was consulted to evaluate
> the patient. The patient refused to talk to the Psychiatry team, see their
> note for details.
>
> The patient finally agreed to a planned C/S on 7/13.
> …
> With respect to her psychosocial situation, she was granted custody of her
> child and was found to be competent to make her own medical decisions
> on 7/16/18. Social work and DSS are involved and aware of the situation
> and we were cleared to discharge her. She will be seen in our office in one
> week and will follow-up with psychiatry as well.[196]

180.    Lucile D. Eidson, RN noted her observations of Elizabeth in her

antepartum room at 1:00 p.m. on July 17, 2018, over one hundred hours after birth,

"Baby returned to mom from DSS, lactation called to assist mom."[197]

181.    At 4:00 p.m. on July 17, 2018, Lucile D. Eidson documented Elizabeth's

observed emotional state as, "anxious; apprehensive; cooperative" and her

mood/behavior as "anxious".[198]

182.    On July 17, 2018 Elizabeth left the hospital with her baby and entered

twenty-four hour a day supervision at her own home. Because she was forced to have 24-

hour a day supervision by SCDSS, she relied on friends and church members, over ten

---

[195] FCA Bates No. 001278-001281.
[196] FCA Bates No. 001278-001281.
[197] FCA Bates No. 001286.
[198] FCA Bates No. 001451-001452; 001516.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

different women, to come to her home and spend the night. When no one was available, she had to pay someone to stay with her. SCDSS required each supervisor to provide their personal information, undergo criminal background checks, and child protective services background checks.

183.    After spending over $500.00 for supervision, Elizabeth realized she could not afford this situation and she moved into the home of Henry and Susan Brown.

184.    On July 30, 2018 Cynthia Bradford learned that Elizabeth had seen psychiatrist Connie Guille, M.D., for an assessment. SCDSS learned Dr. Guille determined Elizabeth was mentally fit to take care of the baby. Dr. Johnson informed Cynthia Bradford, "I am comfortable to tell you she is not depressed." Dr. Johnson also told Cynthia Bradford, "70% of people who take babies home are more incapable than Elizabeth." Dr. Johnson also informed Cynthia Bradford:

> the Ethics committee told us we need to C-section this lady against her will. We are taught not to do that. There is a law in South Carolina if you don't protect viable unborn child that you can be prosecuted, so I created that plan for her so the faculty and Ms. Scannell would feel comfortable because I wasn't always available to let them know when she would be willing to do a C-section so we didn't feel like she had to do anything against her will. I am the chair of this department, I managed this because there was so much controversy among my faculty.

> …the issue was the pediatrician was overzealous. First of all, pediatricians think much differently than obstetricians do. The pediatrician (Dr. Amaya) never met the woman. Elizabeth is competent. Dr. Amaya was upset because the lady didn't get a C-section. We have to be careful as healthcare providers to make sure we don't put our values onto others. Every time she (Ms. Scannell) bled, she came to the hospital. Elizabeth did what she said she would do. l was disappointed on Thursday (7/ I 2/ 18) when Elizabeth said she didn't want the C-section. When she was thinking about something, she usually meant she didn't get it.

185.    On August 2, 2018 Cynthia Bradford and Mosetta Clark made a home visit to the home of Henry and Susan Brown, where Elizabeth was forced to stay by

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

SCDSS. The SCDSS caseworkers did not note any safety or health hazards and there were no marks or bruises on the baby.

186.    On August 7, 2018 SCDSS, Cynthia Bradford and Mosetta Clark, ended their investigation and determined Elizabeth had physically abused the minor child due to an incident of alleged domestic violence on June 29, 2018, two weeks before the child was even born.

187.    On August 8, 2018, Dr. Johnson testified, under oath, regarding Elizabeth's delay in having a caesarean section and stated the following:

> …she understood that from 35 weeks to 40 weeks there were brain development that was useful to the baby, that's why she wanted to delay her treatment.

> …her intentions were to be a good mother. I don't know exactly what kind of research she did. I know she visited the March of Dimes website.

> …her decisions were consistent with that with the exception that they're talking about low risk patients and that was where we differed…

> …when I talked with her about -- there was no -- the only thing after 41 weeks was risk. She agreed with the c-section.

> In her sight, she was only doing what she felt like was very safe and the best for her child.

> So she was very conscientious… she had very justified reason and I understood that. But, most people when I tell them to be delivered by 37 weeks, they will be, okay. But, she had what she felt was reasonable and I didn't -- when I challenged it medically, I didn't challenge it by EPC, you know, a Judge's order or anything like that.

> So as a patient, I feel like she advocated for her child, okay.

Dr. Johnson also agreed, that, "…when push came to shove, [Elizabeth] agreed to a c-section."

188.    On August 10, 2018 the SCDSS transferred case management of the CPS case from Cynthia Bradford to Louchetia Simmons-Robinson.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

189.    On August 14, 2018 Emilio Macedonio signed an affidavit stating that the physical altercations in June 2018 that SCDSS complained about were not Elizabeth's fault.

190.    On August 22, 2018 SCDSS determined that Title IV-E of the Social Security Act would not pay for the baby's stay in foster care due to the failure to meet deprivation standards.

191.    On August 23, 2018 Louchetia Robinson-Simmons conducted a home visit at the Brown's home. Elizabeth informed the SCDSS caseworker that she wanted to go to her own home with her baby. SCDSS told Elizabeth she needed to be assessed for "Paternal Fitness" and a domestic violence assessment and she would have to pay for these assessments. Elizabeth also stated that she was having to pay people to provide supervision for her.

192.    On August 23, 2018 Elizabeth filed a motion to dismiss the Child Protective Services Case against her.

193.    On August 31, 2018 MUSC responded to several interrogatories from the Charleston County Legislative Delegations regarding the seizure of Elizabeth and her baby. MUSC stated:

> DSS was contacted because the patient was 41 weeks pregnant and Dr. Johnson felt that with placenta previa and an age of 49 years, that the patient required a c-section. The patient had previously agreed to undergo a c-section on multiple dates, but withdrew her consent when each date arrived stating that that she wanted to afford the baby more development time and wished to have natural delivery. At 41 weeks, Dr. Johnson was of the opinion that the baby would not benefit from remaining in utero and could be harmed. The EPC was put in place as MUSC needed to be prepared to proceed with the c-section to prevent harm to the mother and the full term baby if the patient failed to consent to the c-section of her own accord.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

194.    On August 31, 2018 SCDSS finalized a Family Assessment which required Elizabeth to participate in a parental fitness assessment, parenting classes, and she was required to have supervised contact with her child.

195.    On September 10, 2018 Ms. Scannell informed Ms. Louchetia Simmons-Robinson that she did not have the $2,000 to pay for the parental fitness assessment.

196.    By September 24, 2018 Rubin Aujla, M.D. wrote a memorandum stating:

> Ms. Scannell ' s mental health diagnosis is that she has a remote history of major depression, which means that she has experienced depression symptoms in the past. She does not currently have any depression symptoms, and has not had any symptoms since working with me. She has not displayed any symptoms relating to any other psychiatric disorders since working with me. I am not prescribing any medications to Ms. Scannell, as she does not require any mental health medications currently. She has attended all of her appointments and has fully engaged in treatment. I would have no concerns at this time if Ms. Scannell were to discontinue therapy.
>
> On August 28th Ms. Scannell brought her baby to her appointment with me, which allowed me to observe her interaction and relationship with her baby. Patient interaction with baby very appropriate, no distress when baby cried, able to sooth baby appropriately and meet baby's immediate needs. During my time working with Ms. Scannell, and while observing her with her baby, I have not had any concerns regarding her baby's safety. I do not have any concerns that Ms. Scannell is a danger to herself or anyone else.

197.    SCDSS completely disregarded Dr. Aujla's memorandum.

198.    On September 25, 2018 Louchetia Simmons-Robinson and Jane Bell conducted another home visit at the Brown's home where Elizabeth and her baby were trapped. Even though she was represented by an attorney, the two caseworkers attempted to force Elizabeth to sign a treatment plan that included a "Paternal Fitness assessment" and a psychological examination and pay $650 for the assessment.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

199.    On October 16, 2018 SCDSS, more than three months after the Elizabeth's cesarean surgery and 24/7 supervision, Louchetia Simmons-Robinson, and Jane Bell recommended to the Family Court that Elizabeth complete a psychological evaluation with a parental fitness component, participate in individual counseling, and complete a domestic violence batterer's assessment.

200.    That same day, the Family Court dismissed the case for lack of jurisdiction as the allegations of domestic violence did not even allege the child was harmed and the Agency lacked any evidence regarding medical neglect as Elizabeth complied with the caesarean section procedure.

201.    Elizabeth Scannell suffered physical, mental, and emotional injuries from (1) wrongful seizure, (2) having her newborn daughter wrongfully seized, (3) from being forced to live outside her home and under supervision of third parties. She suffered physical pain after her daughter was seized. She was not allowed to physically and emotionally bond with her daughter or breastfeed her daughter. She no longer trusts medical professionals and service providers. She is fearful of law enforcement, social workers, physicians, and nurses. She panics when her doorbell is rung. She has nightmares that SCDSS or law enforcement will take her child. She is fearful of leaving her daughter with others. She is fearful when her daughter receives a cut, scrape, or bruise from playing. Elizabeth Scannell's life will never be the same.

### III.    Causes of Action

### FOR A FIRST CAUSE OF ACTION
### (Gross Negligence – South Carolina Tort Claims Act – South Carolina Department of Social Services)

202.    Plaintiff incorporates paragraphs 1 – 201 as if stated herein verbatim.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

203.    That under the South Carolina Tort Claims Act, § 15-78-10 *et seq.* of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina, Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment.

204.    That Plaintiff alleges Defendant SCDSS owed a duty of care to Elizabeth Scannell because it is statutorily charged by the General Assembly to provide social services to Elizabeth Scannell as a client.

205.    That SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care using threats, intimidation, false statements, suppression of evidence, and abuse of its authority to extrajudicially limit Elizabeth Scannell's custody and relationship with her daughter during a critical period of human development and need for attachment, force her into a safety plan, telling her the Family Court ordered her to have a supervisor, forcing her to live outside of her home, and requiring she be supervised 24 hours a day, seven days a week, with her new born daughter for three months, until October 16, 2018. This was made upon threats of seizing her child again just after she got to hold her newborn for the first time after her newborn was taken immediately after birth, all without cause or justification.

206.    That Plaintiff further alleges that Defendant SCDSS's breach of its duty was the proximate cause of Plaintiff Elizabeth Scannell's damages.

207.    That as a result of the actions of Defendant SCDSS, Plaintiff Elizabeth Scannell suffered damages, financial loss, mental and emotional harm and suffering,

physical harm, harm to her relationship with her daughter, loss of enjoyment of life, and future damages as the direct and proximate result of SCDSS's tortious conduct.

208.    That Plaintiff asks the Court to award damages and costs of this action.

## FOR A SECOND CAUSE OF ACTION
### (42 U.S.C. §1983 against Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell for violation of Amendments IV, V, and XIV of the United States Constitution)

209.    Plaintiff incorporates paragraphs 1 – 208 as if stated herein verbatim.

210.    That Plaintiff Elizabeth Scannell asserts Defendants Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell, acting under color of law, violated her constitutional rights under the Fourth, Fifth, and the Fourteenth Amendment of the United States Constitution.

211.    That the Fifth and Fourteenth Amendment to the United States Constitution guarantees the right to due process under the law and freedom from unlawful seizure under the Fourth Amendment of the United States Constitution.

212.    That under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

213.    That SCDSS has a long history of allowing its caseworkers, to include Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell to remove children under the guise of safety plans by using threats, intimidation, false statements, suppression of evidence, and abusing their authority as caseworkers to detain children and family members under the guise of providing services for the South Carolina Department of Social Services, which is a violation of the Fourth, Fifth, and Fourteenth Amendment of the United States Constitution.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

214.    Michael Leach, as the Director of the South Carolina Department of Social Services is responsible for implementing policies and procedures related to the use, implementation, and due process protections for safety plans and kinship care plans – the shadow foster care system. Michael Leach has failed to provide any post-deprivation process for parents whose children are wrongfully seized, hidden from oversight by the Family Courts. Michael Leach is aware of the due process violations of safety plan and kinship care plans through (1) nationwide public policy discussions through the United States Department of Health and Human Services and other State, County, Municipal, and Tribal social services agencies, (2) social work policy discussions through professional trainings and peer-reviewed academic works, and (3) specific cases here in South Carolina and through his former employment in Tennessee. With this knowledge, SCDSS has refused to offer due process protections for families and children who are wrongfully seized.

215.    That despite the Family Court issuing an order restoring Elizabeth Scannell's parental rights, Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell used threats, intimidation, false statements, suppression of evidence, and abuse of their authority to extrajudicially limit Elizabeth Scannell's custody and relationship with her daughter and force her into a safety plan, telling her the Family Court ordered her to have a supervisor, forcing her to live outside of her home, and requiring she be supervised with her new born daughter for three months, until October 16, 2018. This was made upon threats of seizing her child again, all without cause or justification, in violation of Elizabeth Scannell's Fourth, Fifth, and Fourteenth Amendment Rights under the United States Constitution

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

216.    That Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell refused to allow Elizabeth Scannell to resume sole custody of her child despite a court order and physicians opining she did not present a threat of harm to herself or her daughter.

217.    That these actions by Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell are part of Defendant SCDSS's policy, custom, pattern, or practice of violating the constitutional rights of children, parents, and families.

218.    That Elizabeth Scannell suffered damages, financial loss, mental and emotional harm and suffering, physical harm, harm to her relationship with her daughter, loss of enjoyment of life, and future damages as the direct and proximate result of the constitutional violations by Defendants Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell.

219.    That Plaintiff Elizabeth Scannell asks the Court to award her damages, punitive damages, and attorney's fees and costs for this action.

220.    That Plaintiff Elizabeth Scannell asks the Court to provide injunctive relief and attorney's fees and costs against Michael Leach, as the director of South Carolina Department of Social Services.

## FOR A THIRD CAUSE OF ACTION
### (Gross Negligence – South Carolina Tort Claims Act – Medical University of South Carolina)

221.    Plaintiff incorporates paragraphs 1 – 220 as if stated herein verbatim.

222.    That Plaintiff alleges that a duty of care was owed Elizabeth Scannell by Defendant Medical University of South Carolina to:

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

(a) Not place a patient in emergency protective custody unless they presented an actual threat of harm to themselves or others;

(b) Not place a patient in prophylactic emergency protective custody because they might not agree to a procedure;

(c) Not place a patient in prophylactic emergency protective custody because they might present a threat of harm to their fetus in the uncertain future;

(d) Not place a patient in emergency protective custody when a psychiatric examination demonstrated the patient was not a threat of harm to herself or others;

(e) Not place a child into emergency protective custody unless the evidence showed the child was being harmed or there was an actual threat of herm to the child;

(f) Violate rules of medical ethics in placing a patient in emergency protective custody to force a mother to submit to a caesarean section when there is no actual harm to the fetus;

(g) Violate rules of medical ethics in placing a patient in emergency protective custody for a surgery thirteen hours before it is scheduled;

(h) Violate rules of medical ethics in placing a patient in emergency protective custody when a psychiatric examination demonstrated the patient was not a threat of harm to herself or others;

(i) Violate rules of medical ethics in restraining a patient and not allowing her to seek another medical opinion;

(j) Violate rules of medical ethics by placing a child in emergency protective custody when the child was not harmed and there was no actual threat of harm to the child;

223.    That Defendant Medical University of South Carolina breached all of the above listed duties in the provision of medical treatment and provision of services to Elizabeth Scannell and after the birth of her daughter.

224.    That Plaintiff further alleges Defendant Medical University of South Carolina breached its duty and it was the proximate cause of Plaintiff's damages.

225.    That as a result of Defendant Medical University of South Carolina's breach of its duty, Elizabeth Scannell suffered damages, financial loss, mental and emotional harm and suffering, physical harm, harm to her relationship with her daughter, loss of enjoyment of life, and future damages as the direct and proximate result.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

226.    That Plaintiff Elizabeth Scannell asks the Court to award her damages and costs of this action.

### FOR A FOURTH CAUSE OF ACTION
### (42 U.S.C. §1983 against Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 for violation of Amendments IV and XIV of the United States Constitution)

227.    Plaintiff incorporates paragraphs 1 – 226 as if stated herein verbatim.

228.    That Plaintiff Elizabeth Scannell asserts Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3, acting under color of law, violated her constitutional rights under the Fourth Amendment and the Fourteenth Amendment of the United States Constitution.

229.    That the Fourteenth Amendment to the United States Constitution guarantees the right to due process under the law and freedom from unlawful seizure under the Fourth Amendment of the United States Constitution.

230.    That under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

231.    That on July 12, 2018, Defendant Donna Johnson unlawfully seized Elizabeth Scannell, even though she was not a threat to herself or others nor a victim of abuse or neglect, by placing her in emergency protective custody, so that she could perform a caesarean section thirteen hours later, in violation of Elizabeth Scannell's Fourth and Fourteenth Amendment Rights.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

232.    That upon information and belief, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3, ordered Dr. Johnson to place Elizabeth Scannell into emergency protective custody, in violation of Elizabeth Scannell's Fourth and Fourteenth Amendment Rights.

233.    That on July 12, 2018, Michelle Irene Amaya, who had never met with Elizabeth Scannell or spoken with her, ordered Kelly Finke to report Elizabeth Scannell to SCDSS for harming her unborn child despite the fact that no harm had been done and there was no threat of harm and the hospital had scheduled the caesarean section fourteen hours from the time she made the complaint. This was in violation of Elizabeth Scannell's Fourth and Fourteenth Amendment Rights.

234.    That upon information and belief, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3, allowed Michelle Irene Amaya and Kelly Finke to place A.D.S. into emergency protective custody, in violation of Elizabeth Scannell's Fourth and Fourteenth Amendment Rights.

235.    That on July 13, 2018 Michelle Irene Amaya and Kelly Finke placed ADS in emergency protective custody despite the fact that Elizabeth Scannell followed medical advice and underwent the scheduled caesarean section, there was no harm to A.D.S., and there was no threat of herm to A.D.S.

236.    That on July 13, 2018 Michelle Irene Amaya and Kelly Finke placed ADS in emergency protective custody despite the fact that Elizabeth Scannell followed medical advice and underwent the scheduled caesarean section, there was no harm to A.D.S., and there was no threat of herm to A.D.S.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

237.    That these acts by Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 were the proximate cause of Elizabeth Scannell's damages.

238.    That Elizabeth Scannell suffered damages, financial loss, mental and emotional harm and suffering, physical harm, harm to her relationship with her daughter, loss of enjoyment of life, and future damages as the direct and proximate result of the constitutional violations by Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3.

239.    That Plaintiff Elizabeth Scannell asks the Court to award her damages, punitive damages, and attorney's fees and costs for this action.

## FOR A FIFTH CAUSE OF ACTION
### (Negligence/Gross Negligence – South Carolina Tort Claims Act – Medical University of South Carolina)

240.    Plaintiff incorporates paragraphs 1 – 237 as if stated herein verbatim.

241.    That Plaintiff alleges that a duty of care was owed Elizabeth Scannell by Defendant Medical University of South Carolina to:

(a) Not place a patient in emergency protective custody unless they presented an actual threat of harm to themselves or others;
(b) Not place a patient in prophylactic emergency protective custody because they might not agree to a procedure;
(c) Not place a patient in prophylactic emergency protective custody because they might present a threat of harm to their fetus in the uncertain future;
(d) Not place a patient in emergency protective custody when a psychiatric examination demonstrated the patient was not a threat of harm to herself or others;
(e) Not place a child into emergency protective custody unless the evidence showed the child was being harmed or there was an actual threat of herm to the child;

(f) Violate the rules of social work ethics in placing a patient in emergency protective custody to force a mother to submit to a caesarean section when there is no actual harm to the fetus;

(g) Violate rules of social work ethics in placing a patient in emergency protective custody for a surgery thirteen hours before it is scheduled;

(h) Violate rules of social work ethics in placing a patient in emergency protective custody when a psychiatric examination demonstrated the patient was not a threat of harm to herself or others;

(i) Violate rules of social work ethics in restraining a patient and not allowing her to seek another medical opinion;

(j) Violate rules of social work ethics by placing a child in emergency protective custody when the child was not harmed and there was no actual threat of harm to the child;

242.    That Defendant Medical University of South Carolina breached all of the above listed duties in the provision of social work services to Elizabeth Scannell and after the birth of her daughter.

243.    That Plaintiff further alleges Defendant Medical University of South Carolina breached its duty and it was the proximate cause of Plaintiff's damages.

244.    That as a result of Defendant Medical University of South Carolina's breach of its duty, Elizabeth Scannell suffered damages, financial loss, mental and emotional harm and suffering, physical harm, harm to her relationship with her daughter, loss of enjoyment of life, and future damages as the direct and proximate result.

245.    That Plaintiff Elizabeth Scannell asks the Court to award her damages and costs of this action.

### FOR A SIXTH CAUSE OF ACTION
### (Violation of the Americans with Disabilities Act, 42 U.S.C. §12102 et seq.)
### (Alternative Claim)

246.    Plaintiff incorporates paragraphs 1 – 245 as if stated herein verbatim.

247.    A "disability" means"

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

(A) A physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) A record of such impairment;

(C) Being regarded as having such an impairment.

42 U.S.C. §12102(1).

248.    An individual meets the requirements of "being regarded as having such a impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. §12102(3)(A).

249.    42 U.S.C. §12203 states, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act."

250.    In giving the Plaintiff proper treatment, the Defendant Medical University of South Carolinan would have realized she was not mentally incompetent.

251.    Defendant Medical University of South Carolina is a "department, agency, special purpose district, or other instrumentality of" the State of South Carolina and is defined as a "public entity" under the Americans with Disabilities Act.

252.    Plaintiff is a qualified individual under the Americans with Disabilities Act in that she was perceived to have a disability and was denied reasonable services by the Defendant Medical University of South Carolina.

253.    Defendant Medical University of South Carolina violated the American with Disabilities Act by claiming and perceiving she was mentally incompetent but it

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

refused to provide her with services and treatment when she was seized and placed into the care of Defendant Medical University of South Carolina.

254.    As a direct cause of Defendant Medical University of South Carolina's violation of the American's with Disabilities Act, Plaintiff suffered damages and special damages.

255.    Plaintiff asks the Court to award damages, special damages, punitive damages, and attorney's fees and costs.

## FOR A SEVENTH CAUSE OF ACTION
**(Civil Conspiracy as to Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3)**

256.    Plaintiff incorporates paragraphs 1 – 255 as if stated herein verbatim.

257.    For the purposes of this cause of action, Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 are sued in their individual capacities.

258.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 entered into a conspiracy for the purposes of injuring the Plaintiff.

259.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 demonstrated actual malice in their acts.

260.    As a direct result of this conspiracy, Plaintiff suffered damages and special damages.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

261.    Plaintiff asks the Court to award damages, special damages, and punitive damages.

### FOR AN EIGHTH CAUSE OF ACTION
**(Abuse of Process – as to MUSC under the South Carolina Tort Claims Act and as to Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3)**

262.    Plaintiff incorporates paragraphs 1 – 258 as if stated herein verbatim.

263.    Defendant Medical University of South Carolina used process not proper in the regular conduct of proceedings, in that it placed Plaintiff in Emergency Protective Custody even though Plaintiff was competent and the Plaintiff and her unborn child were in no immediate harm, for an ulterior purpose, so that MUSC could perform a Caesarian section upon Plaintiff thirteen hours later to relieve their liability concerns and without regard to the fiduciary duty they owed this patient,.

264.    For the purposes of this cause of action, Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 are sued in their individual capacities.

265.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 used process not proper in the regular conduct of proceedings, abusing their fiduciary duty, in that they placed Plaintiff in Emergency Protective Custody even though Plaintiff was competent and the Plaintiff and her unborn child were in no immediate harm, for an ulterior purpose, so that MUSC physicians could perform a Caesarian section upon Plaintiff thirteen hours later, when it was convenient for the physicians to do so.

266.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 demonstrated actual malice in their acts.

267.    As a direct result of this abuse of process by the Defendants, Plaintiff suffered damages and special damages.

268.    Plaintiff asks the Court to award damages, special damages, and punitive damages (when allowed by statute or common law).

### FOR A NINTH CAUSE OF ACTION
### (Assault as to MUSC Public Safety Supervisor)

269.    Plaintiff incorporates paragraphs 1 – 268 as if stated herein verbatim.

270.    For the purposes of this cause of action, Defendant MUSC Public Safety Supervisor is sued in her individual capacity.

271.    Defendant MUSC Public Safety Supervisor inflicted forcible contact on the person of the Plaintiff.

272.    As a direct result of this assault, Plaintiff suffered damages and special damages.

273.    Plaintiff asks the Court to award damages and special damages.

### FOR A TENTH CAUSE OF ACTION
### (Fraud and Misrepresentation – as to Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3)

274.    Plaintiff incorporates paragraphs 1 – 273 as if stated herein verbatim.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

275.    For the purposes of this cause of action, Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 are sued in their individual capacities.

276.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 made a false representation to MUSC Public Safety that Plaintiff was incompetent when they knew this was not true and that Plaintiff and her unborn child were being harmed when they knew the assertion was not true and a Caesarian section surgery was scheduled thirteen hours later.

277.    They had knowledge of the falsity of these representations as a psychiatrist had evaluated Plaintiff previously and not declared Plaintiff incompetent and the surgery was scheduled for the next day.

278.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 intended that MUSC Public Safety act upon this information, place Plaintiff in emergency protective custody, and provide the same false information to the Family Court in further proceedings.

279.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 relied upon their positions and authority as physicians and social worker in asserting these falsities.

280.    MUSC Public Safety Officers relied upon the truth of these false statements.

281.    MUSC Public Safety Officers had the right to rely upon the truth of these false statements.

282.    MUSC Public Safety Officers placed Plaintiff and her child in emergency protective custody as a consequence of these false statements.

283.    Plaintiff suffered injury as a direct and proximate result of these falsities and she suffered damages and special damages.

284.    Plaintiff asks the Court to award damages, special damages, and punitive damages.

### FOR AN ELEVENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress/Outrage – as to Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3)

285.    Plaintiff incorporates paragraphs 1 – 284 as if stated herein verbatim.

286.    For the purposes of this cause of action, Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 are sued in their individual capacities.

287.    Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 intentionally and recklessly inflicted severe emotional distress or they were certain that such distress would result from their conduct.

288.    The conduct of Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

289. The actions of Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 caused Plaintiff's emotional distress.

290. The emotional distress suffered by Plaintiff was severe so that no reasonable man could be expected to endure it.

291. Plaintiff asks the Court to award damages, special damages, and punitive damages.

## FOR AN TWELFTH CAUSE OF ACTION
### (False Imprisonment – as to Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3)

292. Plaintiff incorporates paragraphs 1 – 291 as if stated herein verbatim.

293. For the purposes of this cause of action, Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 are sued in their individual capacities.

294. Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 intentionally and recklessly restrained Plaintiff.

295. The restraint was intentional.

296. The restraint was unlawful.

297. Plaintiff suffered damages and special damages as a result of the false imprisonment.

298. Plaintiff asks the Court to award damages, special damages, and punitive damages.

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

## FOR AN THIRTEENTH CAUSE OF ACTION
### (False Imprisonment – as to Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell)

299.    Plaintiff incorporates paragraphs 1 – 298 as if stated herein verbatim.

300.    For the purposes of this cause of action, Defendants Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell are sued in their individual capacities.

301.    Defendants Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell intentionally and recklessly restrained Plaintiff by threatening to take her child if she did not live with a third party.

302.    The restraint was intentional.

303.    The restraint was unlawful.

304.    Plaintiff suffered damages and special damages as a result of the false imprisonment.

305.    Plaintiff asks the Court to award damages, special damages, and punitive damages.

## FOR A FOURTEENTH CAUSE OF ACTION
### (42 U.S.C. §1985 against Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 for violation of Amendments IV and XIV of the United States Constitution)

306.    Plaintiff incorporates paragraphs 1 – 305 as if stated herein verbatim.

307.    That Plaintiff Elizabeth Scannell asserts Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3, acting under color of law, violated her constitutional rights

under the Fourth Amendment and the Fourteenth Amendment of the United States Constitution.

308.    That the Fourteenth Amendment to the United States Constitution guarantees the right to due process under the law and freedom from unlawful seizure under the Fourth Amendment of the United States Constitution.

309.    That under 42 U.S.C. § 1985, two or more persons conspired to directly and indirectly deprive Plaintiff of equal protection, due process, and equal privileges under the law in that Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 conspired to place Plaintiff into Emergency Protective Custody when no emergency existed and there was no threat that Elizabeth would harm herself or her child.

310.    That under 42 U.S.C. § 1985, two or more persons conspired to directly and indirectly deprive Plaintiff of equal protection, due process, and equal privileges under the law in that Defendants Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 conspired to place A.D.S. into Emergency Protective Custody when no emergency existed and there was no threat Elizabeth would harm herself or her child.

311.    That these acts by Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3 were the proximate cause of Elizabeth Scannell's damages.

312.    That Elizabeth Scannell suffered damages, financial loss, mental and emotional harm and suffering, physical harm, harm to her relationship with her daughter, loss of enjoyment of life, and future damages as the direct and proximate result of the

ELECTRONICALLY FILED - 2020 Jul 13 4:46 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

constitutional violations by Defendants Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, and MUSC Administrator 3.

313.    That Plaintiff Elizabeth Scannell asks the Court to award her damages, punitive damages, and attorney's fees and costs for this action.

**WHEREFORE**, Plaintiff demands a trial by jury and requests judgment against Defendants, jointly and severally, for damages, compensatory damages, punitive damages, when allowed by statute or the common law injunctive relief, attorneys' fees and costs, when allowed by statute or the common law, for interest allowed by law, and all other compensation this Court deems just, equitable and proper.

Respectfully Submitted,

By:   s/Robert J. Butcher
Deborah J. Butcher
S.C. Bar No. 74029
Fed. Bar No. 10731
Robert J. Butcher
S.C. Bar No. 74722
Fed. Bar No. 9767
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone:     (803) 432-7599
Facsimile:     (803) 432-7499
rbutcher@camdensc-law.com
dbutcher@camdensc-law.com

Attorneys for Plaintiff

Camden, South Carolina
July 13, 2020

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | NINTH  JUDICIAL CIRCUIT |
| | ) | |
| ELIZABETH DE'ANNA SCANNELL, | ) | CASE NO. 2020-CP-10-02959 |
| | ) | 2020-NI-10-00059 |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT OF | ) | |
| SOCIAL SERVICES (SCDSS), MEDICAL | | |
| UNIVERSITY OF SOUTH CAROLINA, | | |
| CYNTHIA BRADFORD, MOSETTA | | **ACCEPTANCE OF SERVICE** |
| CLARK, LOUCHETIA SIMMONS- | | |
| ROBINSON, JANE BELL, MICHAEL | | |
| LEACH, DONNA JOHNSON, MICHELLE | | |
| IRENE AMAYA, KELLY FINKE, MUSC | | |
| ADMINISTRATOR 1, MUSC | | |
| ADMINISTRATOR 2, MUSC | | |
| ADMINISTRATOR 3, AND MUSC | | |
| PUBLIC SAFETY SUPERVISOR , | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

I, D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC Public Safety Supervisor.

D. Jay Davis, Jr.

Charleston, South Carolina

Dated: 7/22/20

STATE OF SOUTH CAROLINA      )    IN THE COURT OF COMMON PLEAS
                                     )

COUNTY OF CHARLESTON        )    NINTH  JUDICIAL CIRCUIT

ELIZABETH DE'ANNA SCANNELL,  )    CASE NO. 2020-CP-10-02959
                                     )             2020-NI-10-00059
                                     )

               PLAINTIFF,     )

                             )

        vs.                     )

SOUTH CAROLINA DEPARTMENT OF  )
SOCIAL SERVICES (SCDSS), MEDICAL
UNIVERSITY OF SOUTH CAROLINA,
CYNTHIA BRADFORD, MOSETTA
CLARK, LOUCHETIA SIMMONS-
ROBINSON, JANE BELL, MICHAEL           **ACCEPTANCE OF SERVICE**
LEACH, DONNA JOHNSON, MICHELLE
IRENE AMAYA, KELLY FINKE, MUSC
ADMINISTRATOR 1, MUSC
ADMINISTRATOR 2, MUSC
ADMINISTRATOR 3, AND MUSC
PUBLIC SAFETY SUPERVISOR ,
                                  )

            DEFENDANTS.   )
_____  )

     I, D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC Public Safety Supervisor.

                                                                     _____
                                            D. Jay Davis, Jr.

Charleston, South Carolina

Dated: 7/22/20

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | NINTH  JUDICIAL CIRCUIT |
| | ) | |
| ELIZABETH DE'ANNA SCANNELL, | ) | CASE NO. 2020-CP-10-02959 |
| | ) | 2020-NI-10-00059 |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT OF | ) | |
| SOCIAL SERVICES (SCDSS), MEDICAL | | |
| UNIVERSITY OF SOUTH CAROLINA, | | **ACCEPTANCE OF SERVICE** |
| CYNTHIA BRADFORD, MOSETTA | | |
| CLARK, LOUCHETIA SIMMONS- | | |
| ROBINSON, JANE BELL, MICHAEL | | |
| LEACH, DONNA JOHNSON, MICHELLE | | |
| IRENE AMAYA, KELLY FINKE, MUSC | | |
| ADMINISTRATOR 1, MUSC | | |
| ADMINISTRATOR 2, MUSC | | |
| ADMINISTRATOR 3, AND MUSC | | |
| PUBLIC SAFETY SUPERVISOR , | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

I, D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC Public Safety Supervisor.

D. Jay Davis, Jr.

Charleston, South Carolina

Dated: 7/22/20

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
                        )
COUNTY OF CHARLESTON    ) NINTH JUDICIAL CIRCUIT
                        )
ELIZABETH DE'ANNA SCANNELL, ) CASE NO. 2020-CP-10-02959
                        )         2020-NI-10-00059
                        )
              PLAINTIFF, )
                        )
      vs.               )
                        )
SOUTH CAROLINA DEPARTMENT OF )
SOCIAL SERVICES (SCDSS), MEDICAL
UNIVERSITY OF SOUTH CAROLINA,
CYNTHIA BRADFORD, MOSETTA
CLARK, LOUCHETIA SIMMONS-           **ACCEPTANCE OF SERVICE**
ROBINSON, JANE BELL, MICHAEL
LEACH, DONNA JOHNSON, MICHELLE
IRENE AMAYA, KELLY FINKE, MUSC
ADMINISTRATOR 1, MUSC
ADMINISTRATOR 2, MUSC
ADMINISTRATOR 3, AND MUSC
PUBLIC SAFETY SUPERVISOR ,
                        )
              DEFENDANTS. )
                        )

I, D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC Public Safety Supervisor.

_____
D. Jay Davis, Jr.

Charleston, South Carolina

Dated: 7/22/20

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

STATE OF SOUTH CAROLINA    )    IN THE COURT OF COMMON PLEAS
)
COUNTY OF CHARLESTON    )    NINTH  JUDICIAL CIRCUIT
)
ELIZABETH DE'ANNA SCANNELL,    )    CASE NO. 2020-CP-10-02959
)    2020-NI-10-00059
)
       PLAINTIFF,    )
)
    vs.    )
)
SOUTH CAROLINA DEPARTMENT OF    )
SOCIAL SERVICES (SCDSS), MEDICAL
UNIVERSITY OF SOUTH CAROLINA,
CYNTHIA BRADFORD, MOSETTA    **ACCEPTANCE OF SERVICE**
CLARK, LOUCHETIA SIMMONS-
ROBINSON, JANE BELL, MICHAEL
LEACH, DONNA JOHNSON, MICHELLE
IRENE AMAYA, KELLY FINKE, MUSC
ADMINISTRATOR 1, MUSC
ADMINISTRATOR 2, MUSC
ADMINISTRATOR 3, AND MUSC
PUBLIC SAFETY SUPERVISOR ,
)
       DEFENDANTS.    )
)
_____)

    I**,** D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case**

**number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons**

**and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of

the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya,

Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC

Public Safety Supervisor.

                    _____
                    D. Jay Davis, Jr.

Charleston, South Carolina

Dated: _7/22/20_

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS

COUNTY OF CHARLESTON ) NINTH JUDICIAL CIRCUIT

ELIZABETH DE'ANNA SCANNELL, ) CASE NO. 2020-CP-10-02959
) 2020-NI-10-00059
)
PLAINTIFF, )
)
)
vs. )
)
)
SOUTH CAROLINA DEPARTMENT OF )
SOCIAL SERVICES (SCDSS), MEDICAL
UNIVERSITY OF SOUTH CAROLINA,
CYNTHIA BRADFORD, MOSETTA
CLARK, LOUCHETIA SIMMONS-            **ACCEPTANCE OF SERVICE**
ROBINSON, JANE BELL, MICHAEL
LEACH, DONNA JOHNSON, MICHELLE
IRENE AMAYA, KELLY FINKE, MUSC
ADMINISTRATOR 1, MUSC
ADMINISTRATOR 2, MUSC
ADMINISTRATOR 3, AND MUSC
PUBLIC SAFETY SUPERVISOR ,
)
DEFENDANTS. )
)

I, D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC Public Safety Supervisor.

D. Jay Davis, Jr.

Charleston, South Carolina

Dated: 7/22/20

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
)
COUNTY OF CHARLESTON ) NINTH  JUDICIAL CIRCUIT
)
ELIZABETH DE'ANNA SCANNELL, ) CASE NO. 2020-CP-10-02959
) 2020-NI-10-00059
)
PLAINTIFF, )
)
)
vs. )
)
)
SOUTH CAROLINA DEPARTMENT OF )
SOCIAL SERVICES (SCDSS), MEDICAL
UNIVERSITY OF SOUTH CAROLINA,
CYNTHIA BRADFORD, MOSETTA
CLARK, LOUCHETIA SIMMONS-
ROBINSON, JANE BELL, MICHAEL
LEACH, DONNA JOHNSON, MICHELLE
IRENE AMAYA, KELLY FINKE, MUSC
ADMINISTRATOR 1, MUSC
ADMINISTRATOR 2, MUSC
ADMINISTRATOR 3, AND MUSC
PUBLIC SAFETY SUPERVISOR ,
)
DEFENDANTS. )
)

**ACCEPTANCE OF SERVICE**

I, D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC Public Safety Supervisor.

_____
D. Jay Davis, Jr.

Charleston, South Carolina

Dated: 7/22/20

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Jul 24 12:30 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
)
COUNTY OF CHARLESTON ) NINTH JUDICIAL CIRCUIT
)
ELIZABETH DE'ANNA SCANNELL, ) CASE NO. 2020-CP-10-02959
) 2020-NI-10-00059
)
PLAINTIFF, )
)
)
vs. )
)
)
SOUTH CAROLINA DEPARTMENT OF )
SOCIAL SERVICES (SCDSS), MEDICAL
UNIVERSITY OF SOUTH CAROLINA,
CYNTHIA BRADFORD, MOSETTA **ACCEPTANCE OF SERVICE**
CLARK, LOUCHETIA SIMMONS-
ROBINSON, JANE BELL, MICHAEL
LEACH, DONNA JOHNSON, MICHELLE
IRENE AMAYA, KELLY FINKE, MUSC
ADMINISTRATOR 1, MUSC
ADMINISTRATOR 2, MUSC
ADMINISTRATOR 3, AND MUSC
PUBLIC SAFETY SUPERVISOR ,
)
DEFENDANTS. )
_____ )

I, D. Jay Davis, Jr., hereby accept delivery of the **Summons and Complaint in case**

**number 2020CP1002959 and the Notice of Intent, Affidavit, Interrogatories, and Summons**

**and Complaint in case number 2020NI1000059,** required by Rule 4( d), SCRCP on behalf of

the Defendants, Medical University of South Carolina. Donna Johnson, Michelle Irene Amaya,

Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3 and MUSC

Public Safety Supervisor.

_____
D. Jay Davis, Jr.

Charleston, South Carolina

Dated: 7/22/20

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | NINTH  JUDICIAL CIRCUIT |
| | ) | |
| ELIZABETH DE'ANNA SCANNELL, | ) | CASE NO. 2020-CP-10-02959 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT | ) | |
| OF SOCIAL SERVICES (SCDSS), | ) | |
| MEDICAL UNIVERSITY OF SOUTH | ) | |
| CAROLINA, CYNTHIA BRADFORD, | ) | |
| MOSETTA CLARK, LOUCHETIA | ) | **ANSWER ON BEHALF OF DEFENDANT** |
| SIMMONS-ROBINSON, JANE BELL, | ) | **DONNA JOHNSON** |
| MICHAEL LEACH, DONNA | ) | |
| JOHNSON, MICHELLE IRENE | ) | |
| AMAYA, KELLY FINKE, MUSC | ) | |
| ADMINISTRATOR 1, MUSC | ) | |
| ADMINISTRATOR 2, MUSC | ) | |
| ADMINISTRATOR 3, AND MUSC | ) | |
| PUBLIC SAFETY SUPERVISOR , | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

TO: ROBERT J. BUTCHER AND DEBORAH J. BUTCHER, ATTORNEYS FOR THE PLAINTIFF:

The Defendant Donna Johnson (hereinafter referred to as "Dr. Johnson" or "this Defendant"), by and through her undersigned counsel, hereby responds to the allegations set forth in the Complaint as follows:

1.     Any allegation set forth in the Complaint not specifically admitted, modified, or otherwise denied is hereby expressly denied and strict proof is demands thereof.

2.     This Defendant admits the allegations contained in Paragraph 1 of the Complaint, upon information and belief.

1

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

3.    The allegations contained in Paragraphs 2, 3, 4, 5, 6 and 7 of the Complaint are directed parties other than this Defendant and therefore no response is required.

4.    Answering the allegations contained in Paragraph 8 of the Complaint, this Defendant admits that MUSC is a corporation organized and existing under the laws of the State of South Carolina and that it conducts business in Charleston County, including the facility where Plaintiff gave birth to A.D.S. Further, this Defendant admits that MUSC is a state agency and assert that it is covered under the South Carolina Tort Claims Act and is entitled to all protections, immunities, and limitations of liability afforded thereunder.

5.    Answering the allegations contained in Paragraph 9 of the Complaint, this Defendant admits only that she is a physician and professor employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

6.    Answering the allegations contained in Paragraph 10 of the Complaint, this Defendant admits only that Michelle Irene Amaya, M.D., M.P.H. is a physician and associate professor employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

7.    Answering the allegations contained in Paragraph 11 of the Complaint, this Defendant admits only that Kelly Finke, MSW is a Licensed Master Social Worker employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

8.     This Defendant lacks the knowledge or information sufficient to form an opinion as to the truth of the allegations in Paragraph 12 of the Complaint regarding the residency and citizenry of unnamed Defendants who are supposedly employed by MUSC, and therefore, denies the same and demands strict proof thereof. Further responding, this Defendant denies these alleged MUSC employees ordered or approved of putting Ms. Scannell into emergency protective custody without cause. Finally, this Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in Paragraph 12 and, therefore, denies the same and demands strict proof thereof.

9.     Answering the allegations contained in Paragraph 13 of the Complaint, this Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the allegations regarding an unnamed Defendant who is supposedly employed by this Defendant, and therefore, denies the same and demands strict proof thereof.

10.     The allegations contained in Paragraphs 14 and 15 of the Complaint call for legal conclusions and do no warrant a response.

11.     This Defendant denies the allegations contained in Paragraph 16 of the Complaint, as stated, and demands strict proof thereof.

12.     The Defendants would crave reference to Ms. Scannell MUSC IOP's psychiatric medical records in response to the allegations contained in Paragraphs 17, 18, 19 and 20 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

13.     This Defendant denies the allegations contained in Paragraph 21 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

14.     This Defendant admits Plaintiff's age, but otherwise is without knowledge or information sufficient to answer the allegations contained in Paragraphs 22, 23, 24, 25, 26, 27, 28, 29, and 30 of the Complaint and, therefore, denies the same and demands strict proof thereof.

15.     Answering the allegations contained in paragraph 31 of the Complaint, the Defendants admits, upon information and belief, Plaintiff was diagnosed with placenta previa at some point and referred to MUSC.  Defendants is without knowledge or information sufficient to answer the remaining allegations and, therefore, denies the same and demands strict proof thereof.

16.     This Defendant is without knowledge or information sufficient to answer the details of the allegations contained in Paragraphs 32 through 61 of the Complaint, but admits generally that Plaintiff was seen and evaluated on several occasions at MUSC by Dr. Head, Dr. Johnson and others during the timeframe in question.   Further answering, Defendants crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

17.     The Defendants denies the allegations contained in Paragraph 62 of the Complaint, as stated.

18.     The Defendants would crave referenced to the MUSC medical records in response to the allegations contained in Paragraphs 63, 64, 65, 66, 67, 68, 69, 70 and 71 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

19.     This Defendant admits Plaintiff did not want anyone to die during childbirth, but denies the remaining allegations contained in Paragraph 72 of the Complaint, as alleged.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

20.     This Defendant would crave reference to the MUSC medical records in answering the allegations contained in Paragraphs 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109 and 110  of the Complaint. This Defendant denies any allegation intended to imply Plaintiff should have felt "reassured" with regards to her continued disregard for the medical providers' recommendations.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

21.     Answering the allegations contained in Paragraph 111 of the Complaint, this Defendant admits that a meeting was held by MUSC's Ethics Committee to discuss the best course of treatment for Plaintiff and her unborn child. This Defendant would crave reference to the MUSC medical records regarding the details of their care and treatment. Any allegation inconsistent with this response is denied.

22.     This Defendant would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 112 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

23.     This Defendant denies the allegations contained in Paragraph 113 of the Complaint, as stated, and demands strict proof thereof.

24.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 114 regarding the content of Dr. Navarro's. This Defendant lacks knowledge or information sufficient to form an opinion as to Ms. Scannell's mental state and therefore, denies the same and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

25.     This Defendant is without knowledge or information sufficient to answer the allegation contained in Paragraphs 115 of the Complaint, but crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

26.     This Defendant would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 116 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

27.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraph 117 of the Complaint and therefore, denies the same and demands strict proof thereof.

28.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in 118, 119, 120, 121, 122, 123, 124 and 125 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

29.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 126 of the Complaint regarding the patient's expectations after her constant consultations with numerous medical staff in the weeks leading up to her child's birth.  This Defendant does admit the child was healthy upon delivery due to the work of the medical team.  Any allegations inconsistent with these records or intended to allege liability or damages against this Defendant are expressly denied.

30.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraphs 127, 128, 129, 130, 131, 132, 133, 134, 135, 136 and 137

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

which reference records of outside individuals, but could crave reference to the MUSC medical records regarding care and treatment by their staff members.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

31.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraph 138 regarding Ms. Scannell's mental state and therefore, denies the same and demands strict proof thereof. Further answering, this Defendant denies the allegations regarding Ms. Scannell's grievous suffering and demands strict proof thereof.

32.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 139, 140, 141, 142, 143, 144, 145 and 146 of the Complaint.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

33.     Answering the allegations contained in Paragraph 147 of the Complaint, this Defendant admits there was approximately a 36 hour timeframe where Plaintiff did not see her child, but denies the remaining allegations as alleged and demands strict proof thereof.

34.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 148, 149, 150, 151 and 152 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

35.     This Defendant denies the allegations set forth in Paragraph 153 of the Complaint as stated and demands strict proof thereof.

36.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

and 165 of the Complaint.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

37.    Answering the allegations contained in Paragraph 166, 167, 168 and 169 of the Complaint, this Defendant admits that a probable cause hearing was held at Charleston County's Family Court and admits the child was ordered to be returned to the Plaintiff.  This Defendant is without knowledge or information sufficient to answer the allegations regarding specific statements, testimony and details of the Court Order from said hearing and crave reference to the transcript for its contents. Any allegations inconsistent with said transcript or intended to allege liability or damages against this Defendant are expressly denied.  Defendant would crave reference to the MUSC medical records regarding Plaintiff's mental state.

38.    The allegations contained in Paragraph 170 of the Complaint are directed parties other than this Defendant and therefore no response is required.

39.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 171, 172 and 173 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

40.    This Defendant denies the allegations set forth in Paragraph 174 of the Complaint as stated and demands strict proof thereof.

41.    The allegations contained in Paragraphs 175, 176 and 177 of the Complaint are directed parties other than this Defendant and therefore no response is required.

42.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 178, 179, 180 and 181 of the Complaint.   Any

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

43.    Answering the allegations contained in Paragraph 182 of the Complaint, this Defendant admits Plaintiff was discharged from the hospital on or about July 17, 2018, but the remaining allegations are directed at other parties and do not warrant a response.  Any allegation inconsistent with this response is denied.

44.    This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraphs 183 and 184 of the Complaint, but crave reference to the Plaintiff's medical records regarding the contents of her psychiatric evaluation by Dr. Guille and communication Dr. Johnson had with Ms. Bradford. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

45.    The allegations contained in Paragraphs 185 and 186 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

46.    This Defendant admits that she testified at some point regarding this matter, but lacks knowledge or information sufficient to answer the detailed allegations contained in Paragraph 187 of the Complaint and, therefore, demands strict proof thereof. Further responding, this Defendant craves reference to the complete transcript of such testimony for its contents therein. Any allegations inconsistent with that transcript or intention to allege liability or damages against this Defendant are expressly denied.

47.    The allegations contained in Paragraphs 188, 189, 190, 191 and 192 of the Complaint are directed parties other than this Defendant and therefore no response is required.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

48.    This Defendant would crave reference to the MUSC responses to interrogatories from the Charleston Legislative Delegations in response to the allegations contained in Paragraph 193 of the Complaint, but denies this cut-and-paste excerpt should be viewed as an adequate explanation of Plaintiff's complex medical care and treatment leading up to the birth of her child as detailed in the MUSC medical records.  Any allegations inconsistent with this response is expressly denied.

49.    The allegations contained in Paragraphs 194, 195, 196, 197, 198, 199 and 200 of the Complaint are directed parties other than this Defendant and therefore no response is required.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

50.    This Defendant denies the allegations contained in Paragraph 201 of the Complaint and demands strict proof thereof.

51.    Answering the allegations contained in Paragraph 202 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

52.    The allegations contained in Paragraphs 203, 204, 205, 206, 207 and 208 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

53.    Answering the allegations contained in Paragraph 209 of the Complaint, this Defendant restates its answer contained in the above paragraphs as if stated verbatim herein.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

54.    The allegations contained in Paragraphs 210, 211, 212, 213, 214, 215, 216, 217, 218, 219 and 220 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

55.    Answering the allegations contained in Paragraph 221 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

56.    This Defendant denies the allegations contained in Paragraphs 222, 223, 224, 225 and 226 of the Complaint, including all subparts, and demands strict proof thereof.

57.    Answering the allegations contained in Paragraph 227 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

58.    This Defendant denies the allegations contained in Paragraph 228 of the Complaint, including all subparts, and demands strict proof thereof.

59.    The allegations set forth in Paragraphs 229 and 230 call for legal conclusions to which no response is required.

60.    This Defendant denies the allegations contained in Paragraphs 231, 232, 233, 234, 235, 236, 237, 238 and 239 of the Complaint, including all subparts, and demands strict proof thereof.

61.    Answering the allegations contained in Paragraph 240 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

62.    This Defendant denies the allegations contained in Paragraphs 241, 242, 243, 244 and 245 of the Complaint, including all subparts, and demands strict proof thereof.

63.    Answering the allegations contained in Paragraph 246 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

64.     The allegations set forth in Paragraphs 247, 248 and 249 call for legal conclusions to which no response is required. Further responding, this Defendant asserts that such Codes do not establish the applicable standard of care in this case.

65.     This Defendant denies the allegations contained in Paragraph 250 of the Complaint and demands strict proof thereof.

66.     The allegations contained in Paragraphs 251 and 252 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

67.     This Defendant denies the allegations contained in Paragraphs 253, 254 and 255 of the Complaint and demands strict proof thereof.

68.     Answering the allegations contained in Paragraph 256 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

69.     This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 257 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

70.     This Defendant denies the allegations contained in Paragraphs 258, 259, 260 and 261 of the Complaint and demands strict proof thereof.

71.     Answering the allegations contained in Paragraph 262 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

72.     This Defendant denies the allegations contained in Paragraph 263 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

73.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 264 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

74.    This Defendant denies the allegations contained in Paragraphs 265, 266, 267 and 268 of the Complaint and demands strict proof thereof.

75.    Answering the allegations contained in Paragraph 269 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

76.    This Defendant denies the allegations contained in Paragraphs 270, 271, 272 and 273 of the Complaint and demands strict proof thereof.

77.    Answering the allegations contained in Paragraph 274 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

78.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 275 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

79.    This Defendant denies the allegations contained in Paragraphs 276, 277, 278, 279, 280, 281, 282, 283 and 284 of the Complaint and demands strict proof thereof.

80.    Answering the allegations contained in Paragraph 285 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

81.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 286 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

82.    This Defendant denies the allegations contained in Paragraphs 287, 288, 289, 290 and 291 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

83.    Answering the allegations contained in Paragraph 292 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

84.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 293 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

85.    This Defendant denies the allegations contained in Paragraphs 294, 295, 296, 297 and 298 of the Complaint and demands strict proof thereof.

86.    Answering the allegations contained in Paragraph 299 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

87.    The allegations contained in Paragraphs 300, 301, 302, 303, 304 and 305 of the Complaint are directed parties other than this Defendant and therefore no response is required.

88.    Answering the allegations contained in Paragraph 306 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

89.    This Defendant denies the allegations contained in Paragraph 307 of the Complaint and demands strict proof thereof.

90.    The allegations contained in Paragraph 308 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

91.    This Defendant denies the allegations contained in Paragraphs 309, 310, 311, 312 and 313 of the Complaint and demands strict proof thereof.

92.    This Defendant denies Plaintiff's Prayer for Relief in full.

**<u>FURTHER ANSWERING AND BY WAY OF A<br>FURTHER AND AFFIRMATIVE DEFENSE</u>**

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

93.    This Defendant is a governmental entity of the State of South Carolina as defined under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 *et. seq.*, and thereby asserts the defense of sovereign immunity pursuant to the terms of the aforesaid Tort Claims Act.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

94.    As an agency of the State of South Carolina, this case is subject to the South Carolina Tort Claims Act, to include and not be limited to its limitations on liability.  Further, as to any violation of common law or state law, this Defendant assert the provisions of the South Carolina Tort Claims Act, <u>S.C. Code Ann.</u> §15-78-10, <u>et</u> <u>seq</u>, and its pertinent parts which include but are not limited to §§15-78-120; 15-78-60(5); 15-78-60(25); 15-78-60(20); and 15-78 100(c).

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

95.    This Defendant plead that any award or assessment of punitive damages is barred by the South Carolina Tort Claims Act, and would also violate the this Defendant' constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and comparable provisions of the South Carolina Constitution. this Defendant move to strike any such claim.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

96.    Plaintiff's Complaint fails to state facts sufficient to constitute a cause of action and therefore, should be dismissed pursuant to Rule 12(b)(6), SCRCP.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

97.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1983 by failing to identify the deprivation of any valid right secured by the Constitution or laws of the United States.

**FURTHER ANSWERING AND FOR A
FURTHER AND AFFIRMATIVE DEFENSE**

98.    To the extent that punitive damages are sought by Plaintiff, Plaintiff is not entitled to punitive damages vis-à-vis this Defendant because the alleged acts, omissions or failures to act by this Defendant were not willful, wanton or reckless.

**FURTHER ANSWERING AND BY WAY OF A
FURTHER AND AFFIRMATIVE DEFENSE**

99.    This Defendant would affirmatively state that at all times it and its employees complied with the applicable standard of care.

**FURTHER ANSWERING AND FOR A
FURTHER AND AFFIRMATIVE DEFENSE**

100.    These individual Defendants were state officials acting in an official capacity and is entitled to immunity pursuant to the Eleventh Amendment of the Constitution of the United States from suit for monetary damages.

**FURTHER ANSWERING AND FOR A
FURTHER AND AFFIRMATIVE DEFENSE**

101.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1985 by failing to identify a conspiracy, an act in furtherance of the conspiracy, and/or an intent to deprive the Plaintiff of equal protection of the law on part of this Defendant.

**FURTHER ANSWERING AND FOR A
FURTHER AND AFFIRMATIVE DEFENSE**

102.    Plaintiff's claim under 42 U.S.C § 1985 fail as a matter of law pursuant to the intracorporate conspiracy doctrine.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

### FURTHER ANSWERING AND FOR A
### FURTHER AND AFFIRMATIVE DEFENSE

103.    Certain of Plaintiff's claims fail as a matter of law under S.C. Code Ann. § 15-78-70(b) because Plaintiff has not shown that this Defendant's actions or inactions constituted fraud, malice, an intent to harm, or a crime involving moral turpitude.

### FURTHER ANSWERING AND BY WAY OF A
### FURTHER AND AFFIRMATIVE DEFENSE

104.    A claim for punitive damages and an award of punitive damages would violate those clauses of the Constitutions of the United States and South Carolina related to privileges and immunities, due process and equal protection and this Defendant would further assert the protections, defenses, and statutory rights set forth in S.C. Code Ann. §§ 15-32-510, 15-32-520, 15-32-530, 15-32-540, *et. seq.*

### FURTHER ANSWERING AND BY WAY OF A
### FURTHER AND AFFIRMATIVE DEFENSE

105.    There was no negligence, gross negligence, recklessness, or wantonness on the part of this Defendant which proximately caused or contributed to Plaintiff's alleged injuries.

### FURTHER ANSWERING AND FOR A
### FURTHER AND AFFIRMATIVE DEFENSE

106.    Plaintiff's claims may be barred in whole or in part by applicable statutes of limitation or statutes of repose.

### FURTHER ANSWERING AND BY WAY OF A
### FURTHER AND AFFIRMATIVE DEFENSE

107.    Plaintiff did not have an "impairment," real or perceived, under 42 U.S.C. §12102(1) and 42 U.S.C. §12102(3)(A) and therefore her claims under the Americans with Disabilities Act should be dismissed.

### FURTHER ANSWERING AND BY WAY OF A

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

**FURTHER AND AFFIRMATIVE DEFENSE**

108.    This Defendant did not coerce, intimidate, threaten, or interfere with Plaintiff's exercise or enjoyment of any right granted or protected by the Americans with Disabilities Act, and therefore her claims under that Act should be dismissed.

**FURTHER ANSWERING AND BY WAY OF A
FURTHER AND AFFIRMATIVE DEFENSE**

109.    42 U.S.C. §12202 of the Americans with Disabilities Act is unconstitutional and therefore this Defendant is protected from legal action arising under the Act by the Eleventh Amendment of the United States Constitution.

**FURTHER ANSWERING AND BY WAY OF A
FURTHER AND AFFIRMATIVE DEFENSE**

110.    This Defendant reserve any additional affirmative defenses as may be revealed or available to it during the course of their investigation or discovery in this case.


                                        YOUNG CLEMENT RIVERS, LLP


                                        By: s/D. Jay Davis, Jr.
                                        D. Jay Davis, Jr.
                                        James E. Scott, IV
                                        Kate C. Mettler
                                        P.O. Box 993, Charleston, SC  29402
                                        (843) 577-4000; jdavis@ycrlaw.com;
                                        jscott@ycrlaw.com; kmettler@ycrlaw.com
                                        Attorneys for Defendant Donna Johnson

Charleston, South Carolina

Dated: September 21, 2020

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | NINTH  JUDICIAL CIRCUIT |
| | ) | |
| ELIZABETH DE'ANNA SCANNELL, | ) | CASE NO. 2020-CP-10-02959 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT | ) | |
| OF SOCIAL SERVICES (SCDSS), | ) | |
| MEDICAL UNIVERSITY OF SOUTH | ) | |
| CAROLINA, CYNTHIA BRADFORD, | ) | **ANSWER ON BEHALF OF DEFENDANT** |
| MOSETTA CLARK, LOUCHETIA | ) | **KELLY FINKE** |
| SIMMONS-ROBINSON, JANE BELL, | ) | |
| MICHAEL LEACH, DONNA | ) | |
| JOHNSON, MICHELLE IRENE | ) | |
| AMAYA, KELLY FINKE, this Defendant | ) | |
| ADMINISTRATOR 1, this Defendant | ) | |
| ADMINISTRATOR 2, this Defendant | ) | |
| ADMINISTRATOR 3, AND this | ) | |
| Defendant PUBLIC SAFETY | ) | |
| SUPERVISOR , | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

TO: ROBERT J. BUTCHER AND DEBORAH J. BUTCHER, ATTORNEYS FOR THE PLAINTIFF:

The Defendant Kelly Finke (hereinafter referred to as "Ms. Finke" or "this Defendant"), by and through her undersigned counsel, hereby responds to the allegations set forth in the Complaint as follows:

1.    Any allegation set forth in the Complaint not specifically admitted, modified, or otherwise denied is hereby expressly denied and strict proof is demands thereof.

2.    This Defendant admits the allegations contained in Paragraph 1 of the Complaint, upon information and belief.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

3.    The allegations contained in Paragraphs 2, 3, 4, 5, 6 and 7 of the Complaint are directed parties other than this Defendant and therefore no response is required.

4.    Answering the allegations contained in Paragraph 8 of the Complaint, this Defendant admits that MUSC is a corporation organized and existing under the laws of the State of South Carolina and that it conducts business in Charleston County, including the facility where Plaintiff gave birth to A.D.S. Further, this Defendant admits that MUSC is a state agency and assert that it is covered under the South Carolina Tort Claims Act and is entitled to all protections, immunities, and limitations of liability afforded thereunder.

5.    Answering the allegations contained in Paragraph 9 of the Complaint, this Defendant admits only that Dr. Johnson is a physician and professor employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

6.    Answering the allegations contained in Paragraph 10 of the Complaint, this Defendant admits only that Michelle Irene Amaya, M.D., M.P.H. is a physician and associate professor employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

7.    Answering the allegations contained in Paragraph 11 of the Complaint, this Defendant admits only that she is a Licensed Master Social Worker employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

2

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

8.      This Defendant lacks the knowledge or information sufficient to form an opinion as to the truth of the allegations in Paragraph 12 of the Complaint regarding the residency and citizenry of unnamed Defendants who are supposedly employed by MUSC, and therefore, denies the same and demands strict proof thereof. Further responding, this Defendant denies these alleged MUSC employees ordered or approved of putting Ms. Scannell into emergency protective custody without cause. Finally, this Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in Paragraph 12 and, therefore, denies the same and demands strict proof thereof.

9.      Answering the allegations contained in Paragraph 13 of the Complaint, this Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the allegations regarding an unnamed Defendant who is supposedly employed by this Defendant, and therefore, denies the same and demands strict proof thereof.

10.     The allegations contained in Paragraphs 14 and 15 of the Complaint call for legal conclusions and do no warrant a response.

11.     This Defendant denies the allegations contained in Paragraph 16 of the Complaint, as stated, and demands strict proof thereof.

12.     The Defendants would crave reference to Ms. Scannell MUSC IOP's psychiatric medical records in response to the allegations contained in Paragraphs 17, 18, 19 and 20 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

13.     This Defendant denies the allegations contained in Paragraph 21 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

14.    This Defendant admits Plaintiff's age, but otherwise is without knowledge or information sufficient to answer the allegations contained in Paragraphs 22, 23, 24, 25, 26, 27, 28, 29, and 30 of the Complaint and, therefore, denies the same and demands strict proof thereof.

15.    Answering the allegations contained in paragraph 31 of the Complaint, the Defendants admits, upon information and belief, Plaintiff was diagnosed with placenta previa at some point and referred to MUSC.  Defendants is without knowledge or information sufficient to answer the remaining allegations and, therefore, denies the same and demands strict proof thereof.

16.    This Defendant is without knowledge or information sufficient to answer the details of the allegations contained in Paragraphs 32 through 61 of the Complaint, but admits generally that Plaintiff was seen and evaluated on several occasions at MUSC by Dr. Head, Dr. Johnson and others during the timeframe in question.  Further answering, Defendants crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

17.    The Defendants denies the allegations contained in Paragraph 62 of the Complaint, as stated.

18.    The Defendants would crave referenced to the MUSC medical records in response to the allegations contained in Paragraphs 63, 64, 65, 66, 67, 68, 69, 70 and 71 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

19.    This Defendant admits Plaintiff did not want anyone to die during childbirth, but denies the remaining allegations contained in Paragraph 72 of the Complaint, as alleged.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

20.    This Defendant would crave reference to the MUSC medical records in answering the allegations contained in Paragraphs 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109 and 110  of the Complaint. This Defendant denies any allegation intended to imply Plaintiff should have felt "reassured" with regards to her continued disregard for the medical providers' recommendations.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

21.    Answering the allegations contained in Paragraph 111 of the Complaint, this Defendant admits that a meeting was held by MUSC's Ethics Committee to discuss the best course of treatment for Plaintiff and her unborn child. This Defendant would crave reference to the MUSC medical records regarding the details of their care and treatment. Any allegation inconsistent with this response is denied.

22.    This Defendant would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 112 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

23.    This Defendant denies the allegations contained in Paragraph 113 of the Complaint, as stated, and demands strict proof thereof.

24.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 114 regarding the content of Dr. Navarro's. This Defendant lacks knowledge or information sufficient to form an opinion as to Ms. Scannell's mental state and therefore, denies the same and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

25.     This Defendant is without knowledge or information sufficient to answer the allegation contained in Paragraphs 115 of the Complaint, but crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

26.     This Defendant would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 116 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

27.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraph 117 of the Complaint and therefore, denies the same and demands strict proof thereof.

28.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in 118, 119, 120, 121, 122, 123, 124 and 125 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

29.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 126 of the Complaint regarding the patient's expectations after her constant consultations with numerous medical staff in the weeks leading up to her child's birth.  This Defendant does admit the child was healthy upon delivery due to the work of the medical team.  Any allegations inconsistent with these records or intended to allege liability or damages against this Defendant are expressly denied.

30.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraphs 127, 128, 129, 130, 131, 132, 133, 134, 135, 136 and 137

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

which reference records of outside individuals, but could crave reference to the MUSC medical records regarding care and treatment by their staff members.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

31.    This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraph 138 regarding Ms. Scannell's mental state and therefore, denies the same and demands strict proof thereof. Further answering, this Defendant denies the allegations regarding Ms. Scannell's grievous suffering and demands strict proof thereof.

32.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 139, 140, 141, 142, 143, 144, 145 and 146 of the Complaint.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

33.    Answering the allegations contained in Paragraph 147 of the Complaint, this Defendant admits there was approximately a 36 hour timeframe where Plaintiff did not see her child, but denies the remaining allegations as alleged and demands strict proof thereof.

34.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 148, 149, 150, 151 and 152 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

35.    This Defendant denies the allegations set forth in Paragraph 153 of the Complaint as stated and demands strict proof thereof.

36.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

and 165 of the Complaint.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

37.     Answering the allegations contained in Paragraph 166, 167, 168 and 169 of the Complaint, this Defendant admits that a probable cause hearing was held at Charleston County's Family Court and admits the child was ordered to be returned to the Plaintiff.  This Defendant is without knowledge or information sufficient to answer the allegations regarding specific statements, testimony and details of the Court Order from said hearing and crave reference to the transcript for its contents. Any allegations inconsistent with said transcript or intended to allege liability or damages against this Defendant are expressly denied.  Defendant would crave reference to the MUSC medical records regarding Plaintiff's mental state.

38.     The allegations contained in Paragraph 170 of the Complaint are directed parties other than this Defendant and therefore no response is required.

39.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 171, 172 and 173 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

40.     This Defendant denies the allegations set forth in Paragraph 174 of the Complaint as stated and demands strict proof thereof.

41.     The allegations contained in Paragraphs 175, 176 and 177 of the Complaint are directed parties other than this Defendant and therefore no response is required.

42.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 178, 179, 180 and 181 of the Complaint.   Any

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

43.     Answering the allegations contained in Paragraph 182 of the Complaint, this Defendant admits Plaintiff was discharged from the hospital on or about July 17, 2018, but the remaining allegations are directed at other parties and do not warrant a response. Any allegation inconsistent with this response is denied.

44.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraphs 183 and 184 of the Complaint, but crave reference to the Plaintiff's medical records regarding the contents of her psychiatric evaluation by Dr. Guille and communication Dr. Johnson had with Ms. Bradford. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

45.     The allegations contained in Paragraphs 185 and 186 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

46.     This Defendant admits that Dr. Johnson testified at some point regarding this matter, but lacks knowledge or information sufficient to answer the detailed allegations contained in Paragraph 187 of the Complaint and, therefore, demands strict proof thereof. Further responding, this Defendant craves reference to the complete transcript of such testimony for its contents therein. Any allegations inconsistent with that transcript or intention to allege liability or damages against this Defendant are expressly denied.

47.     The allegations contained in Paragraphs 188, 189, 190, 191 and 192 of the Complaint are directed parties other than this Defendant and therefore no response is required.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

48.     This Defendant would crave reference to the MUSC responses to interrogatories from the Charleston Legislative Delegations in response to the allegations contained in Paragraph 193 of the Complaint, but denies this cut-and-paste excerpt should be viewed as an adequate explanation of Plaintiff's complex medical care and treatment leading up to the birth of her child as detailed in the MUSC medical records.   Any allegations inconsistent with this response is expressly denied.

49.     The allegations contained in Paragraphs 194, 195, 196, 197, 198, 199 and 200 of the Complaint are directed parties other than this Defendant and therefore no response is required.   Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

50.     This Defendant denies the allegations contained in Paragraph 201 of the Complaint and demands strict proof thereof.

51.     Answering the allegations contained in Paragraph 202 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

52.     The allegations contained in Paragraphs 203, 204, 205, 206, 207 and 208 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

53.     Answering the allegations contained in Paragraph 209 of the Complaint, this Defendant restates its answer contained in the above paragraphs as if stated verbatim herein.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

54.    The allegations contained in Paragraphs 210, 211, 212, 213, 214, 215, 216, 217, 218, 219 and 220 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

55.    Answering the allegations contained in Paragraph 221 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

56.    This Defendant denies the allegations contained in Paragraphs 222, 223, 224, 225 and 226 of the Complaint, including all subparts, and demands strict proof thereof.

57.    Answering the allegations contained in Paragraph 227 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

58.    This Defendant denies the allegations contained in Paragraph 228 of the Complaint, including all subparts, and demands strict proof thereof.

59.    The allegations set forth in Paragraphs 229 and 230 call for legal conclusions to which no response is required.

60.    This Defendant denies the allegations contained in Paragraphs 231, 232, 233, 234, 235, 236, 237, 238 and 239 of the Complaint, including all subparts, and demands strict proof thereof.

61.    Answering the allegations contained in Paragraph 240 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

62.    This Defendant denies the allegations contained in Paragraphs 241, 242, 243, 244 and 245 of the Complaint, including all subparts, and demands strict proof thereof.

63.    Answering the allegations contained in Paragraph 246 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

64.    The allegations set forth in Paragraphs 247, 248 and 249 call for legal conclusions to which no response is required. Further responding, this Defendant asserts that such Codes do not establish the applicable standard of care in this case.

65.    This Defendant denies the allegations contained in Paragraph 250 of the Complaint and demands strict proof thereof.

66.    The allegations contained in Paragraphs 251 and 252 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

67.    This Defendant denies the allegations contained in Paragraphs 253, 254 and 255 of the Complaint and demands strict proof thereof.

68.    Answering the allegations contained in Paragraph 256 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

69.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 257 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

70.    This Defendant denies the allegations contained in Paragraphs 258, 259, 260 and 261 of the Complaint and demands strict proof thereof.

71.    Answering the allegations contained in Paragraph 262 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

72.    This Defendant denies the allegations contained in Paragraph 263 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

73.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 264 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

74.    This Defendant denies the allegations contained in Paragraphs 265, 266, 267 and 268 of the Complaint and demands strict proof thereof.

75.    Answering the allegations contained in Paragraph 269 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

76.    This Defendant denies the allegations contained in Paragraphs 270, 271, 272 and 273 of the Complaint and demands strict proof thereof.

77.    Answering the allegations contained in Paragraph 274 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

78.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 275 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

79.    This Defendant denies the allegations contained in Paragraphs 276, 277, 278, 279, 280, 281, 282, 283 and 284 of the Complaint and demands strict proof thereof.

80.    Answering the allegations contained in Paragraph 285 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

81.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 286 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

82.    This Defendant denies the allegations contained in Paragraphs 287, 288, 289, 290 and 291 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

83.     Answering the allegations contained in Paragraph 292 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

84.     This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 293 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

85.     This Defendant denies the allegations contained in Paragraphs 294, 295, 296, 297 and 298 of the Complaint and demands strict proof thereof.

86.     Answering the allegations contained in Paragraph 299 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

87.     The allegations contained in Paragraphs 300, 301, 302, 303, 304 and 305 of the Complaint are directed parties other than this Defendant and therefore no response is required.

88.     Answering the allegations contained in Paragraph 306 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

89.     This Defendant denies the allegations contained in Paragraph 307 of the Complaint and demands strict proof thereof.

90.     The allegations contained in Paragraph 308 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

91.     This Defendant denies the allegations contained in Paragraphs 309, 310, 311, 312 and 313 of the Complaint and demands strict proof thereof.

92.     This Defendant denies Plaintiff's Prayer for Relief in full.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

93.     This Defendant is a governmental entity of the State of South Carolina as defined under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 *et. seq.*, and thereby asserts the defense of sovereign immunity pursuant to the terms of the aforesaid Tort Claims Act.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

94.     As an agency of the State of South Carolina, this case is subject to the South Carolina Tort Claims Act, to include and not be limited to its limitations on liability.  Further, as to any violation of common law or state law, this Defendant assert the provisions of the South Carolina Tort Claims Act, <u>S.C. Code Ann.</u> §15-78-10, <u>et</u> <u>seq</u>, and its pertinent parts which include but are not limited to §§15-78-120; 15-78-60(5); 15-78-60(25); 15-78-60(20); and 15-78 100(c).

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

95.     This Defendant plead that any award or assessment of punitive damages is barred by the South Carolina Tort Claims Act, and would also violate the this Defendant' constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and comparable provisions of the South Carolina Constitution. this Defendant move to strike any such claim.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

96.     Plaintiff's Complaint fails to state facts sufficient to constitute a cause of action and therefore, should be dismissed pursuant to Rule 12(b)(6), SCRCP.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

97.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1983 by failing to identify the deprivation of any valid right secured by the Constitution or laws of the United States.

<div align="center">

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

</div>

98.    To the extent that punitive damages are sought by Plaintiff, Plaintiff is not entitled to punitive damages vis-à-vis this Defendant because the alleged acts, omissions or failures to act by this Defendant were not willful, wanton or reckless.

<div align="center">

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

</div>

99.    This Defendant would affirmatively state that at all times it and its employees complied with the applicable standard of care.

<div align="center">

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

</div>

100.    These individual Defendants were state officials acting in an official capacity and is entitled to immunity pursuant to the Eleventh Amendment of the Constitution of the United States from suit for monetary damages.

<div align="center">

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

</div>

101.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1985 by failing to identify a conspiracy, an act in furtherance of the conspiracy, and/or an intent to deprive the Plaintiff of equal protection of the law on part of this Defendant.

<div align="center">

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

</div>

102.    Plaintiff's claim under 42 U.S.C § 1985 fail as a matter of law pursuant to the intracorporate conspiracy doctrine.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

## FURTHER ANSWERING AND FOR A
## FURTHER AND AFFIRMATIVE DEFENSE

103.    Certain of Plaintiff's claims fail as a matter of law under S.C. Code Ann. § 15-78-70(b) because Plaintiff has not shown that this Defendant's actions or inactions constituted fraud, malice, an intent to harm, or a crime involving moral turpitude.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

104.    A claim for punitive damages and an award of punitive damages would violate those clauses of the Constitutions of the United States and South Carolina related to privileges and immunities, due process and equal protection and this Defendant would further assert the protections, defenses, and statutory rights set forth in S.C. Code Ann. §§ 15-32-510, 15-32-520, 15-32-530, 15-32-540, *et. seq.*

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

105.    There was no negligence, gross negligence, recklessness, or wantonness on the part of this Defendant which proximately caused or contributed to Plaintiff's alleged injuries.

## FURTHER ANSWERING AND FOR A
## FURTHER AND AFFIRMATIVE DEFENSE

106.    Plaintiff's claims may be barred in whole or in part by applicable statutes of limitation or statutes of repose.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

107.    Plaintiff did not have an "impairment," real or perceived, under 42 U.S.C. §12102(1) and 42 U.S.C. §12102(3)(A) and therefore her claims under the Americans with Disabilities Act should be dismissed.

## FURTHER ANSWERING AND BY WAY OF A

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

**FURTHER AND AFFIRMATIVE DEFENSE**

108.    This Defendant did not coerce, intimidate, threaten, or interfere with Plaintiff's exercise or enjoyment of any right granted or protected by the Americans with Disabilities Act, and therefore her claims under that Act should be dismissed.

**FURTHER ANSWERING AND BY WAY OF A
FURTHER AND AFFIRMATIVE DEFENSE**

109.    42 U.S.C. §12202 of the Americans with Disabilities Act is unconstitutional and therefore this Defendant is protected from legal action arising under the Act by the Eleventh Amendment of the United States Constitution.

**FURTHER ANSWERING AND BY WAY OF A
FURTHER AND AFFIRMATIVE DEFENSE**

110.    This Defendant reserve any additional affirmative defenses as may be revealed or available to it during the course of their investigation or discovery in this case.


                                    YOUNG CLEMENT RIVERS, LLP


                                    By: s/D. Jay Davis, Jr.
                                    D. Jay Davis, Jr.
                                    James E. Scott, IV
                                    Kate C. Mettler
                                    P.O. Box 993, Charleston, SC  29402
                                    (843) 577-4000; jdavis@ycrlaw.com;
                                    jscott@ycrlaw.com; kmettler@ycrlaw.com
                                    Attorneys for Defendant Kelly Finke

Charleston, South Carolina

Dated: September 21, 2020

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | NINTH  JUDICIAL CIRCUIT |
| | ) | |
| ELIZABETH DE'ANNA SCANNELL, | ) | CASE NO. 2020-CP-10-02959 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT | ) | |
| OF SOCIAL SERVICES (SCDSS), | ) | |
| MEDICAL UNIVERSITY OF SOUTH | ) | |
| CAROLINA, CYNTHIA BRADFORD, | ) | **ANSWER ON BEHALF OF DEFENDANT** |
| MOSETTA CLARK, LOUCHETIA | ) | **MICHELLE IRENE AMAYA** |
| SIMMONS-ROBINSON, JANE BELL, | ) | |
| MICHAEL LEACH, DONNA | ) | |
| JOHNSON, MICHELLE IRENE | ) | |
| AMAYA, KELLY FINKE, this Defendant | ) | |
| ADMINISTRATOR 1, this Defendant | ) | |
| ADMINISTRATOR 2, this Defendant | ) | |
| ADMINISTRATOR 3, AND this | ) | |
| Defendant PUBLIC SAFETY | ) | |
| SUPERVISOR , | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

TO: ROBERT J. BUTCHER AND DEBORAH J. BUTCHER, ATTORNEYS FOR THE PLAINTIFF:

The Defendant Michelle Irene Amaya (hereinafter referred to as "Dr. Amaya" or "this Defendant"), by and through her undersigned counsel, hereby responds to the allegations set forth in the Complaint as follows:

1.    Any allegation set forth in the Complaint not specifically admitted, modified, or otherwise denied is hereby expressly denied and strict proof is demands thereof.

2.    This Defendant admits the allegations contained in Paragraph 1 of the Complaint, upon information and belief.

1

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

3.      The allegations contained in Paragraphs 2, 3, 4, 5, 6 and 7 of the Complaint are directed parties other than this Defendant and therefore no response is required.

4.      Answering the allegations contained in Paragraph 8 of the Complaint, this Defendant admits that MUSC is a corporation organized and existing under the laws of the State of South Carolina and that it conducts business in Charleston County, including the facility where Plaintiff gave birth to A.D.S. Further, this Defendant admits that MUSC is a state agency and assert that it is covered under the South Carolina Tort Claims Act and is entitled to all protections, immunities, and limitations of liability afforded thereunder.

5.      Answering the allegations contained in Paragraph 9 of the Complaint, this Defendant admits only that Dr. Johnson is a physician and professor employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

6.      Answering the allegations contained in Paragraph 10 of the Complaint, this Defendant admits only that she is a physician and associate professor employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

7.      Answering the allegations contained in Paragraph 11 of the Complaint, this Defendant admits only that Kelly Finke, MSW is a Licensed Master Social Worker employed by MUSC. This Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, denies the same and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

8.     This Defendant lacks the knowledge or information sufficient to form an opinion as to the truth of the allegations in Paragraph 12 of the Complaint regarding the residency and citizenry of unnamed Defendants who are supposedly employed by MUSC, and therefore, denies the same and demands strict proof thereof. Further responding, this Defendant denies these alleged MUSC employees ordered or approved of putting Ms. Scannell into emergency protective custody without cause. Finally, this Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in Paragraph 12 and, therefore, denies the same and demands strict proof thereof.

9.     Answering the allegations contained in Paragraph 13 of the Complaint, this Defendant lacks knowledge or information sufficient to form an opinion as to the truth of the allegations regarding an unnamed Defendant who is supposedly employed by this Defendant, and therefore, denies the same and demands strict proof thereof.

10.     The allegations contained in Paragraphs 14 and 15 of the Complaint call for legal conclusions and do no warrant a response.

11.     This Defendant denies the allegations contained in Paragraph 16 of the Complaint, as stated, and demands strict proof thereof.

12.     The Defendants would crave reference to Ms. Scannell MUSC IOP's psychiatric medical records in response to the allegations contained in Paragraphs 17, 18, 19 and 20 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

13.     This Defendant denies the allegations contained in Paragraph 21 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

14.     This Defendant admits Plaintiff's age, but otherwise is without knowledge or information sufficient to answer the allegations contained in Paragraphs 22, 23, 24, 25, 26, 27, 28, 29, and 30 of the Complaint and, therefore, denies the same and demands strict proof thereof.

15.     Answering the allegations contained in paragraph 31 of the Complaint, the Defendants admits, upon information and belief, Plaintiff was diagnosed with placenta previa at some point and referred to MUSC.  Defendants is without knowledge or information sufficient to answer the remaining allegations and, therefore, denies the same and demands strict proof thereof.

16.     This Defendant is without knowledge or information sufficient to answer the details of the allegations contained in Paragraphs 32 through 61 of the Complaint, but admits generally that Plaintiff was seen and evaluated on several occasions at MUSC by Dr. Head, Dr. Johnson and others during the timeframe in question.  Further answering, Defendants crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

17.     The Defendants denies the allegations contained in Paragraph 62 of the Complaint, as stated.

18.     The Defendants would crave referenced to the MUSC medical records in response to the allegations contained in Paragraphs 63, 64, 65, 66, 67, 68, 69, 70 and 71 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

19.     This Defendant admits Plaintiff did not want anyone to die during childbirth, but denies the remaining allegations contained in Paragraph 72 of the Complaint, as alleged.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

20.    This Defendant would crave reference to the MUSC medical records in answering the allegations contained in Paragraphs 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109 and 110  of the Complaint. This Defendant denies any allegation intended to imply Plaintiff should have felt "reassured" with regards to her continued disregard for the medical providers' recommendations.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

21.    Answering the allegations contained in Paragraph 111 of the Complaint, this Defendant admits that a meeting was held by MUSC's Ethics Committee to discuss the best course of treatment for Plaintiff and her unborn child. This Defendant would crave reference to the MUSC medical records regarding the details of their care and treatment. Any allegation inconsistent with this response is denied.

22.    This Defendant would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 112 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

23.    This Defendant denies the allegations contained in Paragraph 113 of the Complaint, as stated, and demands strict proof thereof.

24.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 114 regarding the content of Dr. Navarro's. This Defendant lacks knowledge or information sufficient to form an opinion as to Ms. Scannell's mental state and therefore, denies the same and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

25.     This Defendant is without knowledge or information sufficient to answer the allegation contained in Paragraphs 115 of the Complaint, but crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

26.     This Defendant would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 116 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

27.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraph 117 of the Complaint and therefore, denies the same and demands strict proof thereof.

28.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in 118, 119, 120, 121, 122, 123, 124 and 125 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

29.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 126 of the Complaint regarding the patient's expectations after her constant consultations with numerous medical staff in the weeks leading up to her child's birth.  This Defendant does admit the child was healthy upon delivery due to the work of the medical team.  Any allegations inconsistent with these records or intended to allege liability or damages against this Defendant are expressly denied.

30.     This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraphs 127, 128, 129, 130, 131, 132, 133, 134, 135, 136 and 137

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

which reference records of outside individuals, but could crave reference to the MUSC medical records regarding care and treatment by their staff members.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

31.    This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraph 138 regarding Ms. Scannell's mental state and therefore, denies the same and demands strict proof thereof. Further answering, this Defendant denies the allegations regarding Ms. Scannell's grievous suffering and demands strict proof thereof.

32.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 139, 140, 141, 142, 143, 144, 145 and 146 of the Complaint.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

33.    Answering the allegations contained in Paragraph 147 of the Complaint, this Defendant admits there was approximately a 36 hour timeframe where Plaintiff did not see her child, but denies the remaining allegations as alleged and demands strict proof thereof.

34.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 148, 149, 150, 151 and 152 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

35.    This Defendant denies the allegations set forth in Paragraph 153 of the Complaint as stated and demands strict proof thereof.

36.    This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

and 165 of the Complaint.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

37.     Answering the allegations contained in Paragraph 166, 167, 168 and 169 of the Complaint, this Defendant admits that a probable cause hearing was held at Charleston County's Family Court and admits the child was ordered to be returned to the Plaintiff.  This Defendant is without knowledge or information sufficient to answer the allegations regarding specific statements, testimony and details of the Court Order from said hearing and crave reference to the transcript for its contents. Any allegations inconsistent with said transcript or intended to allege liability or damages against this Defendant are expressly denied.  Defendant would crave reference to the MUSC medical records regarding Plaintiff's mental state.

38.     The allegations contained in Paragraph 170 of the Complaint are directed parties other than this Defendant and therefore no response is required.

39.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 171, 172 and 173 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

40.     This Defendant denies the allegations set forth in Paragraph 174 of the Complaint as stated and demands strict proof thereof.

41.     The allegations contained in Paragraphs 175, 176 and 177 of the Complaint are directed parties other than this Defendant and therefore no response is required.

42.     This Defendant would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 178, 179, 180 and 181 of the Complaint.   Any

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

43.    Answering the allegations contained in Paragraph 182 of the Complaint, this Defendant admits Plaintiff was discharged from the hospital on or about July 17, 2018, but the remaining allegations are directed at other parties and do not warrant a response. Any allegation inconsistent with this response is denied.

44.    This Defendant is without knowledge or information sufficient to answer the allegations contained in Paragraphs 183 and 184 of the Complaint, but crave reference to the Plaintiff's medical records regarding the contents of her psychiatric evaluation by Dr. Guille and communication Dr. Johnson had with Ms. Bradford. Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

45.    The allegations contained in Paragraphs 185 and 186 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

46.    This Defendant admits that Dr. Johnson testified at some point regarding this matter, but lacks knowledge or information sufficient to answer the detailed allegations contained in Paragraph 187 of the Complaint and, therefore, demands strict proof thereof. Further responding, this Defendant craves reference to the complete transcript of such testimony for its contents therein. Any allegations inconsistent with that transcript or intention to allege liability or damages against this Defendant are expressly denied.

47.    The allegations contained in Paragraphs 188, 189, 190, 191 and 192 of the Complaint are directed parties other than this Defendant and therefore no response is required.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

48.    This Defendant would crave reference to the MUSC responses to interrogatories from the Charleston Legislative Delegations in response to the allegations contained in Paragraph 193 of the Complaint, but denies this cut-and-paste excerpt should be viewed as an adequate explanation of Plaintiff's complex medical care and treatment leading up to the birth of her child as detailed in the MUSC medical records.  Any allegations inconsistent with this response is expressly denied.

49.    The allegations contained in Paragraphs 194, 195, 196, 197, 198, 199 and 200 of the Complaint are directed parties other than this Defendant and therefore no response is required.  Any allegations inconsistent with those records or intended to allege liability or damages against this Defendant are expressly denied.

50.    This Defendant denies the allegations contained in Paragraph 201 of the Complaint and demands strict proof thereof.

51.    Answering the allegations contained in Paragraph 202 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

52.    The allegations contained in Paragraphs 203, 204, 205, 206, 207 and 208 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

53.    Answering the allegations contained in Paragraph 209 of the Complaint, this Defendant restates its answer contained in the above paragraphs as if stated verbatim herein.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

54.     The allegations contained in Paragraphs 210, 211, 212, 213, 214, 215, 216, 217, 218, 219 and 220 of the Complaint are directed parties other than this Defendant and therefore no response is required. To the extent those allegations are directed at this Defendant or a response is required, they are expressly denied.

55.     Answering the allegations contained in Paragraph 221 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

56.     This Defendant denies the allegations contained in Paragraphs 222, 223, 224, 225 and 226 of the Complaint, including all subparts, and demands strict proof thereof.

57.     Answering the allegations contained in Paragraph 227 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

58.     This Defendant denies the allegations contained in Paragraph 228 of the Complaint, including all subparts, and demands strict proof thereof.

59.     The allegations set forth in Paragraphs 229 and 230 call for legal conclusions to which no response is required.

60.     This Defendant denies the allegations contained in Paragraphs 231, 232, 233, 234, 235, 236, 237, 238 and 239 of the Complaint, including all subparts, and demands strict proof thereof.

61.     Answering the allegations contained in Paragraph 240 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

62.     This Defendant denies the allegations contained in Paragraphs 241, 242, 243, 244 and 245 of the Complaint, including all subparts, and demands strict proof thereof.

63.     Answering the allegations contained in Paragraph 246 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

64.    The allegations set forth in Paragraphs 247, 248 and 249 call for legal conclusions to which no response is required. Further responding, this Defendant asserts that such Codes do not establish the applicable standard of care in this case.

65.    This Defendant denies the allegations contained in Paragraph 250 of the Complaint and demands strict proof thereof.

66.    The allegations contained in Paragraphs 251 and 252 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

67.    This Defendant denies the allegations contained in Paragraphs 253, 254 and 255 of the Complaint and demands strict proof thereof.

68.    Answering the allegations contained in Paragraph 256 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

69.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 257 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

70.    This Defendant denies the allegations contained in Paragraphs 258, 259, 260 and 261 of the Complaint and demands strict proof thereof.

71.    Answering the allegations contained in Paragraph 262 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

72.    This Defendant denies the allegations contained in Paragraph 263 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

73.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 264 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

74.    This Defendant denies the allegations contained in Paragraphs 265, 266, 267 and 268 of the Complaint and demands strict proof thereof.

75.    Answering the allegations contained in Paragraph 269 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

76.    This Defendant denies the allegations contained in Paragraphs 270, 271, 272 and 273 of the Complaint and demands strict proof thereof.

77.    Answering the allegations contained in Paragraph 274 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

78.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 275 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

79.    This Defendant denies the allegations contained in Paragraphs 276, 277, 278, 279, 280, 281, 282, 283 and 284 of the Complaint and demands strict proof thereof.

80.    Answering the allegations contained in Paragraph 285 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

81.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 286 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

82.    This Defendant denies the allegations contained in Paragraphs 287, 288, 289, 290 and 291 of the Complaint and demands strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

83.    Answering the allegations contained in Paragraph 292 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

84.    This Defendant is without knowledge or information sufficient to answer the allegations in Paragraph 293 of the Complaint and, therefore, denies the same and demands strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

85.    This Defendant denies the allegations contained in Paragraphs 294, 295, 296, 297 and 298 of the Complaint and demands strict proof thereof.

86.    Answering the allegations contained in Paragraph 299 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

87.    The allegations contained in Paragraphs 300, 301, 302, 303, 304 and 305 of the Complaint are directed parties other than this Defendant and therefore no response is required.

88.    Answering the allegations contained in Paragraph 306 of the Complaint, this Defendant restates its answers contained in the above paragraphs as if stated verbatim herein.

89.    This Defendant denies the allegations contained in Paragraph 307 of the Complaint and demands strict proof thereof.

90.    The allegations contained in Paragraph 308 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

91.    This Defendant denies the allegations contained in Paragraphs 309, 310, 311, 312 and 313 of the Complaint and demands strict proof thereof.

92.    This Defendant denies Plaintiff's Prayer for Relief in full.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

93.    This Defendant is a governmental entity of the State of South Carolina as defined under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 *et. seq.*, and thereby asserts the defense of sovereign immunity pursuant to the terms of the aforesaid Tort Claims Act.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

94.    As an agency of the State of South Carolina, this case is subject to the South Carolina Tort Claims Act, to include and not be limited to its limitations on liability.  Further, as to any violation of common law or state law, this Defendant assert the provisions of the South Carolina Tort Claims Act, S.C. Code Ann. §15-78-10, et seq, and its pertinent parts which include but are not limited to §§15-78-120; 15-78-60(5); 15-78-60(25); 15-78-60(20); and 15-78 100(c).

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

95.    This Defendant plead that any award or assessment of punitive damages is barred by the South Carolina Tort Claims Act, and would also violate the this Defendant' constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and comparable provisions of the South Carolina Constitution. this Defendant move to strike any such claim.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

96.    Plaintiff's Complaint fails to state facts sufficient to constitute a cause of action and therefore, should be dismissed pursuant to Rule 12(b)(6), SCRCP.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

97.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1983 by failing to identify the deprivation of any valid right secured by the Constitution or laws of the United States.

<p style="text-align:center"><b>FURTHER ANSWERING AND FOR A<br>FURTHER AND AFFIRMATIVE DEFENSE</b></p>

98.    To the extent that punitive damages are sought by Plaintiff, Plaintiff is not entitled to punitive damages vis-à-vis this Defendant because the alleged acts, omissions or failures to act by this Defendant were not willful, wanton or reckless.

<p style="text-align:center"><b>FURTHER ANSWERING AND BY WAY OF A<br>FURTHER AND AFFIRMATIVE DEFENSE</b></p>

99.    This Defendant would affirmatively state that at all times it and its employees complied with the applicable standard of care.

<p style="text-align:center"><b>FURTHER ANSWERING AND FOR A<br>FURTHER AND AFFIRMATIVE DEFENSE</b></p>

100.    These individual Defendants were state officials acting in an official capacity and is entitled to immunity pursuant to the Eleventh Amendment of the Constitution of the United States from suit for monetary damages.

<p style="text-align:center"><b>FURTHER ANSWERING AND FOR A<br>FURTHER AND AFFIRMATIVE DEFENSE</b></p>

101.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1985 by failing to identify a conspiracy, an act in furtherance of the conspiracy, and/or an intent to deprive the Plaintiff of equal protection of the law on part of this Defendant.

<p style="text-align:center"><b>FURTHER ANSWERING AND FOR A<br>FURTHER AND AFFIRMATIVE DEFENSE</b></p>

102.    Plaintiff's claim under 42 U.S.C § 1985 fail as a matter of law pursuant to the intracorporate conspiracy doctrine.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

103.    Certain of Plaintiff's claims fail as a matter of law under S.C. Code Ann. § 15-78-70(b) because Plaintiff has not shown that this Defendant's actions or inactions constituted fraud, malice, an intent to harm, or a crime involving moral turpitude.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

104.    A claim for punitive damages and an award of punitive damages would violate those clauses of the Constitutions of the United States and South Carolina related to privileges and immunities, due process and equal protection and this Defendant would further assert the protections, defenses, and statutory rights set forth in S.C. Code Ann. §§ 15-32-510, 15-32-520, 15-32-530, 15-32-540, *et. seq.*

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

105.    There was no negligence, gross negligence, recklessness, or wantonness on the part of this Defendant which proximately caused or contributed to Plaintiff's alleged injuries.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

106.    Plaintiff's claims may be barred in whole or in part by applicable statutes of limitation or statutes of repose.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

107.    Plaintiff did not have an "impairment," real or perceived, under 42 U.S.C. §12102(1) and 42 U.S.C. §12102(3)(A) and therefore her claims under the Americans with Disabilities Act should be dismissed.

**FURTHER ANSWERING AND BY WAY OF A**

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

## FURTHER AND AFFIRMATIVE DEFENSE

108.    This Defendant did not coerce, intimidate, threaten, or interfere with Plaintiff's exercise or enjoyment of any right granted or protected by the Americans with Disabilities Act, and therefore her claims under that Act should be dismissed.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

109.    42 U.S.C. §12202 of the Americans with Disabilities Act is unconstitutional and therefore this Defendant is protected from legal action arising under the Act by the Eleventh Amendment of the United States Constitution.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

110.    This Defendant reserve any additional affirmative defenses as may be revealed or available to it during the course of their investigation or discovery in this case.


YOUNG CLEMENT RIVERS, LLP


By: s/D. Jay Davis, Jr.
D. Jay Davis, Jr.
James E. Scott, IV
Kate C. Mettler
P.O. Box 993, Charleston, SC  29402
(843) 577-4000; jdavis@ycrlaw.com;
jscott@ycrlaw.com; kmettler@ycrlaw.com
Attorneys for Defendant Michelle Amaya

Charleston, South Carolina

Dated: September 21, 2020

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | NINTH  JUDICIAL CIRCUIT |
| | ) | |
| ELIZABETH DE'ANNA SCANNELL, | ) | CASE NO. 2020-CP-10-02959 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT | ) | **ANSWER ON BEHALF OF DEFENDANT** |
| OF SOCIAL SERVICES (SCDSS), | ) | **MEDICAL UNIVERSITY OF SOUTH** |
| MEDICAL UNIVERSITY OF SOUTH | ) | **CAROLINA, MUSC ADMINISTRATOR 1,** |
| CAROLINA, CYNTHIA BRADFORD, | ) | **MUSC ADMINISTRATOR 2, MUSC** |
| MOSETTA CLARK, LOUCHETIA | ) | **ADMINISTRATOR 3, AND MUSC** |
| SIMMONS-ROBINSON, JANE BELL, | ) | **PUBLIC SAFETY SUPERVISOR** |
| MICHAEL LEACH, DONNA | ) | |
| JOHNSON, MICHELLE IRENE | ) | |
| AMAYA, KELLY FINKE, MUSC | ) | |
| ADMINISTRATOR 1, MUSC | ) | |
| ADMINISTRATOR 2, MUSC | ) | |
| ADMINISTRATOR 3, AND MUSC | ) | |
| PUBLIC SAFETY SUPERVISOR , | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

TO: ROBERT J. BUTCHER AND DEBORAH J. BUTCHER, ATTORNEYS FOR THE PLAINTIFF:

The Defendants, Medical University of South Carolina, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3, and MUSC Public Safety Supervisor (hereinafter referred to as "MUSC Defendants" or "these Defendants"), by and through their undersigned counsel, hereby respond to the allegations set forth in the Complaint as follows:

1.    Any allegation set forth in the Complaint not specifically admitted, modified, or otherwise denied is hereby expressly denied and strict proof is demanded thereof.

2.    These Defendants admit the allegations contained in Paragraph 1 of the Complaint, upon information and belief.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

3.     The allegations contained in Paragraphs 2, 3, 4, 5, 6 and 7 of the Complaint are directed parties other than MUSC Defendants and therefore no response is required.

4.     Answering the allegations contained in Paragraph 8 of the Complaint, these Defendants admit that MUSC is a corporation organized and existing under the laws of the State of South Carolina and that it conducts business in Charleston County, including the facility where Plaintiff gave birth to A.D.S. Further, these Defendants admit that MUSC is a state agency and assert that it is covered under the South Carolina Tort Claims Act and is entitled to all protections, immunities, and limitations of liability afforded thereunder.

5.     Answering the allegations contained in Paragraph 9 of the Complaint, these Defendants admit only that Donna Johnson, M.D. is a physician and professor employed by MUSC. MUSC Defendants lack knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, deny the same and demand strict proof thereof.

6.     Answering the allegations contained in Paragraph 10 of the Complaint, these Defendants admit only that Michelle Irene Amaya, M.D., M.P.H. is a physician and associate professor employed by MUSC Defendants. MUSC Defendants lack knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, deny the same and demand strict proof thereof.

7.     Answering the allegations contained in Paragraph 11 of the Complaint, these Defendants admit only that Kelly Finke, MSW is a Licensed Master Social Worker employed by MUSC. MUSC Defendants lack knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in this Paragraph and, therefore, deny the same and demand strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

8.      These Defendants lack the knowledge or information sufficient to form an opinion as to the truth of the allegations in Paragraph 12 of the Complaint regarding the residency and citizenry of unnamed Defendants who are supposedly employed by MUSC, and therefore, deny the same and demand strict proof thereof. Further responding, MUSC Defendants deny these alleged MUSC employees ordered or approved of putting Ms. Scannell into emergency protective custody without cause. Finally, MUSC Defendants lack knowledge or information sufficient to form an opinion as to the truth of the remaining allegations contained in Paragraph 12 and, therefore, deny the same and demand strict proof thereof.

9.      Answering the allegations contained in Paragraph 13 of the Complaint, these Defendants lack knowledge or information sufficient to form an opinion as to the truth of the allegations regarding an unnamed Defendant who is supposedly employed by MUSC Defendants, and therefore, deny the same and demand strict proof thereof.

10.     The allegations contained in Paragraphs 14 and 15 of the Complaint call for legal conclusions and do no warrant a response.

11.     These Defendants deny the allegations contained in Paragraph 16 of the Complaint, as stated, and demand strict proof thereof.

12.     The Defendants would crave reference to Ms. Scannell MUSC IOP's psychiatric medical records in response to the allegations contained in Paragraphs 17, 18, 19 and 20 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

13.     These Defendants deny the allegations contained in Paragraph 21 of the Complaint and demand strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

14.    These Defendants admit Plaintiff's age, but otherwise are without knowledge or information sufficient to answer the allegations contained in Paragraphs 22, 23, 24, 25, 26, 27, 28, 29, and 30 of the Complaint and, therefore, deny the same and demand strict proof thereof.

15.    Answering the allegations contained in paragraph 31 of the Complaint, the Defendants admit, upon information and belief, Plaintiff was diagnosed with placenta previa at some point and referred to MUSC.  Defendants are without knowledge or information sufficient to answer the remaining allegations and, therefore, deny the same and demand strict proof thereof.

16.    These Defendants are without knowledge or information sufficient to answer the details of the allegations contained in Paragraphs 32 through 61 of the Complaint, but admit generally that Plaintiff was seen and evaluated on several occasions at MUSC by Dr. Head, Dr. Johnson and others during the timeframe in question.  Further answering, Defendants crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

17.    The Defendants deny the allegations contained in Paragraph 62 of the Complaint, as stated.

18.    The Defendants would crave referenced to the MUSC medical records in response to the allegations contained in Paragraphs 63, 64, 65, 66, 67, 68, 69, 70 and 71 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

19.    These Defendants admit Plaintiff did not want anyone to die during childbirth, but deny the remaining allegations contained in Paragraph 72 of the Complaint, as alleged.

20. These Defendants would crave reference to the MUSC medical records in answering the allegations contained in Paragraphs 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109 and 110 of the Complaint. These Defendants deny any allegation intended to imply Plaintiff should have felt "reassured" with regards to her continued disregard for the medical providers' recommendations. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

21. Answering the allegations contained in Paragraph 111 of the Complaint, these Defendants admit that a meeting was held by MUSC's Ethics Committee to discuss the best course of treatment for Plaintiff and her unborn child. These Defendants would crave reference to the MUSC medical records regarding the details of their care and treatment. Any allegation inconsistent with this response is denied.

22. These Defendants would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 112 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

23. These Defendants deny the allegations contained in Paragraph 113 of the Complaint, as stated, and demand strict proof thereof.

24. These Defendants would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 114 regarding the content of Dr. Navarro's. These Defendants lack knowledge or information sufficient to form an opinion as to Ms. Scannell's mental state and therefore, deny the same and demand strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

25.     These Defendants are without knowledge or information sufficient to answer the allegation contained in Paragraphs 115 of the Complaint, but crave reference to the Plaintiff's medical records for their contents. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

26.     These Defendants would crave reference to the Plaintiff's medical records in response to the allegations contained in Paragraph 116 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

27.     These Defendants are without knowledge or information sufficient to answer the allegations contained in Paragraph 117 of the Complaint and therefore, deny the same and demand strict proof thereof.

28.     These Defendants would crave reference to the MUSC medical records in response to the allegations contained in 118, 119, 120, 121, 122, 123, 124 and 125 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

29.     These Defendants would crave reference to the MUSC medical records in response to the allegations contained in Paragraph 126 of the Complaint regarding the patient's expectations after her constant consultations with numerous medical staff in the weeks leading up to her child's birth.  Defendants do admit the child was healthy upon delivery due to the work of the medical team.  Any allegations inconsistent with these records or intended to allege liability or damages against these Defendants are expressly denied.

30.     These Defendants are without knowledge or information sufficient to answer the allegations contained in Paragraphs 127, 128, 129, 130, 131, 132, 133, 134, 135, 136 and 137

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

which reference records of outside individuals, but could crave reference to the MUSC medical records regarding care and treatment by their staff members.  Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

31.     These Defendants are without knowledge or information sufficient to answer the allegations contained in Paragraph 138 regarding Ms. Scannell's mental state and therefore, deny the same and demand strict proof thereof. Further answering, these Defendants deny the allegations regarding Ms. Scannell's grievous suffering and demand strict proof thereof.

32.     These Defendants would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 139, 140, 141, 142, 143, 144, 145 and 146 of the Complaint.  Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

33.     Answering the allegations contained in Paragraph 147 of the Complaint, these Defendants admit there was approximately a 36 hour timeframe where Plaintiff did not see her child, but deny the remaining allegations as alleged and demand strict proof thereof.

34.     These Defendants would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 148, 149, 150, 151 and 152 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

35.     These Defendants deny the allegations set forth in Paragraph 153 of the Complaint as stated and demand strict proof thereof.

36.     These Defendants would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 154, 155, 156, 157, 158, 159, 160, 161, 162,

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

163, 164 and 165 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

37.    Answering the allegations contained in Paragraph 166, 167, 168 and 169 of the Complaint, these Defendants admit that a probable cause hearing was held at Charleston County's Family Court and admit the child was ordered to be returned to the Plaintiff. These Defendants are without knowledge or information sufficient to answer the allegations regarding specific statements, testimony and details of the Court Order from said hearing and crave reference to the transcript for its contents. Any allegations inconsistent with said transcript or intended to allege liability or damages against these Defendants are expressly denied. Defendant would crave reference to the MUSC medical records regarding Plaintiff's mental state.

38.    The allegations contained in Paragraph 170 of the Complaint are directed parties other than these Defendants and therefore no response is required.

39.    These Defendants would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 171, 172 and 173 of the Complaint. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

40.    These Defendants deny the allegations set forth in Paragraph 174 of the Complaint as stated and demand strict proof thereof.

41.    The allegations contained in Paragraphs 175, 176 and 177 of the Complaint are directed parties other than these Defendants and therefore no response is required.

42.    These Defendants would crave reference to the MUSC medical records in response to the allegations contained in Paragraphs 178, 179, 180 and 181 of the Complaint.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

43.    Answering the allegations contained in Paragraph 182 of the Complaint, these Defendants admit Plaintiff was discharged from the hospital on or about July 17, 2018, but the remaining allegations are directed at other parties and do not warrant a response. Any allegation inconsistent with this response is denied.

44.    These Defendants are without knowledge or information sufficient to answer the allegations contained in Paragraphs 183 and 184 of the Complaint, but crave reference to the Plaintiff's medical records regarding the contents of her psychiatric evaluation by Dr. Guille and communication Dr. Johnson had with Ms. Bradford. Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

45.    The allegations contained in Paragraphs 185 and 186 of the Complaint are directed parties other than these Defendants and therefore no response is required. To the extent those allegations are directed at these Defendants or a response is required, they are expressly denied.

46.    These Defendants admit Dr. Johnson testified at some point regarding this matter, but lack knowledge or information sufficient to answer the detailed allegations contained in Paragraph 187 of the Complaint and, therefore, demand strict proof thereof. Further responding, these Defendants crave reference to the complete transcript of such testimony for its contents therein. Any allegations inconsistent with that transcript or intention to allege liability or damages against these Defendants are expressly denied.

47.    The allegations contained in Paragraphs 188, 189, 190, 191 and 192 of the Complaint are directed parties other than these Defendants and therefore no response is required.

9

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

To the extent those allegations are directed at these Defendants or a response is required, they are expressly denied.

48.     These Defendants would crave reference to the MUSC responses to interrogatories from the Charleston Legislative Delegations in response to the allegations contained in Paragraph 193 of the Complaint, but deny this cut-and-paste excerpt should be viewed as an adequate explanation of Plaintiff's complex medical care and treatment leading up to the birth of her child as detailed in the MUSC medical records.  Any allegations inconsistent with this response is expressly denied.

49.     The allegations contained in Paragraphs 194, 195, 196, 197, 198, 199 and 200 of the Complaint are directed parties other than these Defendants and therefore no response is required.  Any allegations inconsistent with those records or intended to allege liability or damages against these Defendants are expressly denied.

50.     These Defendants deny the allegations contained in Paragraph 201 of the Complaint and demand strict proof thereof.

51.     Answering the allegations contained in Paragraph 202 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

52.     The allegations contained in Paragraphs 203, 204, 205, 206, 207 and 208 of the Complaint are directed parties other than these Defendants and therefore no response is required. To the extent those allegations are directed at these Defendants or a response is required, they are expressly denied.

53.     Answering the allegations contained in Paragraph 209 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

54.    The allegations contained in Paragraphs 210, 211, 212, 213, 214, 215, 216, 217, 218, 219 and 220 of the Complaint are directed parties other than these Defendants and therefore no response is required. To the extent those allegations are directed at these Defendants or a response is required, they are expressly denied.

55.    Answering the allegations contained in Paragraph 221 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

56.    These Defendants deny the allegations contained in Paragraphs 222, 223, 224, 225 and 226 of the Complaint, including all subparts, and demand strict proof thereof.

57.    Answering the allegations contained in Paragraph 227 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

58.    These Defendants deny the allegations contained in Paragraph 228 of the Complaint, including all subparts, and demand strict proof thereof.

59.    The allegations set forth in Paragraphs 229 and 230 call for legal conclusions to which no response is required.

60.    These Defendants deny the allegations contained in Paragraphs 231, 232, 233, 234, 235, 236, 237, 238 and 239 of the Complaint, including all subparts, and demand strict proof thereof.

61.    Answering the allegations contained in Paragraph 240 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein

62.    These Defendants deny the allegations contained in Paragraphs 241, 242, 243, 244 and 245 of the Complaint, including all subparts, and demand strict proof thereof.

63.    Answering the allegations contained in Paragraph 246 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

64.     The allegations set forth in Paragraphs 247, 248 and 249 call for legal conclusions to which no response is required. Further responding, these Defendants asserts that such Codes do not establish the applicable standard of care in this case.

65.     These Defendants deny the allegations contained in Paragraph 250 of the Complaint and demand strict proof thereof.

66.     The allegations contained in Paragraphs 251 and 252 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

67.     These Defendants deny the allegations contained in Paragraphs 253, 254 and 255 of the Complaint and demand strict proof thereof.

68.     Answering the allegations contained in Paragraph 256 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

69.     These Defendants are without knowledge or information sufficient to answer the allegations in Paragraph 257 of the Complaint and, therefore, deny the same and demand strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

70.     These Defendants deny the allegations contained in Paragraphs 258, 259, 260 and 261 of the Complaint and demand strict proof thereof.

71.     Answering the allegations contained in Paragraph 262 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

72.     These Defendants deny the allegations contained in Paragraph 263 of the Complaint and demand strict proof thereof.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

73.     These Defendants are without knowledge or information sufficient to answer the allegations in Paragraph 264 of the Complaint and, therefore, deny the same and demand strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

74.     These Defendants deny the allegations contained in Paragraphs 265, 266, 267 and 268 of the Complaint and demand strict proof thereof.

75.     Answering the allegations contained in Paragraph 269 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

76.     These Defendants deny the allegations contained in Paragraphs 270, 271, 272 and 273 of the Complaint and demand strict proof thereof.

77.     Answering the allegations contained in Paragraph 274 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

78.     These Defendants are without knowledge or information sufficient to answer the allegations in Paragraph 275 of the Complaint and, therefore, deny the same and demand strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

79.     These Defendants deny the allegations contained in Paragraphs 276, 277, 278, 279, 280, 281, 282, 283 and 284 of the Complaint and demand strict proof thereof.

80.     Answering the allegations contained in Paragraph 285 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

81.     These Defendants are without knowledge or information sufficient to answer the allegations in Paragraph 286 of the Complaint and, therefore, deny the same and demand strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

82.     These Defendants deny the allegations contained in Paragraphs 287, 288, 289, 290 and 291 of the Complaint and demand strict proof thereof.

83.     Answering the allegations contained in Paragraph 292 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

84.     These Defendants are without knowledge or information sufficient to answer the allegations in Paragraph 293 of the Complaint and, therefore, deny the same and demand strict proof thereof. To the extent those allegations call for legal conclusions, no response is required.

85.     These Defendants deny the allegations contained in Paragraphs 294, 295, 296, 297 and 298 of the Complaint and demand strict proof thereof.

86.     Answering the allegations contained in Paragraph 299 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

87.     The allegations contained in Paragraphs 300, 301, 302, 303, 304 and 305 of the Complaint are directed parties other than these Defendants and therefore no response is required.

88.     Answering the allegations contained in Paragraph 306 of the Complaint, these Defendants restate their answers contained in the above paragraphs as if stated verbatim herein.

89.     These Defendants deny the allegations contained in Paragraph 307 of the Complaint and demand strict proof thereof.

90.     The allegations contained in Paragraph 308 of the Complaint call for legal conclusions and therefore no response is required. To the extent a response is required, those allegations are denied and strict proof is demanded thereof.

91.     These Defendants deny the allegations contained in Paragraphs 309, 310, 311, 312 and 313 of the Complaint and demand strict proof thereof.

92.     These Defendants deny Plaintiff's Prayer for Relief in full.

## <u>FURTHER ANSWERING AND BY WAY OF A<br>FURTHER AND AFFIRMATIVE DEFENSE</u>

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

93.    MUSC Defendants is a governmental entity of the State of South Carolina as defined under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 *et. seq.*, and thereby asserts the defense of sovereign immunity pursuant to the terms of the aforesaid Tort Claims Act.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

94.    As an agency of the State of South Carolina, this case is subject to the South Carolina Tort Claims Act, to include and not be limited to its limitations on liability.  Further, as to any violation of common law or state law, these Defendants assert the provisions of the South Carolina Tort Claims Act, S.C. Code Ann. §15-78-10, et seq, and its pertinent parts which include but are not limited to §§15-78-120; 15-78-60(5); 15-78-60(25); 15-78-60(20); and 15-78 100(c).

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

95.    MUSC Defendants plead that any award or assessment of punitive damages is barred by the South Carolina Tort Claims Act, and would also violate the MUSC Defendants' constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and comparable provisions of the South Carolina Constitution. MUSC Defendants move to strike any such claim.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

96.    Plaintiff's Complaint fails to state facts sufficient to constitute a cause of action and therefore, should be dismissed pursuant to Rule 12(b)(6), SCRCP.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

97.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1983 by failing to identify the deprivation of any valid right secured by the Constitution or laws of the United States.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

98.    To the extent that punitive damages are sought by Plaintiff, Plaintiff is not entitled to punitive damages vis-à-vis these Defendants because the alleged acts, omissions or failures to act by these Defendants were not willful, wanton or reckless.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

99.    MUSC Defendants would affirmatively state that at all times it and its employees complied with the applicable standard of care.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

100.    These individual Defendants were state officials acting in an official capacity and is entitled to immunity pursuant to the Eleventh Amendment of the Constitution of the United States from suit for monetary damages. Furthermore, these government officials were performing discretionary functions that did not violate a clearly established constitutional right, and therefore they are immune from suit under 42 U.S.C. § 1983.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

101.    MUSC did not create or implement policies or standards in a manner that amounted to deliberate indifference towards the known constitutional rights of the Plaintiff and, therefore, this action should be dismissed. Furthermore, MUSC adequately trained its employees and therefore is not subject to liability in this matter.

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

102.    To the extent plaintiff's claims are based on the doctrine of respondeat superior, such claims are barred because the doctrine of respondeat superior is not a basis for recovery under 42 U.S.C. § 1983.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

103.    Plaintiff has failed to state a proper claim under 42 U.S.C § 1985 by failing to identify a conspiracy, an act in furtherance of the conspiracy, and/or an intent to deprive the Plaintiff of equal protection of the law on part of this Defendant.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

104.    Plaintiff's claim under 42 U.S.C § 1985 fail as a matter of law pursuant to the intracorporate conspiracy doctrine.

**FURTHER ANSWERING AND FOR A**
**FURTHER AND AFFIRMATIVE DEFENSE**

105.    Certain of Plaintiff's claims fail as a matter of law under S.C. Code Ann. § 15-78-70(b) because Plaintiff has not shown that this Defendant's actions or inactions constituted fraud, malice, an intent to harm, or a crime involving moral turpitude.

**FURTHER ANSWERING AND BY WAY OF A**
**FURTHER AND AFFIRMATIVE DEFENSE**

106.    A claim for punitive damages and an award of punitive damages would violate those clauses of the Constitutions of the United States and South Carolina related to privileges and immunities, due process and equal protection and these Defendants would further assert the protections, defenses, and statutory rights set forth in S.C. Code Ann. §§ 15-32-510, 15-32-520, 15-32-530, 15-32-540, *et. seq.*

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

107.    There was no negligence, gross negligence, recklessness, or wantonness on the part of these Defendants which proximately caused or contributed to Plaintiff's alleged injuries.

## FURTHER ANSWERING AND FOR A
## FURTHER AND AFFIRMATIVE DEFENSE

108.    Plaintiff's claims may be barred in whole or in part by applicable statutes of limitation or statutes of repose.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

109.    Plaintiff did not have an "impairment," real or perceived, under 42 U.S.C. §12102(1) and 42 U.S.C. §12102(3)(A) and therefore her claims under the Americans with Disabilities Act should be dismissed.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

110.    MUSC Defendants did not coerce, intimidate, threaten, or interfere with Plaintiff's exercise or enjoyment of any right granted or protected by the Americans with Disabilities Act, and therefore her claims under that Act should be dismissed.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

111.    42 U.S.C. §12202 of the Americans with Disabilities Act is unconstitutional and therefore MUSC Defendants are protected from legal action arising under the Act by the Eleventh Amendment of the United States Constitution.

## FURTHER ANSWERING AND BY WAY OF A
## FURTHER AND AFFIRMATIVE DEFENSE

ELECTRONICALLY FILED - 2020 Sep 21 4:20 PM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

112.    MUSC Defendants reserve any additional affirmative defenses as may be revealed or available to it during the course of their investigation or discovery in this case.

YOUNG CLEMENT RIVERS, LLP

By: s/D. Jay Davis, Jr.
D. Jay Davis, Jr.
James E. Scott, IV
Kate C. Mettler
P.O. Box 993, Charleston, SC  29402
(843) 577-4000; jdavis@ycrlaw.com;
jscott@ycrlaw.com; kmettler@ycrlaw.com
Attorneys for MUSC Defendants

Charleston, South Carolina

Dated: September 21, 2020

ELECTRONICALLY FILED - 2020 Nov 12 11:26 AM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF CHARLESTON | FOR THE NINTH JUDICIAL CIRCUIT |
| Elizabeth De'Anna Scannell,<br><div align="right">Plaintiff,</div> | C/A No. 2020CP1002959 |
| v. | **PLAINTIFF'S NOTICE OF FILING OF ACCEPTANCE OF SERVICE FOR THE SCDSS DEFENDANTS** |
| South Carolina Department of Social Services (SCDSS), Medical University of South Carolina, Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell, Michael Leach, Donna Johnson, Michelle Irene Amaya, Kelly Finke, MUSC Administrator 1, MUSC Administrator 2, MUSC Administrator 3, and MUSC Public Safety Supervisor,<br><div align="right">Defendants.</div> | |

Plaintiff asks the Court and all parties to take notice that the following Defendants have accepted service of process of the Summons and Complaint: Defendants South Carolina Department of Social Services (SCDSS), Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell, and Michael Leach.

**[SIGNATURE FOLLOWS THE NEXT PAGE]**

1

ELECTRONICALLY FILED - 2020 Nov 12 11:26 AM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959

**Respectfully Submitted,**

By:    s/Robert J. Butcher

Deborah J. Butcher
S.C. Bar No. 74029
Fed. Bar No. 10731
Robert J. Butcher
S.C. Bar No. 74722
Fed. Bar No. 9767
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone:     (803) 432-7599
Facsimile:     (803) 432-7499
rbutcher@camdensc-law.com
dbutcher@camdensc-law.com

Attorneys for Plaintiff

Camden, South Carolina
November 12, 2020

2

STATE OF SOUTH CAROLINA ) IN TH COURT OF COMMON PLEAS
)
COUNTY OF CHARLESTON )

Elizabeth De'Anna Scannell, )
)                Civil Action No. 2020-CP-10-2959
            Plaintiff, )
)
v. )
)
South Carolina Department of Social )
Services (SCDSS), Medical University of )             **ACCEPTANCE OF SERVICE**
South Carolina, Cynthia Bradford, Mosetta )
Clark, Louchetia Simmons-Robinson, )
Jane Bell, Michael Leach, Donna Johnson, )
Michelle Irene Amaya, Kelly Finke, MUSC )
Administrator 1, MUSC Administrator 2, )
MUSC Administrator 3, and MUSC )
Public Safety Supervisor, )
)
            Defendants. )
_____ )

I hereby accept service of the **Summons and Complaint** served upon me, as counsel for the Defendants South Carolina Department of Social Services, Michael Leach, Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell, on this 10th day of November 2020. I hereby represent that I have been authorized by the South Carolina Department of Social Services, Michael Leach, Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, and Jane Bell to accept service of this process.

LINDEMANN & DAVIS, P.A.

BY:    *s/ Andrew F. Lindemann*
            ANDREW F. LINDEMANN        #13030
            5 Calendar Court, Suite 202
            Post Office Box 6923
            Columbia, South Carolina 29260
            (803) 881-8920
            Email: andrew@ldh-law.com

*Counsel for Defendants South Carolina Department of Social Services, Cynthia Bradford, Mosetta Clark, Louchetia Simmons-Robinson, Jane Bell, and Michael Leach*

ELECTRONICALLY FILED - 2020 Nov 12 11:26 AM - CHARLESTON - COMMON PLEAS - CASE#2020CP1002959